UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE GUIDANT CORPORATION SECURITIES LITIGATION | ) ) ) ) | Master File No. 1:05-CV-01658-SEB-WTL |

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

**INTRODUCTION** ……………………………………………………………………..1

**SUMMARY OF THE COMPLAINT** ………………………………………..3

**Pre-Class Period Events** ……………………………………………………..5

*Guidant's Felony Conviction for the Concealment of Serious Defects And Malfunctioning of its Stent Medical Devices* ……………..5

*Guidant Conceals its ICD and Pacemaker Defects* ……………………..9

*Guidant Refocuses its Business Strategy* …………………………....11

**Class Period Events and Statements** ……………………………………13

**JURISDICTION AND VENUE** …………………………………………………18

**PARTIES** ……………………………………………………………………………19

**DEFENDANT'S FRAUDULENT COURSE OF CONDUCT** ……………………27

**The Ancure Device Debacle** …………………………………………27

**Guidant's Defective ICD and Pacemaker Devices** ……………………39

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD** ..…………………………………………………………………..54

**POST CLASS PERIOD EVENTS** ……………...………………………………..88

**DEFENDANTS' CLASS PERIOD STOCK SALES** ……………………………90

**LOSS CAUSATION/ECONOMIC LOSS** ………………..…………………………90

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE** …………………………………………………………93

**CLASS ACTION ALLEGATIONS** …..…………………………………...94

**NO SAFE HARBOR** ……………………………………………………....96

**COUNT 1** …………………..……………………………………………………..96

**COUNT 2** ……………………………………………………………………………97

**PRAYER FOR RELIEF** ........................................................................................98

**JURY TRIAL DEMAND** ……………………………………………………98

This Consolidated Complaint, filed by Lead Plaintiffs Iron Workers of Western Pennsylvania Pension Plan and David J. Fannon ("Lead Plaintiffs"), is intended to consolidate and relate back to all prior complaints previously filed in this consolidated action. Except as to allegations about the Lead Plaintiffs which are based on their personal knowledge, this Consolidated Complaint is made upon information and belief as to all matters, based on the extensive investigation conducted by and through Lead Plaintiffs' counsel. Lead Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein.

## INTRODUCTION

1. This is a securities class action brought on behalf of all purchasers of the common stock of Guidant between December 15, 2004 and October 18, 2005 (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). The defendants are: Guidant; Ronald W. Dollens ("Dollens"), Guidant's Chief Executive Officer, President and Director; Guido J. Neels ("Neels"), Guidant's Chief Operating Officer; Keith E. Brauer ("Brauer"), Guidant's Vice President and Chief Financial Officer; Beverly H. Lorell ("Lorell"), Guidant's Vice President and Chief Medical Officer; Roger Marchetti ("Marchetti"), Guidant's Vice President of Human Resources; Ronald N. Spaulding ("Spaulding"), Guidant's President of Europe, Middle East, Africa and Canada division; J. Frederick McCoy Jr. ("McCoy"), Guidant's President of Cardiac Rhythm Management; James M. Cornelius ("Cornelius"), Chairman of Guidant's Board of Directors; John B. King ("King"), a Guidant Director; William F. McConnell, Jr. ("McConnell"),Guidant's Vice President and Corporate Information

Officer; and Kathleen Lundberg ("Lundberg"), Senior Vice President and Chief Compliance Officer of Guidant (collectively "Defendants").

2. This securities class action arises out of Defendants' scheme to manipulate and falsify the condition of Guidant's business and finances through the preparation and dissemination of materially false and misleading press releases and filings with the SEC that relate to Guidant's implantable cardioverter defibrillators ("ICD") and pacemakers. Defendants intentionally concealed known manufacturing defects and potential liabilities associated with the Company's defibrillator and pacemaker devices from patients, healthcare providers, the investing public and its prospective merger partner Johnson and Johnson ("J&J") throughout the Class Period in order to: (1) maintain the illusion that Guidant was capable of maintaining its revenue from the Company's defibrillator and pacemaker products; (2) stave off private lawsuits and attendant liabilities relating to ICD and pacemaker defects until after the merger with J&J was complete; (3) facilitate Guidant's sale to J&J; (4) gain shareholder approval and support for Guidant's sale to J&J on the terms announced on December 15, 2004; and (5) sell nearly $89 million of their own Guidant stock before the truth came out.

3. As a result of Defendants' schemes to defraud Guidant's shareholders and the resulting artificial inflation in Guidant's stock price due to Defendants' material misrepresentations and omissions, investors who purchased Guidant stock during the Class Period suffered significant damages. Indeed, once Defendants' manipulations and other fraudulent conduct were revealed, Guidant's stock price collapsed to alarmingly low levels causing damages to the members of the putative class.

**SUMMARY OF COMPLAINT**

4. Guidant claims to provide therapeutic medical solutions for customers, patients and healthcare systems worldwide. The Company, which was spun off from Eli Lilly & Co. in 1994, develops, manufactures and distributes implantable medical devices, including stents, defibrillators, and pacemakers, designed to treat a variety of ailments including cardiac arrhythmias, heart failure, and coronary and peripheral disease.

5. Prior to the Class Period, Guidant pled guilty in June 2003 to concealing from the FDA known defects and patient problems reported to the Company that arose from the use of a stent product called the Ancure Endograft System ("Ancure Device") that Guidant designed and manufactured. When the information regarding this defective stent product came to light, Guidant pled guilty to 10 counts of fraud and was ordered to pay the enormous fine of $92.4 million.

6. As a result of Guidant's June 2003 plea, the Company's revenue attributable to stent devices fell precipitously, as did Guidant's stock price and market value. Moreover, many patients receiving the defective stents filed private lawsuits. These private lawsuits created a huge problem for Guidant when the Company's insurers declined coverage for stent-related actions and refused to offer coverage for claims made in future litigation. As a result Guidant was forced to become self-insured.

7. With Guidant's reputation as a major player in manufacturing and developing stent medical devices irreparably tarnished and its stent-related revenue drastically reduced, the Defendants refocused Guidant's business emphasis away from stents in favor of the Company's business in the design and manufacture of ICD and pacemaker devices. The success of this shift of focus of the Company's business is

reflected in the growth in revenue of Guidant's ICD-related sales from $1.47 billion in fiscal year 2003 to $1.78 billion in fiscal year 2004.

8. Because Defendants were officers and directors of Guidant during the time its business suffered devastating consequences from governmental penalties imposed on the Company for fraudulent acts associated with Guidant's Ancure Device, they knew and/or recklessly disregarded the importance and impact on the Company's business and revenue of failures to disclose manufacturing and design defects in Guidant's ICD and pacemaker devices. Notwithstanding this experience, Defendants engaged in the same recidivistic behavior that led to the indictment and guilty plea with regard to Guidant's Ancure Device, by concealing exactly the same types of facts about the Company's ICD and pacemaker products as is set forth more fully in this Consolidated Complaint.

9. During the Class Period, Defendants intentionally failed to disclose to the market, to their shareholders, and to patients receiving ICD and pacemaker devices, material information regarding known defects in these devices. An independent panel of experts found that Defendants had identified a dangerous and potentially life-threatening defect in Guidant's defibrillator product lines as early as April of 2002, and had secretly taken deliberate steps to introduce manufacturing changes resulting in a series of revisions to the manufacturing process in April and November of 2002. After the revisions to the manufacturing process, the Company nevertheless concealed the existence of the life-threatening defect from physicians and patients as it continued to sell its remaining inventory of nearly 4,000 defective devices to customers and healthcare providers. All told, nearly 78,000 defective ICD and pacemaker devices were manufactured and sold.

**Pre-Class Period Events**

*<u>Guidant's Felony Convictions for the Concealment of Serious Defects and Malfunctioning of its Stent Medical Devices</u>*

10. In 1999, Guidant received FDA approval for the Ancure Device, a cardiac stent designed to prevent an abdominal aneurysm in a patient's aorta, the heart's main artery, from rupturing. The Ancure Device consisted of a delivery catheter attached to a woven fabric patch that was permanently implanted with small hooks to the inside of the aorta in order to strengthen its weakened vascular wall. The FDA's approval of the Ancure Device was conditioned on a Guidant sales representative's being present in the operating room during each surgical implanting of the device.

11. Guidant and the Defendants enjoyed immense success from the Ancure Device, with sales approaching ***$3 billion at the end of fiscal 2002.*** At that time, the Ancure Device comprised nearly half of Guidant's product offerings.




12. However, the appalling truth behind Guidant's immense success was the highly unethical and illegal dumping of defective implantable heart stents and cardiac rhythm devices by the Defendants. Shortly after the Ancure Device hit the market,

Guidant's officers and directors secretly began to receive information from their sales representatives that doctors using the Ancure Device were experiencing an extraordinary number of device malfunctions during surgical installation. Those malfunctions, including the failure of the device's delivery catheter to retract properly during surgery, contributed to deaths and serious injuries.

13. Between 1999 and March 2001, there were an astounding number of problems and incidents involving the Ancure Device which the Company's sales representatives, present in the operating room during each and every surgery, reported to Guidant but which were otherwise concealed from physicians, their patients and the investing public. Defendants not only knew about the problems associated with removing the delivery catheter used to set the fabric patch in the artery, they instructed their sales personnel to disseminate to doctors performing the surgeries an unapproved method of retracting the device from patients' arteries. Guidant had an ethical responsibility to advise the healthcare community of these alarming and dangerous problems and was under a legal duty to report them to the FDA. Under federal law, Guidant was required to report to the FDA any incident in which its medical device may have caused or contributed to a death or serious injury or the medical device experienced a malfunction that would be likely to cause or contribute to a death or serious injury if the malfunction were to recur. The reports to the FDA are called Medical Device Reports ("MDRs"). Out of 7,362 Ancure Devices sold, an astounding 2,800 reportable incidents of malfunction or its use was associated with death or serious bodily harm. Notwithstanding both ethical and legal obligations in this regard, however, the Defendants actively and intentionally concealed from the FDA MDRs for each and every

one of ***2,628*** separate incidents of malfunction of the Ancure Device, resulting in serious injuries, including ***12*** deaths and ***57*** emergency procedures.

14. In October of 2000, in response to Defendants' unethical and illegal business practices, seven Guidant employees anonymously sent a letter to the FDA, describing the Ancure Device's defective heart stent. The letter outlined numerous ethical, legal and safety concerns, including the facts that the testing and analysis of recommended procedures for the implantation of the Ancure Device was incomplete and that the Company had failed to file MDRs with the FDA, as legally required.

15. The U.S. Government thereupon initiated an investigation to determine whether Guidant's corporate policies or practices were endangering the lives of healthcare consumers, and as a part of its investigation, the U.S. Department of Justice ("DOJ") interviewed numerous Guidant employees and officers. In March 2001, based on these interviews and other investigative materials, the FDA suspended Guidant's sale of the Ancure Device.

16. On June 12, 2003, negotiations between the United States government and Guidant led to the simultaneous filing of the Criminal Information and Felony Plea Agreement ("Plea Agreement") in *United States of America v. Endovascular Technologies, Inc.*, Case No. CR 02-0179 SI (N. D. Cal.). As part of the Plea Agreement, Guidant acknowledged that it misled the FDA by not disclosing that the Ancure Device was linked to 12 deaths and thousands of injuries. Defendants also admitted that Guidant "***knowingly and willfully***," "***deliberately and with knowledge***" made false statements that were "material to the activities or decision of a government agency or department" in connection with the FDA's approval and monitoring of the Ancure Device.

17. As part of the Plea Agreement, Guidant was ordered to pay a $92.4 million fine. The ten count guilty plea and $92.4 million fine caused immense damage to Guidant's reputation, as well as to the Company's goodwill. Standard & Poor's Rating Services warned on June 12, 2003, that "cash settlements such as this . . . erode a portion of Guidant's financial insulation at a time when the company is expecting a drop in its vascular segment sales."

18. To make matters worse, the Company was sued by scores of recipient patients who were injured by the defective Ancure Device, some of whom sought punitive damages and class action status. The Company incurred approximately $37 million in costs settling individual Ancure-related actions during fiscal 2004 alone. Shockingly, between 2000 and June 13, 2003, while the Plea Agreement was being negotiated and finalized and at a time in which Guidant's stock price was trading at inflated levels, Defendants Cornelius and Dollens collectively sold over $36 million worth of Guidant stock.

19. After the Ancure Device fiasco, Guidant was faced with the "triple threat" of: (1) reduced earnings and revenues from its stent related products; (2) a growing number of private lawsuits stemming from the Ancure Device defects, potentially without access to liability insurance coverage; and (3) reputational damage arising from the Company's egregious behavior and felony convictions.

20. Not surprisingly, following the Plea Agreement, Guidant stent sales dropped dramatically, falling from approximately $0.8 billion or 23% of sales in 2003, to $0.5 billion or 14% of sales in 2004. Moreover, in October of 2003, Guidant's insurers began declining coverage on Ancure Device-related liability. Allianz Insurance

Company, Guidant's first-layer carrier, alleging common-law fraud, declined coverage on Guidant's Ancure Device-related liability on the basis that Guidant made "false representations and concealed and failed to disclose the status of the Ancure product defects and claims arising therefrom" in the course of Guidant's application for insurance policies issued in 2000 and 2001.

*Guidant Conceals its ICD and Pacemaker Defects*

21. Guidant signed a rigorous "Corporate Integrity Agreement" (CIA) as part of its Plea Agreement with the DOJ. The intent of the CIA was to impose integrity measures – giving the public some assurance that Guidant would abide by its disclosure and reporting obligations. In the eyes of the investment community, the CIA stood as an assurance to regulators that the Company would "clean house" of its troubled business culture, one that had failed to adhere to ethical standards, and would implement corrective and preventative actions mandated by FDA regulations.

22. During the very time that Guidant was entering the CIA with the DOJ in June 2003, the Defendants were in the midst of yet another well-orchestrated and elaborate scheme and artifice to conceal from patients, physicians and investors other defective Guidant medical devices, the ICD and pacemaker products. At the same time Defendants caused the CIA to be publicized on the Company's website, thereby providing false assurances of a commitment to abide by disclosure and reporting obligations, all Defendants were well aware of defective Guidant ICD and pacemaker devices whose defects and malfunctions were then being concealed from the public. Though defects in these devices had prompted changes to the manufacturing process as

early as April 2002, the defective devices manufactured before that date continued to be sold until the Company's inventory of such devices could be exhausted.

23. Amongst the various ICD and pacemaker device defects known to the Company, but concealed from patients, physicians and investors, was the "short circuit" defect, causing the implantable defibrillator to stop functioning for a 24-hour period, then to resume function, but erasing the device's "memory." The memory function of the ICD is critical, since it contains a record of the function of the ICD over time, including indications of device malfunction, which could necessitate some form of intervention, including the replacement of the device. Because the memory in this device is erased after the malfunction, physicians were only able to detect the malfunction in the rare event that the defibrillator malfunctions while being tested in the physician's office.

24. Defendants were also aware of other serious pacemaker issues including problems with a hermetic sealing component and malfunctions causing the devices to lose their pacing output or achieve sustained high rate pacing. Defendants received and confirmed at least 20 reports of pacemaker output-related malfunctions, including one death, in connection with observation of sustained high rate pacing. This information was kept concealed from physicians, patients, government authorities and the investing public during the Class Period.

25. Defendants, who were officers and directors of Guidant during the time when Guidant pled guilty to the concealment of the defective nature of the Company's Ancure Device, are well aware of the devastating impact that any disclosures relating to manufacturing and designs defects in ICD and pacemaker devices would have on

Guidant's revenues, business prospects and merger opportunities. These material omissions constitute intentional fraud by the Company and the Individual Defendants.

26. During the Class Period, Defendants knowingly and intentionally failed to disclose to healthcare providers and the investing community, material information regarding known defects in the Company's ICD and pacemaker devices. Moreover, MDRs filed by Guidant with the FDA regarding the failed ICD and pacemaker devices did not convey an accurate picture of facts known by Guidant at the time – that the defects in the ICD and pacemaker devices were serious enough that Guidant changed how these devices were manufactured in April 2002; that despite these changes, ICD and pacemaker devices manufactured prior to April 2002 were still sold; that disclosures of known defects and problems associated with the pre-April 2002 ICD and pacemaker devices were not made to patients in whom those devices had been or would continue to be installed or to their physicians or the public. Defendants' concealment was intentional and calculated. Their omissions were made in the face of Guidant's public agreement to openly disclose matters relating to the safety and quality of its medical device products. Defendants' concealment during the Class Period was necessary to effectuate Guidant's sale to J&J and to maintain an artificially inflated stock price, which financially benefited the Defendants, who unloaded nearly $89 million of their own stock when they, but not the investing public, knew the truth.

*Guidant Refocuses its Business Strategy*

27. Desperate to save face and potentially Guidant as a going concern, the Defendants embarked on a plan to have the Company acquired. To succeed in doing so, however, Defendants would be forced to refocus Guidant's business model away from its

stent sales to its ICD pacemaker business segment. Defendants' efforts were successful, such that by the end of fiscal year end 2004, revenues from Guidant's Cardiac Rhythm Management ("CRM") business unit increased by 25%:




28. As a result of initial discussions during the spring of 2004, Guidant endeavored to strike a merger deal with J&J. Accordingly, on August 4, 2004, J&J and Guidant executed a confidentiality agreement. Thereafter, numerous discussions between several of the Defendants and the officers and directors of J&J ensued. On October 4, 2004, draft merger agreements were circulated to senior management and advisors of each company.

29. On December 15, 2004, the beginning of the Class Period, Defendants issued a press release stating that Guidant had been sold to J&J for approximately $25 billion in cash and J&J stock, with an imputed value of approximately $76 per share. In

anticipation of this announcement, the Company's stock price had already surged in the preceding two weeks, from $65 to $70 per share and hovered between $71 and $75 per share throughout the spring of 2005.

30. Defendants failed to make a full and complete disclosure regarding Guidant's ICD and pacemaker devices to J&J during merger negotiations, specifically: that the defects in the ICD and pacemaker devices were serious enough that Guidant changed how these devices were manufactured in April 2002; that despite this change, ICD and pacemaker devices manufactured prior to April 2002 were still sold; that disclosures of known defects and problems associated with the pre-April 2002 ICD and pacemaker devices were not made to patients or physicians. Neither public statements issued by Guidant nor the Individual Defendants nor SEC filings made by the Company disclosed this material information.

**Class Period Events and Statements**

31. Throughout the Class Period, Defendants continued their pattern of making knowing and intentional omissions of material fact in their press releases and SEC filings, resulting in a lack of full and fair disclosure of materially adverse information regarding defective ICD and pacemaker devices. On December 21, 2004, January 7, 2005, and January 19, 2005, Defendants filed three separate SEC Form 425's, ostensibly to provide continuing and real-time updates to investors of all the material information about Guidant's planned merger with J&J, including the advantages and material risks resulting from the merger. In all three of these Form 425 filings, Defendants once again deceived the investing public and the healthcare providers using the defective devices on which so much of the Company's revenues and the success of

the Company's business outlook was based by failing to make a full and fair disclosure of the life-threatening risks facing patients implanted with thousands of Guidant's defective ICD and pacemaker devices.

32. Similar press releases and SEC filing were made from January 27, 2005, through March 13, 2005, including Forms 10-K, 8-K, and two additional Form 425 filings. In these documents, Defendants presented, among other things, financial information regarding the Company's performance during the fourth quarter of fiscal 2004, as well as another "update" on the Company's pending merger with J&J. Each of these documents again intentionally failed to disclose material facts regarding Guidant's defective ICD and pacemaker devices.

33. Then, on March 13, 2005, the life-threatening defect inherent in thousands of Guidant's defective ICD devices caused the death of Joshua Oukrop. Unbeknownst to investors, Dr. Barry J. Maron, one of Mr. Oukrop's treating physicians, began his own investigation into the cause of Mr. Oukrop's death. Guidant learned of Mr. Oukrop's death on March 16, 2005, also that his death was the result of a Guidant ICD device's failure to deliver a life saving electrical shock. Although armed with knowledge of not only known defects in ICD and pacemaker devices, but also that the defective device had caused a death, Defendants continued to conceal from healthcare providers and the investing public this material information.

34. Undeterred by Oukrop's death and its obvious implications, on March 24, 2005, Defendants filed a Form DEFM 14A with the SEC, their preliminary proxy statement, which was distributed to shareholders, to inform them of the advantages, material risks and other details regarding the merger, seeking their approval of the sale of

Guidant to J&J pursuant to the agreed upon terms. Again, the document failed to disclose material facts regarding Guidant's defective ICD and pacemaker devices, also that at least one recipient patient had died as a result of and ICD malfunction.

35. In fact, in press releases and SEC filing made by the Individual Defendants and Guidant from March 13, 2005, through July 2005, material information continued to be intentionally omitted, namely disclosures regarding Guidant's defective ICD and pacemaker devices and also that at least one recipient patient had died as a result of an ICD malfunction.

36. Incredibly, while hoarding knowledge of this material information to himself, Dollens, on April 7, 2005, three weeks after Guidant was notified of Joshua Oukrop's Guidant-device-related death, sold 271,404 shares or 52% of his beneficially-owned Guidant stock, for proceeds of $20.1 million.

37. Defendants met with Dr. Maron on May 7, 2005, and again on May 12, 2005, to put on a presentation appropriately characterized as a "dog and pony show" at which Defendants argued that it would "cause more harm than good by publicizing the issue" of Dr. Maron's patient's death and identified defects in the Company's devices. So egregious was Guidant's callous disregard of Oukrop's tragic death and the life-threatening risks facing other patients implanted with thousands of Guidant's defective ICD devices that Dr. Maron would later be called upon to testify about the details before Congress. In the meantime, from May 10, 2005 through May 23, 2005, Defendants Spaulding and Lorell together sold 54,164 shares of their Guidant stock, for combined proceeds of $3.9 million. As a result of her transactions, Lorell had, as of May 23, 2005, liquidated virtually all of her holdings of Guidant stock.

38. Defendants knowingly and intentionally disregarded their obligations under both the Plea Agreement and the federal securities laws to protect patients from a catastrophic defect in the Guidant's ICD and pacemaker devices, and to disclose this material non-public information to healthcare providers, patients, investors and J&J. Defendants were motivated to do so because of the impending $25.4 billion merger with J&J and a desire to increase the value of their personal holdings of Guidant stock or at least maintain the value until they could sell off their stock before the truth came out.

39. Only after learning that a New York Times article was to be published that same day, Guidant on May 23, 2005 was forced to drop a bomb-shell, disclosing to the market for the first time that there were reported problems with its ICDs and pacemaker devices, specifically that there had been 26 reports of failure and at least one death. Still this press release only partially disclosed the severity of the problems associated with these devices.

40. The federal authorities quickly responded. On June 17, 2005, the FDA issued a nationwide recall notification on certain of Guidant's implantable defibrillators and cardiac resynchronization therapy defibrillators. Within that notification, the FDA advised the public that the malfunction of Guidant's devices could lead to a serious, life-threatening event for a patient. Moreover, the FDA advised that there had been two reported deaths suspected to be associated with this malfunction.

41. On this shocking news, the Company's shares fell $3.36, losing 4.5% of its value over the two trading days immediately following the FDA recall, closing on June 21, 2005 at $70.33. Guidant investors lost over $1.09 billion in market share value as a result.

42. Then, on July 18, 2005, the FDA published a "Recall - Firm Press Release" on its website. In the recall publication, Guidant warned physicians and patients to seek replacement of at least nine different cardiac pacemaker models and product lines. Guidant identified its PULSAR® MAX, PULSAR, DISCOVERY®, MERIDIAN®, PULSAR MAX II, DISCOVERY II, VIRTUS PLUS® II, INTELIS II and CONTAK® TR pacemakers as potentially impacted by one or more of the identified defects. The press release noted that as many as 78,000 pacemaker devices were affected.

43. On this news, the Company's shares fell another $2.10, losing 3.0% of market value, closing on July 18, 2005, at $67.31. Guidant investors lost another $660 million in market share value as a result. On the exact same day, while in possession of material non-public information that additional adverse information was yet to be disclosed, Defendant Cornelius dumped 450,000 or 47% of his beneficially owned shares, for proceeds of $30.5 million.

44. Additional adverse information that safety recommendations made to physicians after the defects were initially disclosed actually increased the risk to patients and adverse information that certain of the Company's pacemakers were also defective, trickled out on July 22, 2005. Even then, the Company had not disclosed to the investing public, the material adverse information that the defects and deaths had not been disclosed to J&J when the merger terms were set.

45. Finally, on October 18, 2005, J&J announced that as a direct result of adverse "developments" at Guidant, it would seek ***alternatives to the merger deal*** entered into with Guidant on December 14, 2004.

46. Again, Guidant shares plummeted, this time to the astounding tune of ***$8.28 or 11.4% per share.*** In all, Guidant investors lost over $3.1 billion in share value from June 17, 2005 through October 18, 2005, as a direct result of the fraud of the defendants.

47. During the Class Period, Defendants knew and intentionally concealed material information, including the facts that:

(a) certain ICD and pacemaker devices produced prior to the Class Period had manufacturing defects;

(b) patients with Guidant's ICD and pacemaker devices were experiencing serious and life threatening health issues, and in some instances death, as a result of these manufacturing defects;

(c) revenue from ICD and pacemaker devices would be significantly impacted when disclosure of known defects were revealed to the public, particularly against the backdrop of Guidant's criminal history for the same conduct; and

(d) revelations of ICD and pacemaker defects would potentially constitute a "material adverse effect" that could severely affect the $24.5 billion merger agreement between Guidant and J&J.

## JURISDICTION AND VENUE

48. Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j (b) and 78t (a), and Rule 10b 5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b 5.

49. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and 1367, as well as §27 of the Exchange Act, 15 U.S.C. §78aa.

50. Venue is proper in this District pursuant to §27 of the 1934 Act. The corporate headquarters of Guidant are located in the District.

51. In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## **PARTIES**

52. Lead Plaintiffs Iron Workers of Western Pennsylvania Pension Plan and David J. Fannon, as set forth in the accompanying certification and incorporated by reference herein, purchased shares of Guidant stock at artificially inflated prices during the Class Period and were damaged thereby.

53. Defendant, Guidant, was and is a Fortune 500 corporation existing under the laws of the State of Indiana, with its principal place of business in Indianapolis, Indiana. The Company is comprised of various subsidiaries and divisions, including Guidant Corp. Inc. of California, Guidant Planning, Inc., Guidant Vascular Intervention Group, Inc., Guidant Cnvs, Inc., Guidant Cardiovascular System, Inc., Guidant Cardiac & Vascular Surgery, Inc., Devices for Vascular Intervention, Inc., Advanced Cardiovascular Systems, Inc., Origin Medsystems, Inc. and Endovascular (collectively, "Guidant"). The Company manufactures and markets products that focus on the treatment of cardiac arrhythmias, heart failure, and coronary and peripheral disease, including Guidant's implantable defibrillator systems, used to detect and treat abnormal heart rhythms that could result in sudden cardiac death. Guidant was purchased by Boston Scientific on April 26, 2006.

54. Boston Scientific, the successor in interest of Guidant, maintains the corporate and administrative offices of its wholly-owned Guidant subsidiary, where the Company's day-to-day business activities are conducted, at 111 Monument Circle, 29th Floor, Indianapolis, IN 46204-5129.

55. Defendant Ronald W. Dollens served as Chief Executive Officer ("CEO"), President and Director of Guidant throughout the Class Period. During the Class Period, Dollens sold approximately 271,404 shares or 52% his holdings of Guidant stock, for over $20 million in proceeds. Dollens, serving as CEO, also engaged in communications with the market, including conference calls, reports on Company operations and financing and press releases issued by the Company. Dollens was an officer and/or director for Guidant during the Ancure-Device debacle, when Guidant entered its Plea Agreement with the DOJ in 2003, and when the Company manufactured and sold defective ICD and pacemaker devices. Dollens was also a member of Guidant's Compliance Committee, which was charged with reviewing Guidant's regulatory compliance and internal control procedures and with overseeing compliance with Guidant's Code of Business Conduct, and on its Governance Committee. As such, Dollens was directly responsible for oversight of Guidant's compliance with state and federal laws and FDA regulations and with setting in place proper corporate governance policies and mechanisms. Defendant Dollens, along with Defendant Cornelius, together caused the posting to the Company's website a series of documents entitled "Guidant Code of Business Conduct," including a "Corporate Integrity Agreement", in response to Guidant's felony convictions and plea agreement for violations of the Food, Drug and Cosmetic Act ("FDCA").

56. Defendant James M. Cornelius has been a member of the Company's Board of Directors since 1994 and served as Chairman of the Board throughout the Class Period. From a time prior to the beginning of the Class Period and continuing throughout the Class Period, Defendant Cornelius acted in an executive capacity, to negotiate and

manage Guidant's merger discussions with Johnson and Johnson ("J&J"), including the exercise of influence and control over disclosure of information regarding the progress of the merger discussions with J&J. During the Class Period, Cornelius sold 450,000 shares or 47% of his holdings of Guidant stock for over $30.5 million in proceeds. Cornelius was an officer and/or director for Guidant during the Ancure-Device debacle, when Guidant entered its Plea Agreement with the DOJ in 2003, and when the Company manufactured and sold defective ICD and pacemaker devices. Defendant Cornelius, along with Defendant Dollens, together caused the posting to the Company's website a series of documents entitled "Guidant Code of Business Conduct", including a "Corporate Integrity Agreement", in response to Guidant's felony convictions and plea agreement for violations of the Food, Drug and Cosmetic Act ("FDCA"). Defendant Cornelius sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. In November 2005, Cornelius became interim CEO upon the resignation of Defendant Dollens.

57. Defendant Guido J. Neels served as Guidant's Chief Operating Officer ("COO"). As COO, Defendant McCoy, President of the Company's CRM operating unit reported directly to him. Neels conducted interviews where he made misrepresentations regarding Guidant's ICDs' reliability. During the Class Period, Neels sold approximately 60,000 shares of his Guidant stock for over $4.3 million in proceeds. Neels was an officer and/or director for Guidant during the Ancure-Device debacle, when Guidant entered its Plea Agreement with the DOJ in 2003, and when the Company manufactured and sold defective ICD and pacemaker devices. Defendant Neels sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market.

58. Defendant Keith E. Brauer served as Vice President and Chief Financial Officer ("CFO") of Guidant throughout the Class Period. Brauer signed and certified pursuant to Section 302 of the Sarbanes-Oxley Act, the Guidant 10-K filed during the

Class Period in which the Company's financial report highlighted increasing defibrillator sales revenues even though Brauer knew of adverse material facts which made those sales revenues false and misleading. Moreover, Brauer as CFO provided the financial reporting and communications with the securities market. Communications with the market, including conference calls and the Company's internal reports showing Guidant's forecasted and actual growth were prepared under his direction. Brauer met with representatives of J & J during the merger negotiations in which Brauer made false and misleading representations about the status of Guidant's ICD and pacemaker business. Defendant Brauer sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. During the Class Period, Brauer sold approximately 50,000 shares of Guidant stock for over $3.6 million in proceeds. Brauer was an officer and/or director for Guidant during the Ancure-Device debacle, when Guidant entered its Plea Agreement with the DOJ in 2003, and when the Company manufactured and sold defective ICD and pacemaker devices.

59. Defendant Beverly H. Lorell served as Vice President and Chief Medical and Technology Officer ("CMTO") of Guidant throughout the Class Period. As CMTO Defendant Lorell directly influenced Guidant's public communications, as she acted as an advocate for the Company on public policy matters, as well as provided corporate oversight and leadership over Guidant's technology issues, including those impacting the Company's ICDs and other cardiac rhythm products. Defendant Lorell sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. During the Class Period, Lorell sold approximately 45,967 shares or virtually all of her holdings of Guidant stock for over $3.3 million in proceeds. Lorell was an officer and/or director for Guidant when the Company manufactured and sold defective ICD and pacemaker devices.

60. Defendant Ronald N. Spaulding served as President of Guidant's International Operations, Europe, Middle East, Africa and Canada divisions throughout

the Class Period. Defendant Spaulding was identified by both Guidant and J&J as a particularly knowledgeable member of the Guidant executive team, whose continued advice and counsel throughout the merger and transition process was considered critical. For these reasons, on December 15, 2004, at the beginning of the Class Period, J&J and Guidant jointly modified Spaulding's rights and obligations under Guidant's "Change In Control Severance Pay Plan for Select Employees." Defendant Spauding sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. During the Class Period, Spaulding sold approximately 58,200 shares of Guidant stock for over $4.2 million in proceeds. Spaulding was an officer and/or director for Guidant during the Ancure-Device debacle, when Guidant entered its Plea Agreement with the DOJ in 2003, and when the Company manufactured and sold defective ICD and pacemaker devices.

61. Defendant William F. McConnell Jr. served as Vice President and Chief Information Officer for Guidant throughout the Class Period. In his role as Chief Information Officer, McConnell was identified by both Guidant and J&J as a particularly knowledgeable member of the Guidant executive team, whose continued advice and counsel throughout the merger and transition process was considered critical. For these reasons, on December 15, 2004, at the beginning of the Class Period, J&J and Guidant jointly modified McConnell's rights and obligations under Guidant's "Change In Control Severance Pay Plan for Select Employees." Defendant McConnell sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. During the Class Period, McConnell sold approximately 52,000 shares of Guidant stock for over $3.7 million in proceeds. McConnell was an officer and/or director for Guidant during the Ancure-Device debacle, when Guidant entered its Plea Agreement with the DOJ in 2003, and when the Company manufactured and sold defective ICD and pacemaker devices.

62. Defendant John B. King served as a director of Guidant throughout the Class Period. Defendant King acted as counsel to the law firm of Baker & Daniels, which provided legal services to Guidant. Defendant King was a Director of Guidant and served on various Board Committees, including the Company's Compliance Committee, responsible for the review of Guidant's regulatory compliance and internal control procedures, as well as the company's code of business conduct. Defendant King also served on the Company's Committee for Science and Technology Strategy, and the Management Development and Compensation Committee. Defendant King sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. During the Class Period, King sold 248,944 shares of Guidant stock for over $18.2 million in proceeds. King was a director for Guidant during the Ancure-Device debacle, when Guidant entered its Plea Agreement with the DOJ in 2003, and when the Company manufactured and sold defective ICD and pacemaker devices.

63. Defendant J. Frederick McCoy Jr. served as President of Cardiac Rhythm Management of Guidant throughout the Class Period. As President of CRM, McCoy had accountability and responsibility for the quality and safety of Guidant's CRM products, including the management of adverse medical and product information derived from "customer complaints," adverse medical reports and other reporting received or otherwise obtained by the Company regarding the quality and safety of CRM products, in accordance with Company policies, the FDA regulations and the Company's CIA with the Office of the Inspector General of the Department of Health and Human Services. ("OIG-HHS"). McCoy, as President of Cardiac Rhythm Management ("CRM") conducted interviews during the Class Period, where he made material omissions and misrepresentations regarding the reliability of Guidant's ICDs. Defendant McCoy was identified by both Guidant and J&J as a particularly knowledgeable member of the Guidant executive team, whose continued advice and counsel throughout the merger and transition process was considered critical. For these reasons, on December 15, 2004, at

the beginning of the Class Period, J&J and Guidant jointly modified McCoy's rights and obligations under Guidant's "Change In Control Severance Pay Plan for Select Employees." Defendant McCoy sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. McCoy sold approximately 20,412 shares of Guidant for over $1.5 million in proceeds. McCoy was an officer and/or director for Guidant during the Ancure-Device debacle, when Guidant entered its Plea Agreement with the DOJ in 2003, and when the Company manufactured and sold defective ICD and pacemaker devices.

64. Defendant Roger Marchetti served as Vice President of Human Resources of Guidant throughout the Class Period. Prior to the beginning of the Class Period, Defendant Marchetti served as vice president, finance and information systems and as vice president, human resources, corporate controller and chief accounting officer for Guidant's Vascular Intervention predecessor. Defendant Marchetti participated in, influenced and provided counsel regarding Guidant's merger discussions with J&J. Defendant Marchetti was identified by both Guidant and J&J as a particularly knowledgeable member of the Guidant executive team, whose continued advice and counsel throughout the merger and transition process was considered critical. For these reasons, on December 15, 2004, at the beginning of the Class Period, J&J and Guidant jointly modified Marchetti's rights and obligations under Guidant's "Change In Control Severance Pay Plan for Select Employees." Defendant Marchetti sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. During the Class Period, During the Class Period, Defendant Marchetti sold 9,000 shares of Guidant stock for $649,530 in proceeds.

65. Defendant Kathleen Lundberg served as Senior Vice President and Chief Compliance Officer of Guidant throughout the Class Period. Prior to the beginning of the Class Period, defendant Lundberg executed on behalf of Guidant a "Corporate Integrity Agreement" as part of a plea agreement involving Guidant's unprecedented violations of the Food, Drug and Cosmetic Act ("FDCA"). Lundberg, as the Company's Chief Compliance Officer ("CCO") was responsible for assuring the Company's compliance with FDA regulations and Federal healthcare program requirements, including adherence to the Company's Corporate Integrity Agreement with OIG-HHS. Amongst other responsible officials at Guidant, defendant Lundberg had joint accountability and responsibility for the quality and safety of Guidant's CRM products, including the management of adverse medical and product information derived from "customer complaints," adverse medical reports and other reporting received or otherwise obtained by the Company regarding the quality and safety of CRM products, in accordance with Company policies, the FDA regulations and the Company's CIA with the OIG-HHS.

66. The individuals named as Defendants in ¶¶ 55-65 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Guidant quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, but not to the

public, each Individual Defendant knew that the adverse facts specified herein had not been disclosed and in fact were being concealed from the public and that the positive representations which were being made were materially false and misleading.

67. In addition to the above-described involvement, each Individual Defendant had knowledge of Guidant's problems and each was motivated to conceal such problems. Each Individual Defendant sought to demonstrate that he/she could lead the Company successfully and generate the growth expected by the market.

68. Each Individual Defendant also owed a duty to the Company, its shareholders and investors in the market not to trade on inside information. Each Defendant is liable for (a) making false statements, ***or*** (b) failing to disclose adverse facts known to him/her about Guidant. Defendants' fraudulent scheme and course of business operated as a fraud or deceit on purchasers of Guidant's publicly traded securities and successfully (a) deceived the investing public regarding Guidant's prospects and business; (b) artificially inflated the prices of Guidant's publicly traded securities; (c) allowed Defendants to negotiate a lucrative $25.4 billion merger deal with J&J; (d) allowed insider Defendants to sell nearly $89 million of their own shares at inflated prices; and (e) caused Lead Plaintiffs and other members of the Class to purchase Guidant's publicly traded securities at inflated prices.

## DEFENDANTS' FRAUDULENT COURSE OF CONDUCT

### The Ancure Device Debacle

69. In 1998, Guidant began designing, manufacturing and marketing the Ancure Device stent graft system. It was marketed as a safer and less invasive alternative treatment for abdominal aortic aneurysm than the conventional method of an open surgical procedure referred to as abdominal aortic aneurysm repair.

70. The Ancure Device was known as a stent graft because it included both a "stent," a hard cylinder to prop open an artery, and a "graft," a section of fabric designed to replace the weakened wall of the aorta of a patient. During the Ancure treatment regime, the Ancure stent graft system is inserted into patients by utilizing a non-surgical procedure. The stent is inserted through a one-inch incision in the groin. The stent is then threaded through the artery using a catheter and is positioned so that when deployed, it covers or excludes the aneurysm. This provides a channel through which blood can flow and relieves pressure against the weakened artery wall. The Ancure Device was designed to be attached to the aorta wall with miniature hooks during the delivery and the delivery catheter is supposed to retract within its cover and be safely pulled out of the patient.

71. In September 1999, Defendants received FDA approval of the Ancure Device. The FDA required, as a condition to its approval:

(a) that the device be properly labeled, explaining to doctors how to use the Ancure, including any methods of administration, relevant hazards, contraindications and precautions;

(b) that any changes to the instructions for use that affected the Ancure's safety or effectiveness not be made without FDA approval;

(c) that a Premarket Approval Supplement would be submitted to the FDA for approval before any changes were made to the Ancure that affected its safety or effectiveness; and

(d) that Guidant was required to have a sales representative present in the operating room to observe each surgical procedure in which the Ancure was implanted, or an implant was attempted.

72. The FDA approval was expressly contingent upon compliance with the terms outlined in the approval letter:

> Failure to comply with the conditions of approval invalidates this approval order. Commercial distribution of a device that is not in compliance with these conditions is a violation of the act.

73. Defendants are required by the Safe Medical Devices Act of 1990 to report to the FDA within 30 days whenever they receive or otherwise become aware of information from any source that reasonably suggested that its medical device products (i) may have caused or contributed to a death or serious injury; or (ii) had malfunctioned and the device would be likely to cause or contribute to a death or serious injury if the malfunction were to recur. These reports are known as Medical Device Reports ("MDRs"). The FDA makes MDRs available to physicians and other members of the public so that they can be aware of recurring malfunctions and other risks concerning medical devices. Pursuant to federal regulation, submission of an MDR does not constitute an admission by a manufacturer that a device caused or contributed to the event that is reported.

74. Pursuant to federal law, a medical device causes or contributes to a death or serious injury whenever a death or serious injury was, or may have been, attributed to a medical device, or a medical device was or may have been a factor in a death or serious injury, including events occurring as a result of failure, malfunction, improper or inadequate design, manufacture, labeling, or user error.

75. Pursuant to the relevant federal law, a patient undergoing a surgical procedure using Defendants' medical device products suffered a serious injury when he or she (i) experienced an injury that was life-threatening; (ii) experienced an injury or an illness that resulted in permanent impairment of a body function or permanent damage to body structure; or (iii) experienced an injury that required medical or surgical intervention to preclude permanent impairment of a body function or permanent damage to a body structure. Evidence of actual causation is not required for there to be an obligation to file an MDR.

76. From 1999 through March 2001, there were 2,628 separate incidents of malfunction reported to Guidant relating to the Ancure Device, including 12 related deaths and 57 emergency room procedures, for which Guidant had an ethical and legal responsibility to advise the healthcare community and certainly was under a legal duty to report them to the FDA, but for which Guidant had failed to file the required MDRs.

77. Indeed, it is a matter of public record that Defendants engaged in criminal acts associated with illegal medical device development and marketing activities in violation of the FDA, resulting in felony convictions and fines. On June 12, 2003, the DOJ issued a press release announcing a Felony Plea Agreement with Guidant, which stated in pertinent part:

> ***The guilty plea represents the largest amount ever paid by a Defendant for failing to report malfunctions of a medical device to the Food & Drug Administration ("FDA"), and one of the first times there have been felony convictions for such conduct.*** It is also the second largest criminal and civil settlement in the history of the Northern District of California. The guilty plea and civil settlement was announced today at a press conference by the U.S. Attorney's Office for the Northern District of California, the U.S. Department of Justice's Office of Consumer Litigation and Civil Fraud Section, the FDA and the Federal Bureau of Investigation.

The Defendant, Endovascular Technologies, Inc. ("EVT"), is a wholly owned subsidiary of Guidant Corporation ("Guidant"). The subsidiary is based in Menlo Park, California. According to Guidant's website (www.guidant.com), the Menlo Park facility where the Ancure device was manufactured is also listed as one of Guidant's operating facilities. Guidant is a Fortune 500 company based in Indianapolis, Indiana. The criminal charges relate to a medical device known as the Ancure Endograft System ("Ancure Device"). The Ancure Device treats abdominal aortic aneurysms, a potentially life threatening condition commonly associated with people with heart disease. The Ancure Device is inserted into the patient's body during a surgical procedure.

Under federal law, a company is required to report to FDA any incident in which its medical device may have caused or contributed to a death or serious injury or the medical device experienced a malfunction that would be likely to cause or contribute to a death or serious injury if the malfunction were to recur. The reports to FDA are called Medical Device Reports. ***In this case, the company was aware of every malfunction because, as a condition of FDA approval, it had a sales representative present in the operating room during each surgery and the reports of those failures were repeatedly tabulated and distributed to company officials. In failing to file thousands of Medical Device Reports, the Defendant concealed the true extent of problems with the Ancure Device from patients, doctors and the public.***

According to a Criminal Information which charges EVT with 10 felonies, the Ancure Device was approved for commercial distribution in the United States in September 1999. It was withdrawn from the market on March 15, 2001. During that 19-month span, the company filed a total of 172 Medical Device Reports with FDA concerning the Ancure Device. In pleading guilty, the Defendant admitted that there were an additional 2,628 Medical Device Reports that it had failed to file-each representing an incident in which the Ancure Device malfunctioned or its use was associated with death or serious injury-out of a total of 7,632 medical devices that were sold. Among the unreported incidents were 12 deaths and 57 emergency procedures in which a physician converted the operation into a more invasive procedure. Such a conversion could occur when the delivery system of the Ancure Device became stuck or lodged in the patient's body and could not be removed without opening the patient's stomach during a surgery and slicing open the aorta to remove the broken device and fix the aneurysm.

***Company sales representatives attempted to avoid surgical conversions-which were reportable to FDA-by instructing doctors in a technique to free the delivery system of the Ancure Device when it became stuck in a patient's body. The technique had been devised in part by a company sales representative. It involved breaking the handle of the device and removing the catheters housed within the delivery system of the Ancure Device individually from the patient's body. During the relevant time, the handle breaking technique had not been tested; doctors had not been trained on its use; sales representatives who described the technique to doctors during surgery had not been trained by the company on its use; the instructions accompanying the product did not explain the procedure, and the Defendant failed to seek prior***

***approval of FDA. After a patient died in a case in which the handle breaking technique was used, a group of Defendant's employees concluded that FDA had to be informed about its use. The company failed to do so, even as its sales representatives continued to describe the handle breaking technique to doctors during surgeries.***

Guidant Corporation's EVT division pled guilty to a Criminal Information charging it with nine counts of introducing a misbranded medical device into interstate commerce, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2). The Criminal Information was filed under seal on June 9, 2003. It was unsealed this morning. The corporation then pled guilty and was sentenced before District Judge Susan Illston in San Francisco federal court.

In addition to the nine misbranding counts, the company also pled guilty to one count of making false statements to the FDA, in violation of 18 U.S.C. § 1001. That charge stems from an inspection conducted by FDA of the company's Menlo Park headquarters in July 2000. During the inspection, the FDA official asked specifically for all complaints the company had received about one type of malfunction. The company intentionally misled the inspector by giving him a list of 55 complaints when, in fact, the company knew that there had been hundreds of complaints about this particular malfunction.

As part of the plea agreement and a civil settlement agreement, Guidant's EVT subsidiary will pay $92.4 million. In dollar terms, this is the second largest global criminal and civil settlement in the history of the Northern District of California.

Under the civil settlement, EVT will pay $49 million to settle claims that the company's actions caused Medicare, Medicaid and the Veterans Affairs Program to pay millions of dollars for the adulterated and misbranded devices. Both EVT and Guidant have agreed to enter into a corporate integrity agreement with the Office of Inspector General for the Department of Health and Human Services. Also, as part of the plea agreement, Guidant, as well as EVT, have agreed to cooperate in the United States' continuing investigation into criminal activities associated with the Ancure product.

According to the charges, the government first became aware of the allegations of fraud and cover up in October 2000 when a group of seven anonymous employees wrote a letter to FDA. Later, an investigation authorized by the Defendant which concluded that some of the complaints by the Anonymous Seven were accurate, and that the company was significantly out of compliance with FDA regulations and its own internal policies.

On March 23, 2001, Guidant's EVT division informed FDA that it had failed to file 2,623 MDRs and that the company had inappropriately provided information to doctors about the handle breaking technique. The Ancure Device was suspended from sale at that time. Later, FDA permitted the Ancure Device to be sold with modifications in its warnings to customers and the instructions provided to physicians. It is still on the market. The allegations in the Criminal Information and Plea Agreement

> concern the delivery system of the Ancure Device only, and not the functioning of the Device in those cases where it was successfully implanted without incident.
>
> Assistant Attorney General Robert McCallum said, ***"FDA requirements regarding medical devices are not mere technicalities, but can literally be a matter of life and death for patients receiving these devices. As today's guilty plea and civil settlement demonstrate, the Department of Justice will vigorously prosecute those who seek to evade FDA's requirements, as well as those who seek to profit by claiming payment from federal healthcare programs for potentially unsafe medical devices."***

***

78. Defendants' own press release on that date noted Guidant's record payment of $43.4 million, as well as an additional $49 million in civil settlement to the government and an agreement by the Company to plead guilty to 10 felony counts.

79. Defendants' conduct in connection with its defective Ancure Device was found to be so egregious that the OIG-HHS found it necessary to require a CIA, to obtain regulatory compliance from Guidant. The agreement, which was linked to its "Guidant Code of Business Conduct" webpage ("the Code"), provides a rigorous restatement and imposition of best quality compliance practices that can be adopted pursuant to law and FDA regulations, is material to the extent that the codification was used to assure the investment community of Defendants' various renewed commitments, including a commitment to "corporate integrity."

80. Specifically, Defendant Dollens "codified" the Company's definition of "corporate integrity" as "[c]ontinued honest and ethical business conduct [that] will earn Guidant the trust of customers, patients, suppliers, investors, regulators, and fellow employees, while sustaining our long-term commitment to our shareholders." Defendants' Code goes further, to define a webpage entitled "Dedication to Quality," which begins with the acknowledgement that, "[l]ives depend on the consistent delivery

of quality products and services from Guidant. It is our responsibility to keep this in the forefront of our minds as we perform our duties each day. Superior quality is the key to our success, and anything less than our best is unacceptable."

81. The CIA, signed by Defendant Lundberg, Senior Vice President and Chief Compliance Officer of Guidant Corporation and Larry J. Goldberg, Assistant Inspector General for Legal Affairs, OIG-HHS and published by Defendants on Guidant's website, stated in part:

> C. The scope of this CIA shall be activities regulated by United States laws and regulations and shall be governed by the following definitions:
>
> 1. "Covered Persons" includes ***all officers, employees, contract workers, and agents of Guidant and EVT*** located in the United States.
>
> 2. "Relevant Covered Persons" includes ***those employees, contract workers or agents involved in aspects of marketing, sales or FDA reporting in compliance with the regulatory and statutory obligations related to medical device reporting and corrective and preventative actions located in the United States and as further defined in each relevant provision of this agreement.***
>
> 3. "Compliance Officer" means an individual possessing suitable knowledge, training, education, and credentials in the medical device manufacturing process who will function ***exclusive of and in addition to the management representative as required by 21 C.F.R. § 820.20(b) for EVT.***
>
> 4. "Compliance Committee" means a group of individuals from senior management, in accordance with section III.C.2, ***who will function exclusive of and in addition to the management review pursuant to 21 C.F.R. § 820.20(c).***
>
> III. CORPORATE INTEGRITY OBLIGATIONS
>
> EVT and Guidant shall maintain a Compliance Program that includes the following elements:
>
> A. Compliance Officer and Committee.
>
> 1. Compliance Officer. ***Guidant represents that it currently maintains the position of Chief Compliance Officer.*** Within 90 days after the Effective Date, EVT shall ensure it appoints an individual who meets the requirements of section II.C.3 of the CIA to serve as its Compliance Officer ("Compliance Officer") and to ensure that the requirements of 21

C.F.R. § 820.20 are met. The Chief Compliance Officer and Compliance Officer shall ensure that EVT and ***Guidant develop and implement policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with FDA and Federal health care program requirements.*** The Chief Compliance Officer and Compliance Officer shall be a member of senior management of their respective companies, shall make periodic (at least quarterly) reports regarding compliance matters directly to their respective Boards of Directors, and shall be authorized to report on such matters to their respective Boards of Directors at any time.

***

b. Guidant shall establish management oversight groups in each business unit that will function as a compliance committee. Such a management oversight group ***shall satisfy the requirements of 21 CFR 820.20*** and shall include members of senior management of the business unit necessary to meet the requirements of 21 CFR 820.20(c) (e.g. senior executives of relevant departments such as human resources, audit and operations).

B. Written Standards.

1. Code of Business Conduct. ***Guidant represents that it has established a written Code of Business Conduct.*** EVT has adopted that Code of Business Conduct. To the extent not already accomplished, EVT shall distribute the Code of Business Conduct to all Covered Persons of EVT within 90 days after the Effective Date. EVT shall make the promotion of, and adherence to, the Code of Business Conduct an element in evaluating the performance of all employees. The Code of Business Conduct shall, at a minimum, set forth:

a. EVT and ***Guidant's commitment to full compliance with all FDA*** and Federal health care program requirements;

b. EVT and ***Guidant's requirement*** that all of their Covered Persons shall be expected to comply with all Federal health care program requirements, ***FDA regulatory requirements*** and with Guidant's own Policies and Procedures as implemented pursuant to section III.B (including the requirements of this CIA);

c. the requirement that all of EVT and ***Guidant's Covered Persons shall be expected to report to their respective Compliance Officers or other appropriate individual*** designated by EVT or Guidant ***any suspected violations*** of Federal health care program requirements, ***FDA regulatory requirements*** or of EVT and Guidant's own Policies and Procedures;

d. the possible ***consequences to*** both EVT and ***Guidant's Covered Persons of the failure to comply with*** Federal health care program requirements, ***FDA regulatory requirements*** and with EVT and Guidant's own Policies and Procedures and the failure to report such noncompliance; and

e. the right of all individuals to use the Disclosure Program described in section III.E, and EVT and Guidant's commitment to maintain confidentiality, as appropriate, and nonretaliation with respect to such disclosures.

Unless already accomplished, within 90 days after the Effective Date, each of EVT's Covered Persons shall certify, in writing, that he or she has received, read, understood, and shall abide by Guidant's Code of Business Conduct. New Covered Persons shall receive the Code of Business Conduct and shall complete the required certification within 30 days after becoming a Covered Person or within 90 days after the Effective Date, whichever is later.

***

2. Policies and Procedures. To the extent not already accomplished, within 120 days after the Effective Date, EVT and Guidant shall implement written Policies and Procedures regarding the operation of EVT and Guidant's compliance program and their compliance with Federal health care program requirements and FDA regulatory requirements except as described below with respect to EVT. At a minimum, the Policies and Procedures shall address:

a. the subjects relating to the Code of Conduct identified in section III.B.1;

b. written Medical Device Reporting ("MDR") procedures to include those procedures required by 21 C.F.R. § 803.17;

c. written policies and procedures for employees on how to handle customer complaints and MDRs in accordance with 21 § C.F.R. 803;

d. criteria outlining the minimum qualifications for the specified position filled by a specific person (or persons) who, by reason of background, education, or experience, is (are) competent to maintain the MDR and complaint handling system in accordance with 21 C.F.R. § 803;

***e. complaint handling procedures, including guidelines for evaluating and investigating complaints and implementing the appropriate corrective action to ensure that problems have been remedied and that recurrence of problems have been prevented in accordance with 21 C.F.R. § 820.198;***

f. corrective and preventive action procedures to analyze quality problems, and investigate the root cause of nonconformities reported in accordance with 21 C.F.R. § 820;

g. procedures to ensure that corrective action is effective using appropriate statistical methods and does not adversely affect the finished product in accordance with 21 C.F.R. § 820;

h. procedures in place to notify appropriate individuals directly responsible of quality problems and their correction in accordance with 21 C.F.R. §820;

***i. recall and notification procedures to promptly notify FDA, hospitals, and affected physicians of any correction or removal of a device in accordance with the reporting requirements of FDA's corrections and removal regulations in 21 C.F.R. Part 806;***

j. Proper circumstances to report to the FDA device modifications that affect the safety or effectiveness of the device in accordance with 21 C.F.R. § 814;

k. the proper procedures and processes for modification of the device's Instructions for Use in accordance with 21 C.F.R. § 814;

l. pre-market application approval procedures in accordance with 21 C.F.R. § 814;

m. device modification procedures in accordance with 21 C.F.R. § 814; and

n. establishing and maintaining MDR, Removals and Corrections, and Quality Systems files in compliance with 21 C.F.R. §§ 803.18, 806.20 and 820.198.

Within 120 days after the Effective Date, the relevant portions of the Policies and Procedures shall be distributed to all individuals whose job functions relate to those Policies and Procedures. Appropriate and knowledgeable staff shall be available to explain the Policies and Procedures.

***

D. Exclusion for Material Breach of this CIA.

1. Definition of Material Breach. A material breach of this CIA means:

a. a failure to report a Reportable Event related to EVT and take corrective action as required in section III.H;

b. a repeated or flagrant violation of the obligations under this CIA, including, but not limited to, the obligations addressed in section X.A;

c. a failure to respond to a Demand Letter concerning the payment of Stipulated Penalties in accordance with section X.C; or

d. a failure to retain and use an IRO or, if applicable, a DMC in accordance with section III.D.

2. Notice of Material Breach and Intent to Exclude. The parties agree that a material breach of this CIA constitutes an independent basis for exclusion from participation in the Federal health care programs. Upon a determination by OIG that EVT or Guidant has materially breached its respective obligations under the CIA and that exclusion is the appropriate remedy, OIG shall notify EVT or Guidant, as applicable, of:

> (a) EVT or Guidant's respective material breach; and (b) OIG's intent to exercise its contractual right to impose exclusion (this notification is hereinafter referred to as the "Notice of Material Breach and Intent to Exclude").
>
> 3. Opportunity to Cure. EVT or Guidant shall have 30 days from the date of receipt of the Notice of Material Breach and Intent to Exclude to demonstrate to OIG's satisfaction that:
>
> a. EVT or Guidant is in compliance with the obligations of the CIA cited by OIG as being the basis for the material breach;
>
> b. the alleged material breach has been cured; or
>
> c. the alleged material breach cannot be cured within the 30-day period, but that: (i) EVT or Guidant has begun to take action to cure the material breach; (ii) EVT or Guidant is pursuing such action with due diligence; and (iii) EVT or Guidant has provided to OIG a reasonable timetable for curing the material breach.
>
> 4. Exclusion Letter. If, at the conclusion of the 30-day period, EVT or Guidant fails to satisfy the requirements of section X.D.3, OIG may exclude EVT or Guidant from participation in the Federal health care programs. OIG shall notify Guidant in writing of its determination to exclude Guidant (this letter shall be referred to hereinafter as the "Exclusion Letter"). Subject to the Dispute Resolution provisions in section X.E, below, the exclusion shall go into effect 30 days after the date of the Exclusion Letter. The exclusion shall have national effect and shall also apply to all other Federal procurement and nonprocurement programs. Reinstatement to program participation is not automatic. After the end of the period of exclusion, Guidant may apply for reinstatement by submitting a written request for reinstatement in accordance with the provisions at 42 C.F.R. §§ 1001.3001-.3004.

***

82. Guidant was sued by many patients who received the defective Ancure Device. Many of these suits sought punitive damages and class action status. The Company incurred approximately $37 million in costs settling individual Ancure-related actions during fiscal 2004 alone.

83. In October of 2003, Guidant's insurers began declining coverage on Ancure Device-related liability. Allianz Insurance Company ("Allianz"), Guidant's first-layer carrier declined coverage on Guidant's Ancure Device-related liability and filed in Illinois state court a complaint alleging common-law fraud, on the basis that Guidant

knowingly made "false representations and concealed and failed to disclose the status of the Ancure product defects and claims arising therefrom in the course of Guidant's application for the 2000 issuance of Allianz Policy Number ULA 4100422, and also in the course of its application for the 2001 renewal of Allianz Policy Number ULA 4100422."

84. The insurer's action against Guidant, in which others of Guidant's insurers sought intervention, threatened to void tens of millions of dollars worth of the Company's liability insurance coverage, including the $92.4 million Ancure-related criminal fine, the Company's defense costs and all Ancure-related civil recoveries and judgments. As a result, Guidant, having been priced out of the market, was forced to become largely self-insured, meaning that additional injury claims from other products would have to be paid directly out of the Company's coffers. This leaves shareholders "holding the bag" for the Defendants wrongdoing.

**Guidant's Defective ICD and Pacemaker Devices**

85. Guidant's CRM division is principally responsible for researching, developing, manufacturing and marketing the Company's ICD and pacemaker devices. ICD and pacemaker devices are used to detect and treat abnormally slow or fast heart rhythms that could result in serious injury, including sudden cardiac death. Since the Ancure Device felony conviction, the ICD and pacemakers segment of Guidant's business has accounted for a majority of the Company's revenue. Indeed, Guidant reported $3.8 billion in sales last year, with almost half of that coming from ICD and pacemaker sales.

86. Guidant's ICD and pacemakers are sold to hospitals and physicians for implantation in patients with life-threatening ventricular arrhythmias, and/or those who are at high risk for developing such arrhythmias. An arrhythmia is an irregularity in the force or rhythm of the heart that, if unchecked, can cause myocardial damage, a myocardial infarction (heart attack) and/or death. Medical devices have been developed to correct these abnormal rates of cardiac muscle contractions. These medical devices include pacemakers and implantable defibrillators.

87. Implantable defibrillators are generally designed to correct irregularly fast arrhythmias, while pacemakers are used primarily to correct slow heart rates. If functioning properly, Guidant's ICDs can detect and correct both fast and slow heart rates. The device delivers a strong electrical shock to the heart to restore a normal heartbeat. The device's power source is implanted in a pouch formed in the chest wall, and connected via a lead wire directly onto the heart muscle wall. Electrodes that sense the heart's rhythm are placed in the heart. As illustrated in the diagram below, the devices, about the size of a mini-cassette tape, sense an irregular heartbeat and shock the heart back into proper rhythm:




**Diagram Showing Components of the Ventak Prizm 2 Device before Modification in April 2002.**

A failure involving a deterioration in a wire insulator can result in an electrical short between the DFN wire and the backfill tube. Diagram courtesy of Guidant.

88. Beginning as early as 1994, Guidant designed, manufactured and distributed pacemaker/defibrillator combinations, including the Ventak Prizm 2 VR/DR, models 1860/1861, the Ventak Prizm VR/DR, models 1850/1851/1855/1856, the Ventak Prizm VR/DR HE, models 1852/1853, the Ventak Mini IV, models 1790/1793/1796 and the Ventak Mini III HE, model 1789.

89. Prior to the Ancure Plea Agreement and continuing thereafter, Defendants engaged in the manufacture and distribution of defective implantable defibrillators, which incorporated defects the Company has now admitted it knew of but failed to disclose to doctors and patients. In fact, Defendants discovered the design flaw with one of its models, the VENTAK PRIZM(R) 2 DR (Model 1861), in February 2002 after it received two reports of failures. By April 2002, the Company had made corrections to the unit, and was producing new, revised versions of the device. However, Defendants continued

selling its inventory of defective units without disclosing to physicians or the public their design flaw or the malfunctions which lead to their obsolescence.

90. The Company has said it received 25 reports of short-circuiting in units with the older design still in circulation. At least one patient has died as a result of the defective implantable defibrillator.

91. But for the death of 21 year-old college student Joshua Oukrop on March 13, 2005, Guidant may never have disclosed the existence of the latent defects in its ICD and pacemaker devices. Only after Mr. Oukrop's death, and after being informed that the New York Times was about to publish a story related to Guidant's defective ICDs, did Defendants on May 24, 2005 make partial disclosure of material adverse information regarding this device.

92. Mr. Oukrop had a genetic heart disease. His physician, Dr. Barry Maron, recommended the surgical installation of a Guidant ICD, the VENTAK PRISM(R) 2 DR, assuring Mr. Oukrup that this device would prolong his life and give his life a sense of normalcy. Unbeknownst to Dr. Maron, Guidant's VENTAK PRIZM(R) 2 DR (Model 1861) was defective. The device's defect, a short-circuit which prevents the ICD from delivering life-saving burst of electricity, caused Mr. Oukrup's death.

93. Although Defendants declined to disclose the known adverse facts to the public, they acknowledged to Oukrup's doctors privately that the unit had short-circuited and told Oukrup's doctors that Guidant was aware of 25 other cases in which the same model of defibrillator had malfunctioned in the same way. Defendants also informed Dr. Maron that approximately 24,000 similar ICD devices had been sold. When Dr. Maron inquired whether other ICD recipients would be told of the ICD's defect, ***Defendants***

***said they did not intend to inform anybody, on the asserted ground that they did not feel it was advisable to alarm people based on the Company's statistics***.

94. The Class Period begins on December 15, 2004, on the news of Guidant's impending merger with J&J. On May 24, 2005 an article appeared in *MarketWatch* entitled, "Guidant didn't disclose flaw for 3 yrs - New York Times report highlights defibrillator problem". The article stated in part:

> ***Guidant NEW YORK (MarketWatch) - Guidant Corp. did not tell doctors or patients for three years that a defibrillator implanted in an estimated 24,000 people contained a flaw that caused a small number of units to malfunction, The New York Times reported Tuesday.***
>
> The issue surfaced after the death of a 21-year-old college student from Minnesota, Joshua Oukrop, with a genetic heart disease.
>
> Guidant acknowledges that his defibrillator short-circuited.
>
> The young man was in Utah on a spring break bicycling trip in March when he complained of fatigue. He fell to the ground and died of cardiac arrest.
>
> Guidant then told his doctors that it was aware of 25 other cases in which the defibrillator, a Ventak Prizm 2 Model 1861, had been affected by the same problem.
>
> ***Guidant said it had changed its manufacturing processes three years ago to fix the problem.***
>
> ***The doctors said that had they known earlier, they would have replaced the unit in their patient because he was at high risk of sudden death. His death is the only one known.***
>
> In interviews in recent days, a top Guidant executive, Dr. Joseph M. Smith, said the company had not seen a strong reason to issue an alert to physicians about the defibrillators because the failure rate was very low and replacing the devices might pose greater patient risks.
>
> But late Monday, when told that The New York Times was preparing an article about the device, the company issued an advisory to doctors about it.
>
> ***

95. Indeed, that same day, and only after being prompted by *The New York Times* investigation, the Company finally issued an advisory to physicians regarding the

"clinical performance" of its defective and life-threatening ICD's. The May 24, 2005 advisory provided investors with a partial indication of the potential threats to the deal Guidant had with J&J, based on the previously undisclosed defects associated with the Company's Ventak Prizm defibrillators. The news story had arguably painted Guidant as having caused the death of Joshua Oukrop, a 21-year-old college student from Minnesota.

96. However, Defendants' disclosures, in combination with other media reports had hardly placed a dent in the Company's stock price, since Guidant had told the Times that FDA was well-informed of the issues and had justified its unwillingness to share its product defect knowledge with the medical community. Moreover, the advisory failed to provide hard numbers or facts regarding the nature or extent of defective nature of Defendants' defective defibrillator products. Without this information, investors were unable to comprehend the significance and extent of Defendants' concealment or to make an informed judgment, regarding the potential financial impact of the serious and alarming safety issues that resulted from the defective nature of the Company's defibrillator products.

97. Indeed, FDA officials met with Defendants on May 24, 2005, to discuss issues relating to the Company's ICD and pacemaker devices and inquired specifically why the Company had not informed doctors for three years about the design flaw in the VENTAK PRIZM(R) 2 DR (Model 1861) implantable defibrillator, or told them that it had changed its manufacturing process in 2002 to remedy the defect.

98. On June 17, 2005, the Company issued a release notifying physicians worldwide not only of the problems with and recall of the VENTAK PRIZM(R) 2 DR (Model 1861) implantable defibrillator, but also of defects Defendants had been aware of

with other of the Company's implantable defibrillator devices. The recall announcement came nearly three weeks after the news of the troubling death of Joshua Oukrop, as reported in the Times article of May 24, 2005. On this news, the Company's shares ***fell $3.36, losing 4.5% percent of their value over the two trading days following the FDA recall, closing at $70.33, on a combined volume of over 25 million shares.*** As a result***, Guidant investors lost over $1.09 billion in the value of their shares*** as a result of the announcement of the FDA recall.

99. Guidant's stock price, however, still remained inflated, as defendants sought opportunities to convince the investment community that Guidant had properly and responsibly addressed issues with its defective ICD's and that the merger would occur as expected. Following the close of the markets on June 20, 2004, Reuters published a news article entitled, "J&J unlikely to drop out of Guidant deal--sources". The article pointed to the potential for renegotiation of the Guidant deal, as well as defibrillator recall costs, estimated from well under $100 million to as much as $225 million.

100. Again, on June 24, 2005, the Company was forced to issue a statement notifying physicians worldwide of problems and defects with additional ICD devices. Just as with the VENTAK PRIZM(R) 2 DR (Model 1861) implantable defibrillator device, Defendants had also been aware of the defects in the additional devices for quite some time. Following this, on July 18, 2005, Guidant again shocked the market with its further alarming news of a potentially systemic pattern of product defects and recalls. This time, Guidant warned of a potential defect in the Company's pacemaker devices,

causing the price of the Company's shares ***fell another $2.10, losing 3.0% percent of their value, closing on July 18, 2005 at $67.31, on volume of over 7 million shares.***

101. Notably, on July 18, 2005 – ***the same day as the pacemaker recall*** – and while in a position to know how the events of the day might adversely impact merger prospects and the value of his own personal holdings of the stock, on July 18, 2005, defendant Cornelius ***dumped 450,000 shares of his Guidant stock, for proceeds of $30.5 million.*** This enormous stock sale in a single day – on the same day Guidant's pacemakers were recalled – is highly suspicious both as to timing and amount. Indeed, the amount of Cornelius's sales was also dramatic as it represented ***113%*** of the amount of stock sold by Cornelius over the ***past two years combined***.

102. In spite of these alarming events, defendants sought interviews and other opportunities, to convince the investment community that Guidant had properly and responsibly addressed issues with its defective ICD's and to represent to investors that the original deal between the Company and J&J ***could go forward.*** Notably, during an interview on July 27, 2005, Defendant McCoy, Guidant's President of CRM made false and misleading statements during a newspaper interview. McCoy's statements were carefully woven to conform to the ***publicly available*** material information, as well as the circumstances under which the Company carefully tended to the public disclosure of devastating material information, of critical importance to the healthcare community and adverse to its deal with J&J. The nature and timing of Defendant McCoy's assurances served one purpose – to quiet investor concerns, by asserting his "reasonable belief" in the impending J&J deal. Yet, Defendants were fully aware or in conscious and reckless disregard of all of the disclosed and undisclosed issues under consideration by Johnson &

Johnson. Taking issue with facts and circumstances already reported in news accounts, McCoy made clear that, "[w]e would not represent it that way." Indeed, Defendant McCoy represented otherwise, that it was unnecessary for Guidant ***to worry about any long-term damage to its reputation,*** or provide any further details of ***"attendant risks"*** of its medical devices to the investment community – ***non-public information material to the merger and dialogue between the Company and Johnson & Johnson.***

103. Finally, on October 18, 2005, J&J made a shocking announcement during their October 18, 2004 conference call. Commenting on the most recent disclosures regarding the issues facing Guidant, J&J representatives revealed to the investment community that its efforts to seek "alternatives" in its December 2004 merger deal were in earnest, as a direct result of the "developments" at Guidant, stating in part:

> Bob Darretta - Johnson & Johnson - Vice Chairman, CFO, EVP
>
> [L]et me say a few words to address the pending Guidant transaction. We have previously stated that we anticipated FTC clearance in October. And we continue to believe that to be the case. As it relates to the previously announced product recalls at Guidant, ***and the related regulatory investigations and other developments,*** we believe that these are serious matters, and we are continuing to closely monitor the situation at Guidant.
>
> ***In light of these matters and their impact, we are continuing to consider the alternatives under our merger agreement.*** We do not have any further comment on the Guidant transaction at this time and will not take any questions on the subject of Guidant.
>
> ***

104. Despite Defendants' assurances regarding their "expectations and beliefs" concerning the original December 2004 merger deal with J&J, investors finally learned the truth. As a result of its ***calculated and confidential assessment,*** occurring over a period of several months, of the extent of the problems and adverse "developments" at Guidant, J&J ***told investors that it lacked an express commitment to original terms of its***

***merger agreement.*** On the news, the Company's shares plummeted, from $72.38 on October 17, 2005, to $64.10 per share on October 18, 2005, ***an astounding loss of $8.28 or 11.4% per share, closing on volume of over 30 million shares. In all, Guidant investors lost over $3.1 billion in the value of their shares during the period from June 17, 2005 through October 18, 2005.***

105. While this disclosure revealed to the investing public problems with certain of the Company's devices, Defendants continued to conceal material adverse facts about that none of the defects in any of its models had been previously disclosed to J&J in merger discussions.

106. Guidant Stock traded at artificially high prices after the merger plans with J&J were announced on December 15, 2004. The merger would not have been undertaken or would have occurred at a stock value reflective of the adverse facts which came trickling out between May 24, 2005 and October 14, 2005, had Guidant disclosed to J&J in its merger discussions the true facts about the Company's ICD and pacemaker defects on the many opportunities it had, beginning in the Spring of 2004 when merger talks began:

(a) On August 4, 2004, J&J and Guidant executed a confidentiality agreement;

(b) On August 6, 2004, representatives of J&J met with representatives of Guidant, including Defendants Dollens and Brauer, as well as Messrs. Kury and A. Jay Graf, former Guidant Group Chairman, to discuss and review information regarding Guidant's business.

(c) On August 17, 2004, at a meeting of the Board of directors of Guidant, Defendant Dollens reported on his meetings with J&J's representatives. At this meeting, representatives of JPMorgan, Guidant's financial advisor, made a presentation regarding J&J's business and the potential financial implications of a combination between the two companies. Also at this meeting, the Board of Directors authorized continued discussions with J&J.

(d) On August 19, 2004, representatives of J&J, Messrs. Darretta, Dormer, Caruso and Hilton, met with Defendants Dollens and Brauer, as well as Messrs. Kury and Graf of Guidant and representatives of JPMorgan, to discuss various issues relating to the potential acquisition. During the latter part of August 2004 and the early part of September 2004, discussions between representatives of J&J and Guidant continued regarding issues relating to the proposed transaction.

(e) On September 8, 2004, Mr. Dormer of J&J telephoned Defendant Dollens to discuss a number of issues, including the consideration to be paid to Guidant shareholders in the proposed transaction.

(f) On September 17, 2004, representatives of J&J met with executive officers and other representatives of Guidant to conduct further due diligence on various aspects of Guidant's operations and to discuss various business and organizational issues relating to the proposed transaction.

(g) On September 24, 2004, representatives of J&J met with Defendants Dollens and Marchetti to discuss terms of the proposed transaction.

(h) On September 30, 2004, representatives of J&J met with Defendant Dollens, Mr. Kury and other representatives of Guidant to further discuss some of the terms and conditions of a potential merger agreement.

(i) On October 4, 2004, a draft merger agreement was circulated to senior management and advisors of each company. On October 8, October 9 and October 10, 2004, Mr. Kury, other representatives of Guidant and Guidant's outside legal advisors met with representatives of J&J and J&J's outside legal advisors to negotiate certain terms of the proposed transaction. These negotiations continued through October 27, 2004.

(j) On October 6, 2004, in connection with J&J's due diligence review of Guidant, representatives of Guidant made a presentation to representatives of J&J and Goldman Sachs & Co., financial advisor to J&J, about the business and financial condition of Guidant.

(k) On October 11, 2004, Guidant formally engaged Morgan Stanley to serve as financial advisor to the company in addition to the previously engaged JPMorgan.

(l) On October 18, 2004, at a meeting of the Guidant Board of Directors, Defendant Dollens updated the Board on the status of the discussions with J&J. Representatives of JPMorgan and Guidant's outside legal advisors provided the Board with analyses of the financial and legal matters that continued to be under negotiation with J&J. Representatives of Morgan Stanley were also in attendance. After discussion, the Board of Directors of Guidant authorized Guidant's management and advisors to continue negotiations.

(m) On October 22, 2004, at a meeting of the Board of Directors of J&J, Mr. Dormer of J&J reported on the discussions that had occurred with representatives of Guidant. This review included an update on the diligence effort with respect to Guidant's business and financial aspects of the proposed transaction. At this meeting, J&J's General Counsel and senior members of the J&J's Law Department discussed matters concerning the potential transaction. Representatives of Goldman Sachs also provided a perspective on the proposed transaction.

(n) On October 26, 2004, representatives of J&J met with Defendant Dollens to continue negotiations on the terms of the proposed merger, including the consideration to be paid to Guidant shareholders in the proposed transaction and the exchange ratio for the stock portion of the merger consideration.

(o) On October 27, 2004, the Board of Directors of Guidant met to review the status of the discussions with J&J, and the merits of J&J's then-current proposal as compared to remaining a stand-alone entity. At this meeting, JPMorgan and Morgan Stanley each separately discussed financial aspects of J&J's proposal, valuation issues regarding Guidant and other alternatives available to Guidant as a stand-alone entity. Guidant's outside legal advisors reviewed in detail the regulatory approvals that would be required to complete the proposed transaction. During the week of November 8, 2004, Defendant Dollens and Mr. Dormer had a series of telephone conversions regarding the value of resuming discussions and arranged a meeting between Messrs. Weldon, Dormer and Darretta of J&J and Defendants Cornelius and Dollens to be held on November 16, 2004, to discuss whether further conversations between the two companies would be productive.

(p) Following the Guidant Board meeting, Defendant Cornelius telephoned J&J's representative Mr. Weldon to continue to explore the prospect of further merger discussions between the two companies. On November 19, 2004, and November 24, 2004, representatives of J&J and its outside legal advisors met with Defendants Cornelius and Dollens, as well as Mr. Kury of Guidant and Guidant's outside legal advisors, to continue negotiations with respect to the proposed transaction.

(q) Over the course of the next several weeks, the parties and their respective advisors conducted further negotiations over the terms and conditions of a merger agreement for the proposed transaction. These negotiations focused on the representations, warranties, covenants and closing conditions to be included in the merger agreement, as well as the obligations of the parties to obtain regulatory approvals for the acquisition and the limitations to be included in the agreement on Guidant's ability to contact or engage in discussions with potential acquirers. The negotiations also addressed the circumstances under which the parties could terminate the merger agreement and the circumstances under which termination fees would be payable under the merger agreement, and the amount of these fees.

(r) On November 30, 2004, Messrs. Dormer and Valeriani of J&J met with certain executive officers of Guidant to discuss various organizational issues regarding the proposed transaction, including a proposal whereby such executives would agree to modify the terms of their change in control agreements in connection with the proposed transaction. These conversations continued on December 8, 2004.

(s) On December 2, 2004, at a meeting of the Board of Directors of J&J, Messrs. Dormer and Darretta provided an update on the status of the negotiations

regarding the proposed transaction and the due diligence investigation with respect to Guidant. J&J's legal advisors described the principal terms that had been negotiated in the draft merger agreement as well as the Board's fiduciary duties, both generally and in the specific context of the proposed transaction. J&J's financial advisor provided an update on its perspective on the proposed transaction. After discussion, the Board of Directors directed its management and advisors to continue negotiations with Guidant.

(t) During late November and early December 2004, representatives of J&J continued their due diligence investigation of Guidant. On December 7, 2004, Defendant Brauer, Mr. Kury and other representatives of Guidant, together with representatives from Guidant's financial advisors, met with representatives of J&J to discuss and review business and financial information of the companies.

(u) On December 9, 2004, Mr. Weldon of J&J telephoned Defendant Cornelius of Guidant to discuss the consideration to be paid to Guidant shareholders in the merger, including the exchange ratio for the stock portion of the merger consideration. No agreement was reached on these matters during this discussion.

**(v)** On December 13, 2004, representatives of J&J met with Defendants Cornelius and Dollens to continue negotiations. Negotiations between the management and advisors of J&J and Guidant continued through December 15, 2004, when the merger plan was announced. On none of the above occasions nor at any time prior to the announcement of the merger, did Defendants disclose the material adverse information about Guidant's ICD and pacemaker business that ultimately came out many months later and undermined the merger agreement and caused the price of Guidant shares to plummet.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

107. On December 15, 2004, the Company issued a press release, which was also filed with the SEC on a Form 8-K on December 16, 2005, entitled, "Johnson & Johnson and Guidant Announce Definitive Agreement Valued at $23.9 Billion Based on $76 per Share - Transaction will bring together cardiovascular expertise and technologies to benefit patients and physicians worldwide." The press release stated in part:

> New Brunswick, N.J. and Indianapolis, Ind. — December 15, 2004 — Johnson & Johnson (NYSE: JNJ), the world's most comprehensive and broadly based manufacturer of health care products, and Guidant Corporation (NYSE: GDT), a world leader in the treatment of cardiac and vascular disease, today announced that they have entered into a definitive agreement whereby Johnson & Johnson will acquire Guidant for $25.4 billion in fully diluted equity value.
>
> Under the terms of the agreement, each share of Guidant common stock will be exchanged for $30.40 in cash and $45.60 in Johnson & Johnson common stock, provided the average Johnson & Johnson common stock price is between $55.45 and $67.09 during the 15-day trading period ending three days prior to the transaction closing. Each Guidant share exchanged would be converted into Johnson & Johnson common stock of not more than .8224 and not less than .6797 shares, plus $30.40 in cash. The transaction has an estimated net acquisition cost of $23.9 billion, as of the close of business on December 15, 2004, based upon Guidant's approximately 334 million fully diluted shares outstanding, net of estimated cash on hand at the time of closing.
>
> The Boards of Directors of Johnson & Johnson and Guidant have given their respective approvals to the transaction, which is subject to clearance under the Hart-Scott-Rodino Antitrust Improvements Act, the European Union merger control regulation, and other customary closing conditions. The agreement will require the approval of Guidant's shareholders.
>
> Guidant and Cordis Corporation, a Johnson & Johnson Company, will become part of a newly created cardiovascular device unit within Johnson & Johnson. The newly created franchise will be named Guidant while the Cordis name will be retained for select businesses within the franchise. The franchise will be operated consistent with the Johnson & Johnson operating principle of decentralized management, which provides for focused management and fosters an entrepreneurial culture. This business unit will report to Nicholas J. Valeriani, a member of the Johnson & Johnson Executive Committee.

"The combination of these businesses will enable us to bring innovative new therapies to patients and their physicians in this very important and fast growing therapeutic area," said William C. Weldon, Chairman and Chief Executive Officer of Johnson & Johnson. "Bringing Guidant into the Johnson & Johnson family of companies builds on our history of strategic acquisitions and partnerships that provide a foundation for sustained leadership and growth."

***Guidant business units include cardiac rhythm management (e.g. pacemakers and implantable cardioverter defibrillators), vascular intervention, cardiac surgery and endovascular solutions. These businesses will complement Johnson & Johnson's products and services in cardiology and medical devices, as well as provide future benefits for patients and physicians as a result of collaboration with the Johnson & Johnson pharmaceuticals and diagnostics businesses.***

"This exciting new partnership opens a dynamic era of innovation and product development that will benefit millions of patients around the world," said Ronald W. Dollens, President and Chief Executive Officer of Guidant. "We are pleased to be joining Johnson & Johnson, one of the world's premier companies. ***We strongly believe that this exciting collaboration will benefit patients, customers, employees and shareholders***." Mr. Dollens has agreed to continue to serve as Chief Executive Officer of Guidant until the transaction has closed.

***The cardiovascular segment continues to be one of the fastest growing areas in health care as populations in the United States and other countries age.*** As a combined entity, Guidant and Cordis will more effectively bring technologically based and innovative approaches to the treatment of cardiovascular diseases.

***This new organization will enable Johnson & Johnson to better address the needs of patients around the world who require treatment for heart failure and sudden cardiac death.*** This patient population continues to be significantly underserved. Additionally, Guidant's technology platforms, such as implantable micro-electronics, could be applied to current and future Johnson & Johnson products as part of future efforts to create innovative and advanced technologies in other healthcare areas, such as the neuromodulation market.

In the interventional cardiology market, this business combination provides the capability to accelerate development of new technologically advanced products. This new business can utilize Cordis' expertise, intellectual property and experience in drug development, coating technology and polymers. Together with Guidant's strength in rapid and innovative development of stent platforms and delivery systems, the combined company will bring superior products to the market faster than either company could on its own.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. The company, driven by a strong entrepreneurial culture of approximately 12,000 employees, develops, manufactures and markets a broad array of products and services that enable less invasive

care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

Johnson & Johnson, with approximately 109,000 employees, is the world's most comprehensive and broadly based manufacturer of health care products, as well as a provider of related services, for the consumer, pharmaceutical, and medical devices and diagnostics markets. Johnson & Johnson has more than 200 operating companies in 57 countries, selling products throughout the world. For more information visit www.jnj.com.

Additional commentary regarding the financial impact will be discussed during the conference call noted below. Johnson & Johnson and Guidant will not be available for further comment until after the conference call has concluded.

108. The December 15, 2004 press release was false and misleading for the following reasons. Defendants knew that their implantable defibrillator and pacemaker product lines presented significant liability issues, given past and ongoing unaddressed issues related to substantial life-threatening design and manufacturing defects. Since these problems were difficult to characterize and observe, those patients implanted with these defective devices were unlikely to attribute any temporary physical disablement to the device's malfunction. Therefore, when Dollens made a statement regarding the merger, he was obligated to speak fully and truthfully about all events that could materially impact the deal with J&J. Moreover, all other Individual Defendants, because of their positions as officers and/or directors in the Company and their dealings with J&J during the merger negotiations, knew or recklessly disregarded the fact that Dollens' statements were material misrepresentations. The Individual Defendants were under a duty to insure that all material information was being disseminated to the investing public. Yet the Defendants knowingly misrepresented and omitted to disclose material adverse information necessary to make the positive statements in the Company's press release not misleading, including that:

(a) certain of Guidant's ICD and pacemaker devices had manufacturing defects, including defective ICD and pacemaker devices produced prior to April 2002;

(b) thousands of these defective devices were nevertheless placed into inventory and sold to unsuspecting healthcare providers and patients;

(c) patients with Guidant's defective ICD and pacemaker devices were experiencing serious and life threatening health problems resulting from manufacturing defects in the Company's devices;

(d) revenue from ICD and pacemaker devices would be significantly impacted when disclosure of known defects was made; and

(e) ICD and pacemaker defects would constitute a "material adverse effect" that could severely undermine the $24.5 billion merger agreement between Guidant and J&J.

109. As a result of the December 15, 2004 announcement, a record 36 million shares of Guidant stock were traded, locking in a modest 4.2% speculative appreciation in the price of the Company's stock.

110. During the course of the Company's dealings up to the merger agreement with J&J, there can be no doubt as to the intentional omissions of fact in Defendants' public statements, including Defendants' issued press releases and SEC filings, demonstrating the lack of full and fair disclosure to healthcare providers and the investing public of the adverse impact on patients implanted with of thousands of Guidant's defective ICD and pacemaker devices. From the date Guidant entered into the Plea Agreement with the DOJ, to the time that Defendants announced the merger agreement and continuing throughout the Class Period, Defendants intentionally concealed from healthcare providers, investors, regulators, and, ostensibly, J&J, the truth about known defects affecting thousands of Guidant's ICD and pacemaker devices and posing life-threatening risks to patients and the predictable resultant damage to investors once the truth is revealed.

111. On December 21, 2004, January 7, 2005 and January 19, 2005, Defendants filed three separate SEC Form 425's, with the stated intention of continuing to inform the investing public of all of the material information about the advantages and material risks facing Guidant's planned merger with J&J, including "any specific material adverse events that could still affect the Guidant deal." When Guidant issued statements regarding the merger, the Company was obligated to speak fully and truthfully about all events that could materially impact the deal with J&J. Moreover, the Individual Defendants, because of their positions as officers and/or directors in the Company and their dealings with J&J during the merger negotiations, knew or recklessly disregarded the fact that the Form 425 statements were material misrepresentations, in that they were incomplete. The Individual Defendants were under a duty to insure that all material information was being disseminated to the investing public. In these SEC filings, the Company knowingly misrepresented and omitted to disclose material adverse information necessary to make the positive statements in the Company's SEC filings not misleading, including that:

(a) certain of Guidant's ICD and pacemaker devices had manufacturing defects, including defective ICD and pacemaker devices produced prior to April 2002;

(b) thousands of these defective devices were nevertheless placed into inventory and sold to unsuspecting healthcare providers and patients;

(c) patients with Guidant's defective ICD and pacemaker devices were experiencing serious and life threatening health problems resulting from manufacturing defects in the Company's devices;

(d) revenue from ICD and pacemaker devices would be significantly impacted when disclosure of known defects was made; and

(e) ICD and pacemaker defects would constitute a "material adverse effect" that could severely undermine the $24.5 billion merger agreement between Guidant and J&J.

112. On January 27, 2005, Defendants filed SEC Form 8-K, which contained financial information for Guidant during the fourth quarter of its 2004 fiscal year as well as an update on the Company's pending merger with J&J. Specifically, the 8-K stated the following regarding the merger with J&J:

> Merger Update
>
> As previously announced on December 15, 2004, Guidant and Johnson & Johnson entered into a definitive agreement whereby Johnson & Johnson will acquire Guidant for $76 per share or $25.4 billion in fully diluted equity value. The company has recently submitted its U.S. Hart-Scott-Rodino filing. Next steps in the merger include an antitrust filing in Europe, responding to requests for additional information from government authorities, the filing of a preliminary proxy statement/prospectus with the Securities and Exchange Commission and a meeting of Company shareholders anticipated in the spring.

113. When Guidant issued statements regarding the merger, the Company was obligated to speak fully and truthfully about all events that could materially impact the deal with J&J. Moreover, the Individual Defendants, because of their positions as officers and/or directors in the Company and their dealings with J&J during the merger negotiations, knew or recklessly disregarded the fact that the Form 8-K statements were material misrepresentations, in that they were incomplete. The Individual Defendants were under a duty to insure that all material information was being disseminated to the investing public. In the 8-K, the Company knowingly misrepresented and omitted to disclose material adverse information necessary to make the positive statements in the Company's SEC filing not misleading, including that:

(a) certain of Guidant's ICD and pacemaker devices had manufacturing defects, including defective ICD and pacemaker devices produced prior to April 2002;

(b) thousands of these defective devices were nevertheless placed into inventory and sold to unsuspecting healthcare providers and patients;

(c) patients with Guidant's defective ICD and pacemaker devices were experiencing serious and life threatening health problems resulting from manufacturing defects in the Company's devices;

(d) revenue from ICD and pacemaker devices would be significantly impacted when disclosure of known defects was made; and

(e) ICD and pacemaker defects would constitute a "material adverse effect" that could severely undermine the $24.5 billion merger agreement between Guidant and J&J.

114. During the month of February 2005, Defendants filed two separate SEC Form 425's, on February 7 and 22, 2005, purporting to update investors with full and fair disclosures regarding advantages, material risks, progress and timeline towards the merger including "any specific material adverse events that could still affect the Guidant deal." When Guidant issued statements regarding the merger, the Company was obligated to speak fully and truthfully about all events that could materially impact the deal with J&J. Moreover, the Individual Defendants, because of their positions as officers and/or directors in the Company and their dealings with J&J during the merger negotiations, knew or recklessly disregarded the fact that the Form 425 statements were material misrepresentations, in that they were incomplete. The Individual Defendants were under a duty to insure that all material information was being disseminated to the

investing public. In these SEC filings, the Defendants knowingly misrepresented and omitted to disclose material adverse information necessary to make the positive statements in the Company's SEC filings not misleading, including that:

(a) certain ICD and pacemaker devices had manufacturing defects, namely ICD and pacemaker devices produced prior to April 2002;

(b) thousands of these defective devices were nevertheless placed into inventory and sold to unsuspecting healthcare providers and patients;

(c) patients with Guidant's defective ICD and pacemaker devices were experiencing serious and life threatening health issues as a result of these devices manufacturing defects;

(d) revenue from ICD and pacemaker devices would be significantly impacted when disclosure of known defects were revealed by Guidant; and

(e) ICD and pacemaker defects would constitute a "material adverse effect" that could severely effect the $24.5 billion merger agreement between Guidant and J&J.

115. On February 15, 2005, Defendants filed SEC Form 10-K, signed and certified pursuant to Section 302 of the Sarbanes-Oxley Act by Defendants Dollens, Brauer, and Cornelius, purporting to state Guidant's 2004 annual financial report, highlighting increasing defibrillator sales revenues. Moreover, the 10-K incorporates by reference the Company's December 15, 2004 press release regarding merger agreement between J&J and Guidant.

116. The February 15, 2004 10-K was false and misleading for the following reasons. Defendants knew that their implantable defibrillator and pacemaker product lines presented significant liability issues, given past and ongoing unaddressed issues

related to substantial life-threatening design and manufacturing defects. Therefore, when Dollens, Brauer and Cornelius made a statement regarding the merger, they were obligated to speak fully and truthfully about all events that could materially impact the deal with J&J. Moreover, all other Individual Defendants, because of their positions as officers and/or directors in the Company and their dealings with J&J during the merger negotiations, knew or recklessly disregarded the fact that Dollens, Brauer and Cornelius's statements were material misrepresentations. The Individual Defendants were under a duty to insure that all material information was being disseminated to the investing public. Yet the Defendants knowingly misrepresented and omitted to disclose material adverse information necessary to make the positive statements in the Company's press release not misleading, including that:

(a) certain of Guidant's ICD and pacemaker devices had manufacturing defects, including defective ICD and pacemaker devices produced prior to April 2002;

(b) thousands of these defective devices were nevertheless placed into inventory and sold to unsuspecting healthcare providers and patients;

(c) patients with Guidant's defective ICD and pacemaker devices were experiencing serious and life threatening health problems resulting from manufacturing defects in the Company's devices;

(d) revenue from ICD and pacemaker devices would be significantly impacted when disclosure of known defects was made; and

(e) ICD and pacemaker defects would constitute a "material adverse effect" that could severely undermine the $24.5 billion merger agreement between Guidant and J&J.

117. After Guidant learned on March 16, 2005, of the death three days earlier of 21 year old college student Joshua Oukrop from Minnesota as a direct result of the life-threatening defect inherent in thousands of Guidant's defective ICD devices, Defendants continued its pattern of release select information to the public, failing to disclose not only the known defects of the ICD and pacemaker products, but also that at least one death was now associated with the device.

118. For example, on March 24, 2005, Defendants filed a SEC Form DEFM 14A, their preliminary proxy statement, which was distributed to shareholders, to inform them of the advantages, material risks and other details regarding the merger, seeking their approval of the sale of Guidant to J&J pursuant to the agreed upon terms. This document was signed by Defendant Dollens. Subsequent to this, on March 29, 2005, Defendants filed SEC Form 425, detailing an interview by Dollens, again remiss in glaring omissions of material fact, containing various positive assertions, including his declaration of "something magic that has happened within Guidant."

119. On April 21, 2005, the Company issued a press release, later filed as SEC Form 8-K, entitled, "Guidant Reports Record First Quarter Sales of $953 Million - Company Completes Several Merger-Related Milestones During Quarter - Sales of products other than worldwide coronary stents were $838 million, up 10 percent - Worldwide implantable defibrillator revenue of $478 million, up 18 percent - Worldwide coronary stent revenue of $115 million, down 33 percent - Earnings per share from continuing operations of $0.54, up 13 percent - Adjusted earnings per share from continuing operations of $0.65, up 16 percent". The press release stated in part:

> Guidant Corporation (NYSE: GDT), a world leader in the treatment of cardiac and vascular disease, today reported first quarter sales of $953 million, representing sales growth of $19 million or 2 percent versus the prior year. Foreign currency translations favorably impacted revenue by $13 million. Net income for the quarter was $162 million versus $139 million in the first quarter of 2004, up 16 percent.

Please see the attached schedules and the Guidant website at www.guidant.com/investors/reconciliations/ for additional information, including a reconciliation of special items, income statements and product sales summaries reclassified for discontinued operations.

Management Observations

***Ronald W. Dollens, president and CEO of Guidant Corporation, commented, "Guidant's results this quarter reflect solid operating performance through continued financial discipline and strong revenue growth in implantable defibrillators and our emerging businesses.*** As planned, we are making timely progress toward the closing of the company's merger with Johnson & Johnson."

***Dollens continued, "As we look to the future, we expect strong growth in the implantable defibrillator market supported by expanded Medicare reimbursement, limited erosion in our coronary stent revenue, and increased contributions from our emerging businesses."***

First Quarter Financial Highlights:

Sales of products other than worldwide coronary stents represented 88 percent of total revenues and increased 10 percent versus the first quarter of 2004.

***Worldwide implantable defibrillator sales increased 18 percent to $478 million; U.S. implantable defibrillator sales were $366 million.***

***Worldwide pacemaker sales declined 6 percent to $168 million; U.S. pacemaker sales were $95 million.***

Worldwide coronary stent sales of $115 million declined 33 percent versus the prior year and represented 12 percent of company sales; U.S. stent sales totaled $57 million.

Worldwide angioplasty system sales declined 14 percent to $100 million, reflecting the temporary unavailability of the company's leading dilatation catheter during the quarter.

Worldwide sales of cardiac surgery, biliary, peripheral and carotid systems (emerging businesses) grew 49 percent to $92 million.

Gross margin was 76.4 percent compared to 75.8 percent in the first quarter of 2004.

The company reported first quarter income and earnings per share from continuing operations of $177 million and $0.54 compared to $153 million and $0.48 in the first quarter of 2004. Income from continuing operations in the current quarter includes an after tax impairment charge of $38 million, or $0.11 per share, related to the write-down of assets associated with declining demand and future outlook for the FX miniRAIL Dilatation Catheter. Adjusted income and earnings per share from continuing operations, excluding special items, were $215 million and $0.65 compared to $178 million and $0.56 in the first quarter of 2004, up

20 and 16 percent, respectively. All results include merger-related expenses.

Merger Update

As previously announced on December 15, 2004, Guidant and Johnson & Johnson entered into a definitive agreement whereby Johnson & Johnson will acquire Guidant for $76 per share or $25.4 billion in fully diluted equity value.

Merger related milestones in the quarter included U.S. and European regulatory filings as well as providing proxy materials to company shareholders in connection with the special meeting to approve the merger on April 27, 2005. If approved by Guidant shareholders, the transaction will remain subject to receipt of regulatory approvals as well as other customary closing conditions. As expected, the company anticipates entering the second phase of European Commission review of the transaction this week. As previously announced, Johnson & Johnson and the company received a request for additional information (second request) from the Federal Trade Commission on February 18, 2005 and are in the process of responding.

The announced acquisition price of $76 per share reflects $30.40 in cash and $45.60 in Johnson & Johnson common stock per share, provided the volume weighted average trading price of Johnson & Johnson common stock price is between $55.45 and $67.09 during the 15-day trading period ending three days prior to the transaction closing. Outside this range, each Guidant share exchanged will be converted into a fixed number of shares of Johnson & Johnson common stock equal to .8224 shares (at $55.45 or below) or .6797 shares (at $67.09 or above), plus $30.40 in cash. On April 20, the closing price for common shares of Johnson & Johnson was $68.10.

120. Subsequent to this, at a special shareholder meeting held April 27, 2005, Guidant's shareholders overwhelmingly approved the sale to J&J at $76 per share. The April 21, 2005 press release and subsequent disclosures made at the special shareholder meeting of April 27, 2005, were false and misleading for at least the following reasons. First, Defendants, particularly Defendant Dollens knew or consciously and recklessly disregarded the fact that the Company's defibrillator and pacemaker medical device product lines presented significant liability issues, given past and ongoing unaddressed issues related to substantial life-threatening defects related to the design and manufacture of these devices. Dollens already knew that his expectation of "strong growth in the

implantable defibrillator market supported by expanded Medicare reimbursement" did not factor in the inevitable and extraordinary product recall costs associated with the defective devices.

121. In making his statements of April 21, 2005, Dollens knew or consciously disregarded the fact that the defective nature of Ventak Prizm defibrillators was difficult to characterize and observe. As such, the defective nature of the Ventak Prizm defibrillators was easy to conceal from the medical community, patients and the investment community. Moreover, those patients implanted with the Company's defective medical devices were unlikely to attribute any temporary physical disablement to device malfunction.

122. Specifically, in the Company's disclosures of March 25, 2005, March 29, 2005, April 21, 2005 and April 27, 2005, Defendants knowingly or consciously and recklessly misrepresented and omitted to disclose material adverse information necessary to make the positive statements in the Company's SEC filing not misleading, including that Defendant Dollens knowingly omitted to disclose that:

(a) certain of Guidant's ICD and pacemaker devices had manufacturing defects, including defective ICD and pacemaker devices produced prior to April 2002;

(b) thousands of these defective devices were nevertheless placed into inventory and sold to unsuspecting healthcare providers and patients;

(c) patients with Guidant's defective ICD and pacemaker devices were experiencing serious and life threatening health problems resulting from manufacturing defects in the Company's devices;

(d) revenue from ICD and pacemaker devices would be significantly impacted when disclosure of known defects were revealed by Guidant; and

(e) ICD and pacemaker defects would constitute a "material adverse effect" that could severely undermine the $24.5 billion merger agreement between Guidant and J&J; and

(f) the Company was aware of at least one death that was cause by a defective ICD device.

123. Defendants then quietly met with Dr. Maron on May 7, 2005 and again on May 12, 2005, to put on their "dog and pony show", to argue that it would "cause more harm than goodby publicizing the issue". So egregious was Guidant's callous disregard of Oukrop's tragic death and the life-threatening risks facing other patients implanted with thousands of Guidants' defective ICD devices that Dr. Maron would later be called upon to testify about the details before Congress. In the meantime, from May 10, 2005 and through May 23, 2005, defendants Spaulding and Lorell together sold 54,164 shares of their Guidant stock, for combined proceeds of $3.9 million. As a result of her transactions, Lorell suspiciously liquidated virtually all of her holdings of Guidant stock as of May 23, 2005.

124. Defendants knowingly and intentionally disregarded their obligations under both the Plea Agreement and the federal securities laws, to protect Guidant's patients from a catastrophic defect in the Company's ICD devices, and to disclose this material non-public information to healthcare providers, patients, investors and J&J. Defendants were motivated to do so because of the impending merger with J&J – a $25.4 billion deal – and a desire to increase the value of their own holdings of Guidant stock.

**The Scheme Begins To Unravel**

125. On May 24, 2005, the New York Times published an article entitled, "Maker of Heart Device Kept Flaw From Doctors". The news article stated in part:

> A medical device maker, the Guidant Corporation, did not tell doctors or patients for three years that a unit implanted in an estimated 24,000 people that is designed to shock a faltering heart contains a flaw that has caused a small number of those units to short-circuit and malfunction.
>
> The matter has come to light after the death of a 21-year-old college student from Minnesota, Joshua Oukrop, with a genetic heart disease. Guidant acknowledges that his device, known as a defibrillator, short-circuited. The young man was in Moab, Utah, on a spring break bicycling trip in March with his girlfriend when he complained of fatigue. He then fell to the ground and died of cardiac arrest.
>
> Guidant subsequently told his doctors that it was aware of 25 other cases in which the defibrillator, a Ventak Prizm 2 Model 1861, had been affected by the same flaw. Guidant said it had changed its manufacturing processes three years ago to fix the problem. The physicians say that had they known earlier, they would have replaced the unit in their patient because he was at high risk of sudden death. His death is the only one known.
>
> A defibrillator is surgically implanted in the chest under the skin. It sends out an electrical charge to try to shock a chaotically beating heart back into normal rhythm.
>
> In interviews in recent days, a top Guidant executive, Dr. Joseph M. Smith, said that the company had not seen a compelling reason to issue an alert to physicians about the defibrillators because the failure rate was very low and replacing the devices might pose greater patient risks.
>
> But late yesterday, when told that The New York Times was preparing an article about the device, the company issued an advisory to doctors about it. Guidant is recommending that the unit not be replaced because of the electrical problem.
>
> The episode highlights an important issue: Doctors and patients are not always told when a medical device maker has data indicating that its product has a flaw that, while rare, poses potential dangers. Also, companies are not required to report immediately all safety modifications to the Food and Drug Administration.
>
> In February another defibrillator maker, Medtronic Inc., notified doctors that the battery used in one of its models was draining far faster than expected. At that time, the company had received nine reports among 87,000 affected units, an incidence of failure of 0.01 percent, which is lower than the figure for the affected Guidant defibrillators, which is 0.07 percent, based on 37,000 units manufactured before the modification. The

Medtronic devices have not been associated with a death or an injury. However, in its advisory to doctors, Medtronic said its testing indicated that the problem could worsen over time and affect 0.2 percent to 1.5 percent of its units. The Guidant problem, Dr. Smith said, has remained constant over time.

One cardiologist said that Medtronic officials told him that physicians had replaced over 11,000 of the devices; a company spokeswoman said the company planned to release data today.

Dr. William H. Maisel, who has studied how doctors respond to device alerts, said that companies considering an alert face competing concerns over the cost of replacement versus harm to their reputations. As a result, Dr. Maisel, a cardiologist at Brigham and Women's Hospital in Boston, said there was the potential for a "huge conflict of interest."

The Guidant executive, Dr. Smith, who is the chief medical officer of Guidant's cardiac rhythm management division, rejected any suggestion that financial or liability concerns had influenced the company's decision.

He said that the Model 1861 was among the most reliable defibrillators available, adding that Guidant believed that it would cause more harm than good by publicizing the issue because replacement defibrillators might not perform as well and because surgery also posed risks. While fatalities during defibrillator implantation are extremely rare, the procedure poses an infection rate of about 1 percent.

"We choose to extraordinarily communicate when we have a product that does not live up to our expectations," Dr. Smith said. He added that issues that could improve patient outcomes would also warrant an alert to doctors. "In this case, neither condition was met," he said.

Guidant, which is based in Indianapolis, is one of the largest makers of medical devices, with $3.8 billion in sales last year, almost half of that coming from implantable defibrillators. In December, Johnson & Johnson announced it planned to buy Guidant in a deal worth $25.4 billion.

Defibrillators need to be replaced every five or six years because their batteries drain.

Implanted defibrillators are among the fastest-growing group of medical devices; this year alone, more than 200,000 patients are expected to get one. In 2001, Vice President Dick Cheney received one made by Medtronic. A defibrillator can cost up to $25,000 and hospital and doctor costs can run another $15,000.

In interviews, doctors in Minnesota who treated Joshua Oukrop said they were angered by Guidant's decision not to notify physicians because they said the company had received enough reports about the flaw to establish a pattern and because high-risk patients could suffer potentially catastrophic results.

Dr. Barry J. Maron of Abbott Northwestern Hospital in Minneapolis said that Dr. Smith was simply using numbers to support his stance.

"It is a statistical argument that has little to do with real people," Dr. Maron said. He also said that the numbers reported to Guidant might understate the situation because product problems could go undetected or might not be reported.

The short circuit can occur when the device builds a charge to deliver the type of high-energy shock needed in emergency situations. In three cases, when doctors intentionally induced abnormal heart rhythms during routine checkups, the Guidant device failed to work, forcing doctors to rescue those patients by jolting them with the type of external defibrillator used in emergency rooms.

All the electrical malfunctions involving the particular model occurred in units produced during a two-year period before mid-2002, when the company fixed the flaw. The problem has not happened in any devices made since.

F.D.A. regulations permit companies to inform the agency in two different ways about a manufacturing modification to improve safety, either while the company is making it or later, when a device maker files its annual report with the agency.

A Guidant spokeswoman, Annette Ruzicka, said that it reported the November 2002 change as part of an annual report submitted to the F.D.A. in August 2003.

As reports of individual problems came in, Guidant filed them with the F.D.A.

Dr. Robert G. Hauser, also of Abbott Northwestern Hospital in Minneapolis, said he recently started alerting cardiologists about the Guidant unit through a database he maintains that collects data about defibrillator and pacemaker failures.

He and Dr. Maron have also submitted an article about their patient's case to a medical journal. One of those contacted, Dr. David S. Cannom, who sits on Guidant's board of outside medical advisers, said in an interview that he believed that doctors should have all the facts.

He said that while risks posed by the device were small enough to argue against replacement in many patients, that calculus could shift substantially for high-risk ones.

"At the end of the day, you have to come down on the side of full disclosure," said Dr. Cannom, the director of cardiology at Good Samaritan Hospital in Los Angeles.

Over all, implanted defibrillators have a good record of reliability and are credited with saving countless lives, but the Minnesota case appears to illustrate the consequences that can result when company

officials decide not to directly alert doctors to a problem, even for reasons that they believe are justified. Joshua Oukrop suffered from a relatively common genetic disease, hypertrophic cardiomyopathy, which can cause abrupt cardiac arrest.

One of his doctors, Dr. Maron, is an expert on the condition and a leading proponent of using implanted defibrillators to reduce deaths caused by the disease. Dr. Hauser, who was also involved in the young man's treatment, is a former chief executive of Cardiac Pacemakers Inc., one of five companies that was spun off by Eli Lilly in 1994 to form Guidant.

Joshua's father, Lee Oukrop, said that when his son was 17, he began fainting and falling down at marching band practice or while playing softball. The heart disease had previously been diagnosed in an older son, Jacob, so Mr. Oukrop took Joshua to see Dr. Maron in 2001. The physician determined that the teenager's condition was severe, and an implant was soon performed.

Mr. Oukrop, a millwright who lives in Grand Rapids, Minn., a small town about 80 miles west of Duluth, said that Dr. Maron had said "that this was the fix and that Josh could live with this."

For over three years, Mr. Oukrop said, his son's life was normal. He attended college, where he was studying to be a teacher, and was an outdoor enthusiast who hiked, snowboarded and bicycled. Like other defibrillator users, he saw his doctors every three months so they could check the device.

When Guidant inspected the device after Joshua's death, it found that the unit had short-circuited when it was charging up. Because the short circuit also destroyed the device's memory, it is not possible to know whether the failure occurred while Joshua Oukrop was in cardiac arrest or at some other point.

"There was evidence of a device malfunction," said Dr. Smith, the Guidant executive.

After hearing a presentation a few weeks ago by Dr. Smith about the device, Dr. Maron, the genetic heart disease expert, said he asked what Guidant planned to tell doctors. "The answer was nothing," Dr. Maron said.

Dr. Smith, the Guidant executive, said the overall reliability rate of the Prizm 2 model exceeded company specifications both before and after the wiring fix.

So far, Dr. Maron and Dr. Hauser have notified dozens of their patients who got the Guidant unit to discuss possibly replacing it.

Dr. Maron said that now that the physicians were aware of the problem they had to consider, besides patient safety, their own responsibilities and potential liability.

> Last week, Lee Oukrop, who has the same genetic heart disease as his sons and had the same Guidant device as Joshua, underwent a replacement procedure. He also said he was likely to hire a lawyer soon.
>
> 'Whoever made this decision at Guidant, I pray he doesn't have a son who this happens to," Mr. Oukrop said.

126. The May 24, 2005 press release provided investors with a partial indication of the potential threats to the deal Guidant had with J&J, based on the previously undisclosed defects associated with the Company's Ventak Prizm defibrillators. The news story had arguably painted Guidant as having caused the death of Joshua Oukrop, a 21-year-old college student from Minnesota.

127. However, the news ***story had hardly placed a dent in the Company's stock price,*** since it stated that Guidant had told the Times that FDA was well-informed of the issues and had justified its unwillingness to share its product defect knowledge with the medical community. Moreover, the article failed to provide hard numbers or facts regarding the nature or extent of defective nature of Defendants' defective defibrillator products. Without this information, ***investors were unable to comprehend the significance and extent of Defendants' concealment or to make an informed judgment, regarding the potential financial impact of the serious and alarming safety issues that resulted from the defective nature of the Company's defibrillator products.***

128. On June 17, 2005, the FDA issued a press release entitled, "FDA Issues Nationwide Notification of Recall of Certain Guidant Implantable Defibrillators and Cardiac Resynchronization Therapy Defibrillators". The press release stated in part:

> FDA is notifying health care providers and patients that the Guidant Corporation is recalling certain of its implantable defibrillators and cardiac resynchronization therapy defibrillators. These devices can develop an internal short circuit without warning, resulting in failure to deliver a shock when needed.
>
> The devices affected by this notification are:
>
> PRIZM 2 DR, Model 1861, manufactured on or before April 16, 2002

CONTAK RENEWAL, Model H135, manufactured on or before August 26, 2004

CONTAK RENEWAL 2, Model H155, manufactured on or before August 26, 2004

The devices are surgically implanted in persons who have a type of heart disease that creates the risk of a life-threatening heart arrhythmia (abnormal rhythm). The devices deliver an electrical shock to the heart to restore normal heart rhythm. The PRIZM 2 and RENEWAL devices are subject to different failures, resulting in the devices' inability to deliver an electrical shock during episodes of arrhythmia -- which could lead to a serious, life-threatening event for a patient. There have been two deaths reported to FDA suspected to be associated with this malfunction.

"FDA's first priority is patient safety," said Daniel Schultz, MD, Director of FDA's Center for Devices and Radiological Health. "We want to ensure that all patients who may be affected by this problem are notified and seek appropriate medical advice from their physicians."

FDA is not making a recommendation on whether individual patients who have one of the Guidant devices should have it removed and replaced. This is a decision that should be made by a patient in consultation with his or her physician, based on the specific medical situation of the patient. Removal and replacement of the device may pose some risk, so it is important that patients and physicians carefully discuss this matter before making a decision.

FDA advises patients to take the following steps:

If you have not already been notified, contact your doctor to determine if you have an affected PRIZM 2, CONTAK RENEWAL, or CONTAK RENEWAL 2 device.

Continue to keep your regular doctor appointments.

If you feel an electrical shock from your device, immediately contact your doctor.

If there is an audible "beeping" from your CONTAK RENEWAL or RENEWAL 2 device, immediately contact your doctor or go to the nearest emergency room. Beeping may mean that your defibrillator is damaged.

Guidant also recently informed FDA that it is recalling another set of defibrillator devices called PRIZM AVT, VITALITY AVT, RENEWAL 3 AVT and RENEWAL 4 AVT. The company has said the devices are subject to a memory error, which may affect device performance. Currently, FDA is evaluating this information.

If you are a physician or a patient who has experienced a problem with any of these defibrillators, please send a report to FDA's MedWatch program and to Guidant. See http://www.fda.gov/medwatch/ for filing information or call 1-800-FDA-1088 (1-800-332-1088).

> Guidant will be posting information for physicians on its web site at www.guidant.com. If you have further questions, you may contact Guidant at 1-866-GUIDANT (1-866-484-3268).

129. The June 17, 2005 FDA recall announcement came nearly three weeks after the news of the troubling death of Joshua Oukrop, as reported in the Times article of May 24, 2005. On this news, the Company's shares ***fell $3.36, losing 4.5% percent of their value over the two trading days following the FDA recall, closing at $70.33, on a combined volume of over 25 million shares.*** As a result, Guidant investors lost over $1.09 billion in the value of their shares as a result of the announcement of the FDA recall. Guidant's stock price, however, still remained inflated.

130. Following the close of the markets on June 20, 2004, Reuters published a news article entitled, "J&J unlikely to drop out of Guidant deal--sources". The article, which pointed to the potential for renegotiation of the Guidant deal, as well as defibrillator recall costs, estimated from well under $100 million to as much as $225 million, stated in part:

> CHICAGO, June 20 (Reuters) - Johnson & Johnson (JNJ.N: Quote, Profile, Research) is evaluating all of its options in the planned acquisition of cardiovascular device maker Guidant Corp. (GDT.N: Quote, Profile, Research) but is unlikely to walk away from the $25.4 billion deal, sources familiar with the situation said Monday.
>
> ***
>
> Johnson & Johnson could require Guidant to set aside some funds to cover costs associated with the recall, the sources, who asked not to be named, told Reuters.
>
> J&J could also decide to renegotiate the price of the deal, but at the moment, the financial impact of the recall appears manageable, the sources said.
>
> ***
>
> Lazard Capital Markets analyst Alexander Arrow cut his investment rating on Guidant to "sell" from "hold" on Monday, saying J&J may opt to renegotiate the acquisition price for Guidant. He estimated the cost for Guidant to replace all of the recalled devices at $225 million.

> However, several Wall Street analysts and investors on Monday said they did not expect the recall to derail the deal with J&J, noting device recalls are an inevitable part of the landscape in the medical technology industry.
>
> "These are life-saving devices. They function well 99 percent of the time," said one portfolio manager who asked not to be named.
>
> Eli Kammerman, an analyst with independent research firm Cathay Financial, estimated the financial impact of the recall to Guidant at "well under $100 million," assuming that fewer than 30 percent of patients who have received the Guidant defibrillators request new devices.
>
> "Guidant has more than sufficient cash on hand to fund those expenses," Kammerman said.
>
> ***

131. On July 18, 2005, the FDA published a "Recall - Firm Press Release" on its website, that now revealed the Company's knowledge of pacemaker-related defects. The FDA press release stated in part:

> Recall -- Firm Press Release
>
> FDA posts press releases and other notices of recalls and market withdrawals from the firms involved as a service to consumers, the media, and other interested parties. FDA does not endorse either the product or the company.
>
> Guidant Initiates Worldwide Physician Communications Regarding Important Safety Information and Corrective Action about Certain Pacemakers
>
> Contact:
>
> Steven Tragash
>
> 317-971-2031
>
> FOR IMMEDIATE RELEASE -- Indianapolis, IN -- July 18, 2005 -- Guidant Corporation (NYSE:GDT) said today it is voluntarily advising physicians about important safety information regarding certain devices. Guidant apprised FDA of this action, and FDA may classify this action as a recall. This communication advises physicians and their patients of safety information and is intended to limit adverse events. Physicians should use this information to decide how best to treat their patients.
>
> A subset of the following devices manufactured between November 25, 1997 and October 26, 2000 are impacted:
>
> PULSAR(R) MAX

PULSAR

DISCOVERY(R)

MERIDIAN(R)

PULSAR MAX II

DISCOVERY II

VIRTUS PLUS(R) II

INTELIS II

CONTAK(R) TR

These products, which are of an earlier generation design, have not been sold or implanted for the last four years.

Guidant has determined that a hermetic sealing component used in the subset of devices listed above may experience a gradual degradation, resulting in a higher than normal moisture content within the pacemaker case late in the device's service life.

As of July 11, 2005, Guidant has identified sixty-nine (69) devices that may have exhibited this failure mode from approximately 78,000 devices distributed with this component. While no failures have been reported prior to 44 months of service, the likelihood of occurrence increases with implant time. Guidant's modeling based on field experience and statistical life-table analysis predicts the rate of failure in the remaining active implanted devices to be between 0.17% and 0.51% over the remaining device lifetime. Of the 78,000 devices originally distributed, approximately 28,000 devices remain implanted worldwide; 18,000 of these devices remain in service in the United States with an average implant age of 69 months.

It is Guidant's recommendation to physicians that they consider the unique needs of individual patients and the specific technical recommendations set forth in Guidant's physician communication, dated July 18, 2005. In addition, Guidant recommends that physicians consider replacing devices for pacemaker-dependent patients. In addition, Guidant advises patients to seek medical attention immediately if they notice shortness of breath, dizziness, lightheadedness or a prolonged fast heart rate.

The clinical behaviors associated with this failure mode can result in serious health complications. Guidant has confirmed twenty reports of loss of pacing output associated with this failure mode, including five patients experiencing syncope. Loss of pacing output has also been associated with reports of presyncope requiring hospitalization. Additionally, Guidant has received two reports of sustained Maximum Sensor Rate ("MSR") pacing in which heart failure may have developed in association with sustained high rate pacing. In one report, a patient whose device exhibited sustained MSR pacing was admitted to the hospital with multiple health issues and later died. It is unknown if this device experienced the failure described

above as the device was not returned and this failure mode could not be confirmed.

Many of these devices are nearing or have exceeded their estimated longevity and have thus outlived their warranty. Guidant will provide a replacement device at no charge for pacemaker-dependent patients and other patients deemed by their physicians to be best served by replacement, provided the replacement occurs prior to the normal appearance of elective replacement indicators. This supplemental warranty program is available through December 31, 2005. Additionally, Guidant will reimburse patients up to $2,500 for medical expenses remaining after Medicare and/or health insurance coverage, including device replacement or additional follow-up procedures.

"The health and safety of patients is paramount," stated Ronald W. Dollens, president and CEO, Guidant Corporation. "Our innovative technologies have saved and improved millions of lives. Guidant works diligently to create the most reliable products and services, enhance patient outcomes, and limit adverse events to patients."

The actions taken by the company over the last several weeks reflect our commitment to provide more timely information to physicians and patients about our devices. Guidant has worked closely with FDA since the announcement of the physician communications, and has made FDA aware of all Guidant statements set forth in prior press releases, physician communications, and patient letters on this matter. Guidant will continue to work to meet and exceed the expectations of physicians, patients and FDA.

Guidant recently announced its intention to establish an independent panel of experts to recommend guidelines for when to disseminate information to physicians and patients about life-sustaining implantable devices. Guidant plans to cooperate with and enlist the support of other interested parties.

Additional information about this potential issue is available for physicians and patients at 1-866-GUIDANT (1-866-484-3268) (24/7) and http://www.guidant.com/physician_communications/PDM.pdf.

####

132. In the recall publication, Guidant warned physicians and patients to seek replacement of at least nine different cardiac pacemaker models and product lines. Guidant identified its PULSAR® MAX, PULSAR, DISCOVERY®, MERIDIAN®, PULSAR MAX II, DISCOVERY II, VIRTUS PLUS® II, INTELIS II and CONTAK® TR pacemakers as potentially impacted by one or more of the identified defects. Noting that as many as ***78,000*** pacemaker devices were affected, Guidant recommended that

physicians consider pacemaker replacement and advised patients to seek medical attention immediately if they notice shortness of breath, dizziness, lightheadedness or a prolonged fast heart rate.

133. On this subsequent and shocking news revealing the defective nature of a number of Guidant pacemaker models and product lines, the Company's shares ***fell another $2.10, losing 3.0% percent of their value, closing on July 18, 2005 at $67.31, on volume of over 7 million shares.***

134. Notably, on July 18, 2005 – ***the same day as the pacemaker recall*** – and while in a position to know how the events of the day might adversely impact merger prospects and the value of his own personal holdings of the stock, on July 18, 2005, defendant Cornelius ***dumped 450,000 shares of his Guidant stock, for proceeds of $30.5 million.*** This enormous stock sale in a single day – on the same day Guidant's pacemakers were recalled – is highly suspicious both as to timing and amount. Indeed, the amount of Cornelius's sales was also dramatic as it represented ***113%*** of the amount of stock sold by Cornelius over the ***past two years combined***.

135. Nevertheless, Defendants sought opportunities to convince the investment community that Guidant had properly and responsibly addressed issues with its defective ICD's and that the merger would occur as expected. In an audacious effort to mitigate patient and investor concerns about its products and the merger deal, the Company saw fit to quiet those concerns, ***by dismissing the Company's failure to recall its products and to praise its own quality-control process.*** On July 27, 2005, Defendant McCoy made the following remarks in an interview published in the Minneapolis Star Tribune. The publication stated in part:

> Here's an edited transcript of an interview with Fred McCoy, president of Guidant's Cardiac Rhythm Management division in Arden

Hills, in his first media interview after a spate of heart device recalls in recent weeks.

Star Tribune: How did Guidant get to this point?

McCoy: Let's step back and make the simple observation that the benefits associated with the therapies we provide are extraordinary. We know through the progress of time and clinical science tens of thousands of people are alive today and hundreds of thousands of people feel better because of these therapies. With all of those benefits there are also some issues. One of those issues is that these are little machines, and they're not perfect. And their imperfections are something that we've always had to deal with, and continue to deal with.

The way that we do that is that we have a well-developed quality system and culture of continuous improvement. We try to make the product today better than the product we made yesterday. We try to make the next-generation of product better than the previous generation.

The results have been striking -- very high and rising reliability. Today defibrillators and pacemakers aspire to 99 percent reliability over the course of several years.

When you think how hostile the [body's] environment is [to an implanted device], how specialized this technology is, how important the clinical outcomes are, it's a strikingly high achievement in reliability. And yet, the imperfections remain. The vexing problem has been, is, and will be, what to do with the imperfections. We have a well-developed quality system, we have a dedicated group of engineers, scientists, who relentlessly pursue perfection and relentlessly pursue continuous improvement.

Through all this one of the questions among reasonable people is, "How much information should flow between the companies and physicians and patients about the performance of these products?" Another perfectly valid question is, "When should this information flow?" And then, the biggest question is, "At what point should companies notify physicians about imperfections that may be known to exist in the products?"

If there's anything we've learned from the current situation it's that physicians have a larger appetite for information about product performance, and as a result, we are working with outside experts, with physicians as part of an independent panel, with the Heart Rhythm Society, which is the physician society of electrophysiologists, with the FDA, and regulatory agencies around the world, trying to adapt to a fundamental change in our environment. Which is: People wish to know more, so we will provide more quality performance information in greater quantity and with greater frequency. Plain and simple.

Is that why the company has issued a barrage of press releases about problems with products over the past six weeks?

Actually not. Our quality system has identified these issues, we would describe that as a consistent course of conduct. It is the case that we've had a flurry of product imperfections show up, but if you look across a reasonable sweep of time you would see that the number of field notifications that we've made does not stand out from the crowd.

So how much information should flow between companies and physicians and patients regarding devices that may malfunction? At what statistical level of failure do you go public?

We very actively accumulate observations about our product performance. We open the funnel very wide so that we can hear the observations of physicians, patients, our field sales organizations and any other mechanisms that we have to understand our product performance. Then we very actively follow up on those observations. Some of these are reported via the FDA process called Medical Device Reports.

So, in a sense, there is a lot of information in the public realm about the performance of our products because each of these MDRs are fairly exhaustive as to the situation with regard to the device, with regard to the patient and the outcome. But many would make the observation that that's insufficient, because people are interested in knowing some additional things, as well, such as how do you accumulate these various observations about product performance and then what you might say about that product performance that is significant? Which gets into the area of physician communication. The threshold that we use for physician communication about product performance is that if either one of two conditions are met, we go to physician communication.

The first is if the product is performing outside the pre-established reliability expectations. The second is if we are able to identify a solution or recommendation that will improve patient outcomes or reduce adverse events. Then we communicate, and send a Dear Doctor physician letter, we offer a press release and we very accountably and fully notify physicians and patients about the need for them to do something different to improve patient outcomes.

People are interested in having even more information than that. It's apparent that people want increasing quantity and frequency of product performance information such as the information that we look at to assess product performance as a part of our quality system.

Did this level of interest take you by surprise? Were there indications before the recent situation that indicated people may want more information?

This does actually represent a change.

Are your competitors, Medtronic and St. Jude Medical, going to react with the same level of disclosure?

Each of the companies involved in Cardiac Rhythm Management plans to actively participate with the Heart Rhythm Society to evaluate

this area and work together, with the FDA, to identify new methodology and new communications vectors for getting this information out.

How would you determine how much information is appropriate? Some doctors say they don't want too much information, just reliable information, others want more.

It's something that we're going to have very purposely design so that the information is at once useful, illuminating and at the same time not overly burdensome.

***Isn't there the danger of a conflict of interest if the manufacturer determines what information is released, and how much? You not only have an obligation to patients, but you have an obligation to shareholders, as well.***

***I believe very strongly that a company like Guidant can be entrusted if we establish standards together as to the information about product performance, the desire to have in the public realm, we can faithfully execute against those standards.***

Work together with whom?

With doctors, with physician societies, certainly with regulatory agencies.

What has the FDA's role been in all of this? Shouldn't it be the FDA's role to invoke and enforce these standards?

The FDA's oversight is rigorous, is thorough and is frequent. We work with the FDA in a week-in, week-out basis. However, as it relates to product performance regulation, I think the FDA is interested in physician societies and industry providing some leadership and is interested in participating with us in that process.

***How does your quality process work?***

***The quality process begins with culture. At this company the quality culture is absolutely apparent. We have a pledge that we all sign, "Quality is essential; lives depend on us. We pledge together to build the most reliable products and services. I work every day to drive quality into everything that is Guidant."***

***You will find it on our wall. I do not need to read it. So people get it here, that quality is essential and that lives do depend on us. Then you rely on a terrific process. The process means you define your quality system in a way that is rigorous that is thorough and that is connected. We have eight key processes in our quality system, each of which has process under it. We have a legion of people who are tasked to assure that Guidant products and services are of the highest quality.***

***Then it does come the people. Are the people capable? Are the people of high character? Can they be trusted? The people of this organization are of exceptional capability. A little over a third of the***

***people here are either an engineer, a scientist, have a master's [degree] in their chosen field, a doctor or a nurse.***

***These are caring people. They're our neighbors. They're incredibly capable.***

But how does the quality process actually work then? How do you monitor quality in the field?

As I mentioned, the quality system has eight key processes. Those processes among other things do track field performance of our products, that is, the performance of our products performing their intended function. We get observations about that performance, we receive returned products, we evaluate returned products from an engineering standpoint. We effectively classify observations about product performance and look for similarities in product performance or product non-performance. Those similarities allow us to make judgments about how the products can improve and we use that, among other things, to drive continuous improvement.

Isn't it true that you constantly make changes to products? At what point do you report that to doctors, the FDA and the public?

There are specific rules associated with that, that our regulatory experts in-house understand and various mechanisms by which that is reported. We try to do a very good job of that administration.

It is a concept of continuous improvement, and this is very much in society's best interest. These devices are expected to perform at incredibly high reliability. We need to be fully informed with as much information as we can gather to make them better. That spirit of continuous improvement commands us to make changes that we believe are going to add to the quality of our products and the reliability of our products.

What is the company doing to restore the confidence of doctors and patients?

Part of that is this discussion today. It's time for us to begin having a discussion about the issues of the day. This is a company of startlingly high reliability, of high values and high character and it's appropriate for us to begin speaking about the therapy, about Guidant's place in delivering that therapy, and the honor of the company.

On the pacemaker recall, it appears as though some models of pacemaker had been recalled previously, for different reasons. Do you communicate problems as they arise, or wait until a whole myriad of problems surface?

We would never ship a defective device. We will always communicate that which needs to be communicated. It is the case that we had had a recall on this set of pacemakers back in the late 1990s. This particular problem that we just notified on, is an extraordinary testimony to our quality system and to the engineers who developed it. Do you

realize that in less than 69 failures in a total field of 468,000 [implants] they were able to find and identify that problem?

How can you assure that your suppliers have high quality standards?

Guidant rigorously evaluates our supplier quality during our product development and manufacturing processes. This evaluation includes supplier/component qualification as part of new product testing and evaluation process, ongoing component lot acceptance evaluation, and ongoing audits of our suppliers' quality systems. In addition, during our manufacturing process, our devices (and the components in them) get electrically tested and inspected many times at different stages of assembly.

Components purchased from third parties were a factor in some of our recent physician communications. Guidant is, however, accountable for the performance of our devices, not any third party.

***If you could do it over again, would you have issued a Dear Doctor letter back in 2002 on the Ventak Prizm 2 DR implantable defibrillator when you made the switch in the manufacturing process to remedy the problem?***

***With what information? There was precious little information in 2002 about the actual performance of these devices. It was because of tremendous accounting by our technicians and engineers that were able to take a product that was performing exceptionally well and make it even better. It is only with the benefit of hindsight that you can now look back at 2002 and ask the questions: "Should we have notified? Should we have stopped distribution?" And the answers to those questions in 2002 was "No" and "No." The information did not exist, the engineers very faithfully performed their duties and their actions are honorable.***

***What about notifying doctors that you fixed a flaw, was that worthy of notification?***

***We would not represent it that way. We were trying to take a very high-performing product and make it even better. Please understand that the Prizm 2 DR is the most reliable defibrillator we've ever made.***

How does it compare to others in the industry?

It is among the very finest.

But how do you measure that?

We measure that by looking at total device survival over a period of time and in the case of Prizm 2 DR at 36 months, that percentage was 98.86 percent.

So you wouldn't have done anything differently.

You have to use the information that was available at the time to ask the question and to answer the question.

How do you react to the criticism that you failed to notify doctors about this device -- or any other device that has been subject to recent action?

Low-level imperfections are a physics and engineering fact of the work that we do. Reasonable people can disagree about when the appropriate moment is to communicate and I think it is highly appropriate for Guidant to engage with physicians, the physician societies, the FDA, to develop a road map for a future that will put more information in the public domain. We are perfectly willing to do that.

Why hasn't that happened sooner?

I think that's an interesting question. Perhaps it's because [the industry] has gone from small to large. Perhaps it's because defibrillators have gone from niche therapy to mainstream therapy. Perhaps it's because the number of people who have access to the therapy has dramatically increased as a result of the progress of clinical science and the affirmation of that with clarity of payment which has all flowed in the last two years.

But for all of those reasons, there is an appetite for more information and clearly we are willing to provide that.

. . .We can provide more information about product performance that is short of communication with physicians about the change recommendation in change therapy. We provide that on our Web site, but the question is can provide even more? For example, we provide it on annual basis -- it's quite likely we can provide it on a quarterly basis.

We could also provide more granularity of information about product performance, and that would give people the general information necessary to assess overall reliability even as we struggle with these infrequent imperfections that are a physics and engineering factor in the product line.

***Do you think that doctors adequately communicate to patients the fact that devices may fail?***

Certainly most physicians do talk with patients about the full breadth of therapy. But I think it's clear today -- in July of 2005 -- after our recent experiences, that everyone understands that device therapy has tremendous benefits ***but that there are some attendent risks that need to be discussed and understood.***

With the recent controversy, do you think patients are more aware or ask what type of devices they are receiving?

Yes. People are very involved with their therapy, and the family members are very involved. . . .This therapy saves lives, it makes people feel better, the more people know about it, the higher the adoption can occur. We do have to point out that there is tremendous underutilization of

this therapy. We would represent that only about 20 percent of the people that deserve to have access to defibrillator therapy in the United States have defibrillator therapy today.

Do you think that people will be less likely to ask for a Guidant device, given the recent controversy, and opt for a device from one of your competitors?

That will ebb and flow, of course, as that which is in the public realm ebbs and flows. I do not believe that Guidant has taken a long-term reputational hit. Truth is, we make products of very high reliability that our people are of high character, that our process is strong, and that our engineering is sound.

Those central truths will eventually, of course, play out with people understanding that Guidant is an excellent choice.

***What do you have to say about Sen. Grassley's request for company documents and the fact that these issues may become a topic of discussion before the Senate Finance Committee?***

***We can't speak for Congress. Guidant is an open book. We'll follow that process wherever it leads, it's certainly not something we're concerned about.***

How has the past six weeks played out in the workplace? Is there a morale problem at Guidant?

Our people are tough. Our people are strong. And our people believe they're doing the right thing.

***Shouldn't you have come forward sooner to address the controversy?***

***I don't think so. I think this is the appropriate time for a number of different reasons. And I believe our people have been very patient in waiting for the company to begin talking about the great work that we do here and the great people who do it.***

***Did you hold back because of the impending Johnson & Johnson deal?***

***No.***

***Is that still scheduled for the third-quarter? This is, after all, the third quarter.***

***If one would listen to the Johnson & Johnson call that took place last week and if one would read our press release, the representations are the end of the third quarter and as a result of that, that is my expectation and belief.***

136. In his position as a spokesman for the Company, and intimately aware of all of the issues under consideration, Defendant McCoy sought to represent to investors that the original deal between the Company and J&J ***could go forward.*** Defendant McCoy's statements were false and misleading, both in the sense that he was well aware of how his statements were carefully woven about and limited to the ***publicly available*** material information under consideration, as well as the circumstances under which the Company saw to its careful public disclosure of devastating material information of critical importance to the healthcare community and adverse to its deal with J&J – ***in piecemeal fashion.***

137. The nature and timing of Defendant McCoy's assurances served one purpose – to quiet investor concerns, by asserting his "reasonable belief" in the impending J&J deal. Yet, Defendants were fully aware or in conscious and reckless disregard of all of the disclosed and undisclosed issues under consideration by Johnson & Johnson. Taking issue with facts and circumstances already reported in news accounts, McCoy made clear that, "[w]e would not represent it that way." Indeed, Defendant McCoy represented otherwise, that it was unnecessary for Guidant ***to worry about any long-term damage to its reputation,*** or provide any further details of ***"attendant risks"*** of its medical devices to the investment community – ***non-public information material to the merger and dialogue between the Company and Johnson & Johnson.***

138. Then a bomb-shell was unloaded on Guidant investors when, on October 18, 2005, J&J made the shocking announcement that it would seek "alternatives" in its December 2004 merger deal were in earnest, as a direct result of the "developments" at Guidant, stating in part:

> Bob Darretta - Johnson & Johnson - Vice Chairman, CFO, EVP
>
> [L]et me say a few words to address the pending Guidant transaction. We have previously stated that we anticipated FTC clearance in October. And we continue to believe that to be the case. As it relates to the previously announced product recalls at Guidant, ***and the related***

> ***regulatory investigations and other developments,*** we believe that these are serious matters, and we are continuing to closely monitor the situation at Guidant.
>
> ***In light of these matters and their impact, we are continuing to consider the alternatives under our merger agreement.***

***

139. Despite Defendants' assurances regarding their "expectations and beliefs" concerning the original December 2004 merger deal with J&J, investors finally learned the truth. As a result of its ***calculated and confidential assessment,*** occurring over a period of several months, of the extent of the problems and adverse "developments" at Guidant, J&J ***told investors that it lacked an express commitment to the original terms of its merger agreement.*** On this news, the Company's shares plummeted, from $72.38 on October 17, 2005, to $64.10 per share on October 18, 2005, ***an astounding loss of $8.28 or 11.4% per share, closing on volume of over 30 million shares. In all, Guidant investors lost over $3.1 billion in the value of their shares during the period from June 17, 2005 through October 18, 2005.***

140. During the Class Period, Defendants knew and concealed:

(a) certain ICD and pacemaker devices produced prior to the Class Period had manufacturing defects but thousands of the defective devices were nevertheless placed into inventory and sold to unsuspecting healthcare providers and patients;

(b) patients with Guidant's ICD and pacemaker devices were experiencing serious and life threatening health issues as a result of manufacturing defects identified with these devices;

(c) revenue from ICD and pacemaker devices would be significantly impacted when disclosure of known defects were revealed to the public; and

(d) revelations of ICD and pacemaker defects would constitute a "material adverse effect" that could severely effect the $24.5 billion merger agreement between Guidant and J&J.

**POST-CLASS-PERIOD EVENTS**

141. On November 3, 2005, not more than a day after the US Federal Trade Commission announced its conditions to approve the merger deal, the Attorney General of The State of New York filed a lawsuit and complaint, ***alleging "repeated and persistent fraud" by the Company,*** in connection with its defibrillator sales. In the November 3, 2005 press release entitled "MEDICAL DEVICE MAKER SUED FOR HIDING DEFIBRILLATOR DEFECT - Guidant Misled Doctors About Design Flaw that Could Cause the Device to Fail", issued in connection with the announcement of the lawsuit, Eliot Spitzer, the Attorney General of the State of New York commented in part:

> Attorney General Eliot Spitzer today announced a lawsuit against one of the world's leading manufacturers of medical devices for concealing information about a design flaw in a heart defibrillator.
>
> The lawsuit alleges that the Guidant Corporation failed to inform doctors about a mechanical problem that could cause the implanted device to malfunction with potentially fatal consequences.
>
> ***"Concealment of negative facts that might influence a consumer to purchase another manufacturer's product is the essence of fraud," Spitzer said. "We wouldn't permit this type of conduct in connection with the sale of cars or washing machines. It is simply unconscionable that it occurred with a critical medical device."***
>
> The lawsuit filed November 2, 2005 in New York State Supreme Court in Manhattan alleges that the Indianapolis-based company engaged in fraud by failing to disclose to physicians information about a flaw in its implantable cardio defibrillator – the Ventak Prizm 2 DR Model 1861. The device is surgically implanted in the body of a patient at high risk of sudden cardiac death due to an abnormal heart rhythm. The device is supposed to deliver a controlled electric shock to restore normal functioning of the heart muscle. But if the device fails, the normal rhythm may not be restored, the heart may stop and the patient may die.
>
> The lawsuit alleges that in February 2002, Guidant discovered a design flaw that caused some Prizm 1861 models to short out. The lawsuit

> alleges that between April and November of 2002, Guidant made certain engineering changes to correct the flaw. The company, however, continued to sell Prizm 1861 defibrillators in which the design flaw had not been corrected. And for more than three years, Guidant failed to notify doctors of the defect in the older models. In fact, Guidant did not reveal the facts about the Prizm 1861 defibrillator until May 2005, on the day before the information was to be revealed in a news article.
>
> The electrical short has been implicated in at least 28 failures of the Prizm 1861 defibrillator, including one that resulted in the death of a patient.
>
> Through the lawsuit, the attorney general is seeking a court order that will require Guidant to fully disclose to medical professionals relevant design and performance information about its medical devices.
>
> The lawsuit seeks restitution for any patient who wishes to replace a Prizm 1861 defibrillator made before the 2002 manufacturing changes.
>
> The lawsuit also seeks disgorgement of Guidant's profits from the sale of defective Prizm 1861 defibrillators.
>
> In June of this year, Guidant voluntarily recalled Prizm 1861 defibrillators manufactured before April 2002. At the time Guidant issued its recall, approximately 13,900 defibrillators made before the April 2002 were still in use by patients in the U.S.

***

142. Moreover, on October 25, 2005, Guidant received subpoenas from the U.S. Attorney's offices in Boston and Minneapolis seeking information regarding three models of its defibrillators. Then again, on November 3, 2005, the Attorney General of The State of New York filed an action in the N.Y.S. Supreme Court (Manhattan) against Guidant, alleging that it covered up "repeated and persistent fraud" in connection with its defibrillator sales. On January 24, 2006, the U.S. Attorney's office in Minneapolis announced that it had served Guidant with subpoenas to obtain records disclosed in a Texas lawsuit that indicate Guidant knew that some of its heart devices could catastrophically fail.

## DEFENDANTS' CLASS PERIOD STOCK SALES

143. During the Class Period, Defendants sold shares of their Guidant stock, in accordance with the following schedule:

| Date | Defendant | Shares | Price | Proceeds |
|---|---|---|---|---|
| 7/18/2005 | CORNELIUS JAMES M | 285000 | $68.21 | $19,440,876 |
| 7/18/2005 | CORNELIUS JAMES M | 165000 | $67.40 | $11,120,472 |
| 5/23/2005 | LORELL BEVERLY H | 22667 | $74.00 | $1,677,358 |
| 5/17/2005 | LORELL BEVERLY H | 23300 | $73.55 | $1,713,724 |
| 5/10/2005 | SPAULDING RONALD N | 8200 | $73.27 | $600,785 |
| 4/7/2005 | DOLLENS RONALD W | 271404 | $74.38 | $20,187,300 |
| 2/18/2005 | KING J. B. | 248944 | $73.21 | $18,224,170 |
| 2/8/2005 | NEELS GUIDO J | 60000 | $73.02 | $4,381,278 |
| 1/31/2005 | BRAUER KEITH E | 50000 | $72.30 | $3,615,055 |
| 1/31/2005 | MARCHETTI ROGER | 9000 | $72.17 | $649,530 |
| 1/31/2005 | MCCONNELL WILLIAM F JR | 52000 | $72.26 | $3,757,421 |
| 1/31/2005 | SPAULDING RONALD N | 50000 | $72.19 | $3,609,310 |
| | **Totals** | **1245515** | | **$88,977,280** |

## LOSS CAUSATION/ECONOMIC LOSS

144. During the Class Period, as detailed herein, Defendants engaged in a scheme to defraud the market and a course of conduct that artificially inflated Guidant's stock price and operated as a fraud or deceit on purchasers of Guidant stock Class Period by misrepresenting the Company's business success and future business prospects.

145. Defendants achieved this façade of success, growth and strong future business prospects by making blatant misrepresentations about the Company's medical device business and prospects, and omitting to disclose known material facts necessary to make thoses statements not misleading, all the while Guidant was negotiating with J&J its December 2004 merger deal for $25.4 billion.

146. As late as June 17, 2005, when Defendants' scheme involving prior misrepresentations and fraudulent conduct was more fully disclosed and became apparent to the market, Guidant stock fell precipitously. Thereafter, Defendants nevertheless

sought every opportunity to convince investors that the basis for the merger agreement remained and that there were no underlying reasons to expect J&J to reverse course on the merger on the announced terms. Finally, at the end of the Class Period, having taken months to evaluate all of the information it had the right to expect and demand, J&J told investors that it lacked an express commitment to the original terms of its merger agreement. As a result of their purchases of Guidant stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

147. During the Class Period, the Defendants presented a misleading picture of Guidant's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Guidant's medical device business was not as healthy as represented, Defendants caused Guidant to falsely represent the strength of its business, as it presented the $25.4 billion merger deal with J&J to its shareholders. Defendants' false and misleading statements had the intended effect and caused Guidant stock to trade at artificially inflated levels approaching the merger price of $76 per share throughout the Class Period, permitting insiders to sell as much as 601,218 of their own shares, for proceeds of $44.2 million, plus bonuses and other incentive compensation to themselves.

148. On June 17, 2005, Guidant shocked the market with news of the defective nature of its medical device products. Far from full and complete disclosure of the problems facing the Company, investors began to learn that Guidant's actual prospects for its medical device business might be poorer than represented. In the process, investors were placed on a "rollercoaster ride," left to wonder about the scope and severity of the problems facing the Company and whether or not they were substantial

enough to threaten the deal with J&J. Finally, on October 18, 2005, after months of piecemeal revelations by Guidant regarding deaths, defects and malfunctions involving its medical devices, J&J publicly disclosed to investors ***that it lacked an express commitment to original terms of its merger agreement.*** Once the truth became known, which had been obfuscated by Defendants throughout the Class Period, the prior artificial inflation finally came out of Guidant's stock price, damaging investors.

149. As a direct result of Defendants' admissions and the public revelations regarding the truth about Guidant's previous representations and its actual business prospects going forward, Guidant's stock price plummeted almost 11.4%, falling from $72.38 on October 17, 2005, to $64.10 per share on October 18, 2005, an astounding loss of $8.28 or 11.4% per share, on volume of over 30 million shares. ***In all, Guidant investors lost over $3.1 billion in the value of their shares during the period from June 17, 2005 through October 18, 2005.*** The one day drop of 11.4% on October 18, 2005 removed the inflation from Guidant's stock price, causing real economic loss to investors who had purchased the stock during the Class Period. In sum, as the truth about Defendants' fraud and Guidant's business prospects was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and plaintiff and other members of the Class were damaged, suffering economic losses of as much as $8.28 per share. This loss and damage was caused by the Defendants' fraud as outlined in detail in this Consolidated Complaint.

150. The almost 11.4% decline in Guidant's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Guidant's stock price

declines negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. During the same period in which Guidant's stock price fell almost 11.4% as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index was flat. The economic loss, i.e., damages, suffered by plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate Guidant's stock price and the subsequent significant decline in the value of Guidant's stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

## APPLICABILITY OF PRESUMPTION OR RELIANCE: FRAUD ON THE MARKET DOCTRINE

151. At all relevant times, the market for Guidant's stock was an efficient market for the following reasons, among others:

(a) Guidant's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange ("NYSE"), a highly efficient and automated market;

(b) As a regulated issuer, Guidant filed periodic public reports with the SEC and the NYSE;

(c) Guidant regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Guidant was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

(e) As a result of the foregoing, the market for Guidant's stock promptly digested current information regarding Interchange from all publicly available sources and reflected such information in Guidant's stock price. Under these circumstances, all purchasers of Guidant's common stock during the Class Period suffered similar injury through their purchase of Guidant's common stock at artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

152. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Guidant publicly traded securities (the "Class") on the open market during the Class Period. Excluded from the Class are Defendants, the officers and directors of Guidant during the Class Period, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

153. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Guidant had more than 333 million shares of stock outstanding, which Lead

Plaintiffs believe are owned by hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Guidant or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

154. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the Exchange Act was violated by Defendants;

(b) Whether Defendants omitted and/or misrepresented material facts;

(c) Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e) Whether the prices of Guidant's publicly traded securities were artificially inflated; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

155. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from Defendants' wrongful conduct.

156. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

157. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## NO SAFE HARBOR PROVISIONS

158. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Guidant who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

159. Plaintiff incorporates ¶¶1-150 by reference.

160. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading

in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

161. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Guidant publicly traded securities during the Class Period.

162. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Guidant publicly traded securities. Plaintiff and the Class would not have purchased Guidant publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

163. As a direct and proximate result of these Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Guidant publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against All Defendants

164. Plaintiff incorporates ¶¶1-155 by reference.

165. The Individual Defendants acted as controlling persons of Guidant within the meaning of §20(a) of the 1934 Act. By reason of their positions as officers and/or directors of Guidant, and their ownership of Guidant stock, the Individual Defendants had the power and authority to cause Guidant to engage in the wrongful conduct complained of herein. Guidant controlled each of the Individual Defendants and all of its employees. By reason of such conduct, the Individual Defendants and Guidant are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

Awarding plaintiffs and the members of the Class compensatory damages;

Awarding plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs;

Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

Awarding such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury.

DATED: June 2, 2006

COHEN & MALAD, LLP

/s/ Scott D. Gilchrist________
Irwin B. Levin
Richard E. Shevitz
Scott D. Gilchrist
One Indiana Square, Ste. 1400
Indianapolis, IN 46204
Telephone: (317)636-6481
Facsimile: (317)636-2593
sgilchrist@cohenandmalad.com

*Liason Counsel for Lead Plaintiffs*

SCOTT + SCOTT, LLC
DAVID R. SCOTT
DENISE V. ZAMORE
108 Norwich Avenue
Colchester, CT 06415
Telephone: (860) 537-5537
Fax: (860) 537-4432

-and -

ARTHUR L. SHINGLER III
ANITA MELEY LAING
600 B Street, Suite 1500
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508

-and –

PROVOST UMPHREY LAW FIRM, LLP
JOE KENDALL
WILLIE BRISCOE
KARL RUPP
HAMILTON LINDLEY
3232 McKinney Avenue
Suite 700
Dallas, Texas 75204
Telephone: (214) 744-3000
Facsimile:(214) 744-3015

*Counsel for Lead Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2006 a copy of the foregoing document was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Hugh G. Baker, Jr.
BAKER PITTMAN & PAGE
hbaker@bpp-law.com

Mary K. Blasy
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
maryb@lerachlaw.com

Willie C. Briscoe
PROVOST & UMPHREY LAW FIRM, LLP
wbriscoe@provostumphrey.com

James A.L. Buddenbaum
PARR RICHEY OBREMSKEY & MORTON
jbuddenbaum@parrlaw.com

Keith E. Eggleton
WILSON SONSINI GOODRICH & ROSATI
keggleton@wsgr.com

Boris Feldman
WILSON SONSINI GOODRICH & ROSATI
boris.feldman@wsgr.com

Scott D. Gilchrist
COHEN & MALAD, LLP
sgilchrist@cohenandmalad.com

James H. Ham, III
BAKER & DANIELS
jhham@bakerd.com

Geoffrey M. Johnson
SCOTT + SCOTT LLC
gjohnson@scott-scott.com

Elton J. Kendall
PROVOST & UMPHREY LAW FIRM, LLP
jkendall@provostumphrey.com

Meredith E. Kotler
WILSON SONSINI GOODRICH & ROSATI
mkotler@wsgr.com

Irwin B. Levin
COHEN & MALAD, LLP
ilevin@cohenandmalad.com

Nina F. Locker
WILSON SONSINI GOODRICH & ROSATI
nlocker@wsgr.com

Anthony W. Patterson
PARR RICKEY OBREMSKEY & MORTON
tpatterson@parrlaw.com

Charles J. Piven
LAW OFFICE OF CHARLES J. PIVEN
piven@pivenlaw.com

Darren J. Robbins
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
E_file_sd@lerachlaw.com

John R. Schaibley, III
BAKER & DANIELS
jrschaib@bakerd.com

David R. Scott
SCOTT + SCOTT LLC
drscott@scott-scott.com

Richard E. Shevitz
COHEN & MALAD, LLP
rshevitz@cohenandmalad.com

Arthur L. Shingler, III
SCOTT + SCOTT LLC
ashingler@scott-scott.com

Denise V. Zamore
SCOTT + SCOTT LLC
dzamore@scott-scott.com

I hereby certify that on June 5, 2006 a copy of the foregoing document was mailed by first class mail, postage prepaid and properly addressed to the following:

Jeffrey C. Block
Leslie R. Stern
Bryan A. Wood
BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO
One Liberty Square
Boston, MA 02109

Evan J. Smith
BRODSKY & SMITH, LLC
240 Mineola Blvd.
Mineola, NY 11501

William S. Lerach
LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS, LLP
655 W. Broadway, Ste. 1900
San Diego, CA 92101

Neil Rothstein
SCOTT + SCOTT LLC
108 Norwich Ave.
Colchester, CT 06415

/s/ Scott D. Gilchrist
Scott D. Gilchrist

COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593
E-mail: sgilchrist@cohenandmalad.com