UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

```
_____ )
                                 )
IN RE: GUIDANT CORPORATION       )
SECURITIES LITIGATION            )       Master File No.
_____ )       1:05-cv-1658-SEB-WTL
                                 )
```

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
## AND DENYING PLAINTIFFS' MOTION TO STRIKE

This cause comes before the Court on the Motion to Dismiss [Docket No. 85] filed

by Defendants, Guidant Corporation ("Guidant") and its officers and directors,[1] pursuant

to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation

Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 et seq.  Plaintiffs, who putatively represent a

class of all purchasers of Guidant common stock between December 1, 2004 and October

18, 2005 (the "class period"), allege that Defendants made false and/or misleading

statements about the integrity of Guidant products and the company's then-pending

---

[1] The other defendants in this action are (or were during the relevant time frame) officers
and directors of Guidant Corporation.  The defendants as named in the Consolidated Complaint
("Compl.") [Docket No. 74] are: Guidant Corporation; Ronald W. Dollens ("Dollens"),
Guidant's Chief Executive Officer, President, and Director; Guido J. Neels ("Neels"), Guidant's
Chief Operating Officer; Keith E. Brauer ("Brauer"), Guidant's Vice President and Chief
Financial Officer; Beverly H. Lorell ("Lorell"), Guidant's Vice President and Chief Medical
Officer; Roger Marchetti ("Marchetti"), Guidant's Vice President of Human Resources; Ronald
N. Spaulding ("Spaulding"), Guidant's President of Europe, Middle East, Africa, and Canada
Division; J. Frederick McCoy, Jr. ("McCoy"), Guidant's President of Cardiac Rhythm
Management; James M. Cornelius ("Cornelius"), Chairman of Guidant's Board of Directors;
John B. King ("King"), a Guidant Director; William F. McConnell, Jr. ("McConnell"), Guidant's
Vice President and Corporate Information Officer; and Kathleen Lundberg ("Lundberg"),
Guidant's Senior Vice President and Chief Compliance Officer.  Compl. ¶ 81.

merger with Johnson & Johnson, and collectively sold off nearly $89 million worth of stock during the class period.  Plaintiffs brought this suit alleging that Defendants violated provisions of the Securities Exchange Act of 1934 by artificially inflating the price of Guidant stock and causing significant harm to Guidant's investors.  Defendants counter that Plaintiffs have failed to satisfy the heightened pleading requirements imposed by the PSLRA and to demonstrate the requisite strong inference of scienter on the part of Defendants.  For the reasons detailed in this entry, we <u>GRANT</u> Defendants' Motion to Dismiss.[2]

## **<u>Factual Background</u>**[3]

Guidant is a multinational corporation which develops, manufactures, and markets medical devices, including devices for cardiac rhythm management.  Among these devices are implantable cardioverter defibrillators ("ICDs") and pacemakers, which monitor the heart and deliver electricity to treat cardiac abnormalities.  Compl. ¶¶ 4, 53; Defs.' Ex. A at 2.  Plaintiffs represent a putative class of investors who purchased Guidant stock during the class period (between December 1, 2004 and October 18, 2005).

### *Defects in Guidant's ICDs*

Beginning in 1994, Guidant designed and manufactured the "Ventak" line of

---

[2] In addition, for the reasons discussed herein, we <u>DENY</u> the Motion to Strike [Docket No. 92] filed by Plaintiffs.

[3] Except where explicitly noted, the facts described herein are those alleged by Plaintiffs in their Complaint.

ICDs.  Id. ¶ 88.  Plaintiffs allege that, in February 2002, Defendants discovered a design flaw in one model of Ventak devices, the Ventak Prizm 2 DR, after it received two reports of device failures.  By April 2002, Guidant had made corrections to the product and began producing revised versions of the device.  However, Plaintiffs allege that "Defendants continued selling its [*sic*] inventory of defective units without disclosing to physicians or the public their design flaw or the malfunctions which led to [the devices'] obsolescence."  Id. ¶ 89.  The Complaint alleges that Defendants were aware of at least twenty-five reports of device short-circuiting in the older design units in circulation.  Id. ¶ 90.

### Merger Plans with Johnson & Johnson

During the spring and summer of 2004, Guidant and Johnson & Johnson ("J&J") executed a confidentiality agreement and began taking other steps to lay the groundwork for a merger deal between the two companies.[4]  In order for the merger to be successful, Plaintiffs claim, Guidant needed to refocus its business strategy on its ICD and pacemaker business segment.  Id. ¶¶ 27-28.  On December 1, 2004 – the first day of the class period – Guidant issued a press release containing "highly positive news" regarding growth prospects for this segment of the business, which stated in part that Guidant "remain[ed]

---

[4] A number of meetings, negotiations, and other communications between representatives of Guidant and J&J, occurring between August 4, 2004, and November 24, 2004, are detailed in the Consolidated Complaint.  See Compl. ¶¶ 106(a)-(p), 110.  Plaintiffs assert that on none of these occasions, nor at any other time prior to the announcement of the merger, did Defendants disclose any of the material adverse information about Guidant's defective products.  Id. ¶ 111.

confident about the continued growth of the worldwide [ICD] market and the company's performance within the market."  Plaintiffs assert that this press release was false and misleading because Defendants knew there were significant liability issues related to the defects in these devices, and yet "expressed an unreserved confidence" in Guidant's growth prospects in this market.  In the week following the issuance of the press release, Guidant's share price increased over $5 per share.  Id. ¶¶ 29, 94, 107-09.

On December 15, 2004, Guidant issued a press release announcing it had entered into a merger agreement pursuant to which J&J was to acquire Guidant for approximately $25 billion in cash and stock.  Under this agreement, the imputed value of Guidant stock was $76 per share.  The release cited the strength of the cardiovascular market segment and stated that the new merged organization would better address the needs of heart patients.  The release was also filed with the Securities and Exchange Commission ("SEC") as a Form 8-K.  Compl. ¶¶ 29, 112; Defs.' Ex. C (Form 8-K).  Plaintiffs contend that Guidant's stock price "had already surged" from $65 to $70 per share in anticipation of this announcement.  Compl. ¶ 29.  Plaintiffs further assert that this press release was false and misleading because it again failed to disclose the significant liability issues related to the defects and the potential adverse effect that the defects might have on the J&J merger.  Id. ¶ 113.

On three occasions over the next month (December 21, 2004; January 7, 2005; and January 19, 2005), Guidant filed SEC Form 425's to provide updates to investors on material information about the planned merger.  In these documents, according to the

4

Complaint, Guidant "once again deceived the investing public . . . by failing to make a full and fair disclosure" of the defects in Guidant's ICD and pacemaker devices.  Compl. ¶¶ 31, 116.  Between January 27, 2005, and March 13, 2005, Guidant filed press releases and other SEC filings[5] presenting financial information on the company's performance and again updating the public on the pending merger status.  Plaintiffs assert that these documents "again intentionally failed to disclose material facts" regarding the known product defects.  Id. ¶¶ 32, 117-119.

***Death of Joshua Oukrop***

On March 13, 2005, a 21-year-old college student, Joshua Oukrop, died after his Ventak Prizm 2 DR ICD short-circuited; Guidant learned of the death on March 16, 2005. Id. ¶ 33.  According to the Complaint, though Defendants declined to disclose the device defects to the public, they acknowledged to Oukrop's doctor, Dr. Barry Maron, that the ICD had short-circuited, and that they were aware of twenty-five other cases of similar malfunction.  Defendants also informed Dr. Maron that approximately 24,000 similar ICDs had been sold.  According to the Complaint, when Dr. Maron asked whether other ICD recipients would be informed of the defect, Defendants "said they did not intend to inform anybody, on the asserted ground that they did not feel it was advisable to alarm

---

[5] Specifically, on January 27, 2005, Guidant filed SEC Form 8-K and issued a corresponding press release.  On February 7, 2005, and February 22, 2005, Guidant filed SEC Form 425's.  On February 15, 2005, Guidant filed SEC form 10-K (signed by Defendants Dollens, Brauer, and Cornelius), highlighting increasing defibrillator sales revenues, and incorporating by reference an earlier press release regarding the J&J merger.

people based on the Company's statistics." Id. ¶¶ 93, 128.  Therefore, the Complaint

alleges that even in the face of Mr. Oukrop's death, allegedly caused by known defects in

a Guidant product, Guidant "continued to conceal from healthcare providers and the

investing public this material information" about the defects.  Id. ¶ 33.

    Nine days after Mr. Oukrop's death, on March 24, 2005, Guidant filed a

preliminary proxy statement (Form DEFM 14A) with the SEC.  This form was distributed

to shareholders and was intended to inform them of advantages, risks, and other details

regarding the proposed merger with J&J, and to seek their approval of the merger.  Again,

Plaintiffs assert that the document failed to disclose material facts regarding Guidant's

defective products, including the fact that at least one patient had died due to an ICD

malfunction.  Id. ¶ 34.  They make the same claims regarding SEC filings and press

releases made between March and July 2005.[6]  Id. ¶ 35.

    On April 27, 2005, Guidant's shareholders approved the sale to J&J at a price of

$76 per share.  Plaintiffs assert that disclosures made in an April 21, 2005 press release

and by Defendant Dollens at the special shareholder meeting were false and misleading,

due to their conscious and/or reckless disregard for the significant liability issues that

could result from the concealed product defects.  Compl. ¶¶ 125-26.

_____

    [6] Specifically, Plaintiffs assert that there were material omissions and misrepresentations
in the SEC Form 425 filed by Guidant on March 29, 2005, and the SEC Form 8-K and
corresponding press release issued on April 21, 2005, which reported record first-quarter sales
and "timely progress" toward the J&J merger (Compl. ¶ 124).

*Physician Communications and FDA Recalls*

According to the Complaint, Guidant "was forced to drop a bomb-shell" on May 23, 2005, by disclosing to physicians that there were reported problems with its ICD and pacemaker devices; Plaintiffs maintain that the impetus for this disclosure was that Guidant learned that an article was to be published in The New York Times regarding the defects.[7] Id. ¶ 39.  The physician letter stated that Guidant had, in 2002, discovered the defibrillator defect at issue; that the flaw had been "mitigate[d]" in later device manufacture; and that there had been twenty-six occurrences of the defect found out of approximately 37,000 devices implanted.  In the letter, Guidant informed doctors that it did not recommend replacement of the defective devices, because doing so would not likely lower the risk of device failure and would entail the risks of additional surgery. Defs.' Ex. F.  On May 25, 2005, Guidant issued a press release which largely replicated the letter to doctors.  Defs.' Mem. at 6; Defs.' Ex. H.

The Complaint asserts that the press release only partially disclosed the severity of the defects, and that these partial disclosures "hardly placed a dent in [Guidant's] stock price, since Guidant had told [The New York Times] that FDA was well-informed of the issues and had justified its unwillingness to share its product defect knowledge with the

---

[7] Indeed, the next day – May 24, 2005 – an article appeared in The New York Times revealing the problems with some types of Guidant defibrillators, discussing Joshua Oukrop's death, and stating that Guidant "had not seen a strong reason to issue an alert to physicians about the defibrillators because the failure rate was very low and replacing the devices might pose greater patient risks."  Barry Meier, "Maker of Heart Device Kept Flaw from Doctors," N.Y. TIMES, May 24, 2005, at A1; Compl. ¶ 130.

medical community." <u>Compl.</u> ¶¶ 39, 96, 132.  Plaintiffs assert that without further

information "investors were unable to comprehend the significance and extent of

Defendants' concealment or to make an informed judgment" about the financial impact of

the product defects.  <u>Id.</u> ¶ 96, 132.

On June 17, 2005, the FDA issued a national recall notification advising the public

of the defects, and stating that two reported deaths were suspected of being associated

with the malfunction.  <u>Id.</u> ¶ 40, 133.  The same day, Guidant issued a physician

communication and press release regarding the defects in the Ventak Prizm 2 devices and

additionally informing doctors and the public of failures in two other device lines (Contak

Renewal models and AVT models).  Defs.' Ex. J.

Following the announcements and the FDA recall, Guidant's share price dropped

$3.36 – 4.5% of its value – over the next two trading days, closing on June 21, 2005 at

$70.33.  Guidant investors lost over $1.09 billion in market share value as a result.

Compl. ¶¶ 41, 98, 134.  According to the Complaint, Guidant's stock price still remained

inflated, however, as "defendants sought opportunities to convince the investment

community that Guidant had properly and responsibly addressed issues with its defective

ICD's and that the merger [with J&J] would occur as expected."  <u>Id.</u> ¶ 99.

Further communications and press releases regarding the AVT and Renewal model

defects were issued on June 24, 2005, and July 18, 2005; Plaintiffs assert that Guidant had

been aware of the defects in these devices for some time, as well.  Defs.' Exs. K, L;

Compl. ¶ 100.  On July 18, 2005, the FDA published a recall notice on its website related

to nine varieties of Guidant pacemakers, affecting up to 78,000 devices.  Compl. ¶¶ 42,

136.  Guidant's stock shares fell another $2.10, which was 3.0% of their market value;

this represented a loss of $660 million in market share value to Guidant investors.  Id. ¶

43.  The Complaint alleges that, despite these events, Defendants continued to make false

and misleading statements to the public representing that the J&J merger could go

forward.[8]

**Guidant's Merger with Boston Scientific**

On October 18, 2005, J&J announced that, in light of "regulatory investigations

and other developments" involving Guidant products, it was "continuing to consider the

alternatives under [the] merger agreement[.]" Id. ¶¶ 103, 143.  After this announcement,

Guidant's share price dropped precipitously, losing $8.28 (or 11.4%) per share (from

$72.38 on October 17, 2005, to $64.10 on October 18, 2005).  Id. ¶ 144.  Guidant

investors lost over $3.1 billion in market share value between June 17, 2005 and October

18, 2005.  Id. ¶¶ 104, 144.

---

[8] In particular, Plaintiffs cite an July 27, 2005, interview given by Defendant McCoy, Guidant's President of Cardiac Rhythm Management, published in the Minneapolis Star Tribune.  Plaintiffs assert the interview was "carefully woven to conform to the publicly available material information . . . Defendant McCoy represented . . . that it was unnecessary for Guidant to worry about any long-term damage to its reputation, or provide any further details of 'attendant risks' of its medical devices to the investment community[.]" Compl. ¶ 102.  In the interview, Defendant McCoy lauded Guidant's quality control process, and defended the company's decision not to notify doctors about the defects in 2002.  Id. ¶ 140.

Guidant counters that such statements were not false or misleading, because during this time period, J&J "repeatedly reiterated" its plans to proceed with the Guidant merger, as revealed in its SEC filings dated August 10 and 25, 2005.  Defs.' Mem. at 7; Defs.' Exs. M, N.

On November 2, 2005, J&J issued a public statement indicating that it considered Guidant's product defect issues a "material adverse event" under the merger agreement terms, and that it therefore did not consider itself obligated to close the merger.  Defs.' Mem. at 7, Defs.' Ex. O.  However, the parties renegotiated the merger terms, and on November 15, 2005, announced that J&J was to purchase Guidant at $63.08 per share, or about $21.5 billion.  Defs.' Mem. at 7, Def.'s Ex. P.  Over the next two months, J&J and Boston Scientific offered competing bids to purchase Guidant, culminating with a successful bid by Boston Scientific to purchase Guidant at $80 per share, for a total of $27.2 billion.  Guidant announced a merger agreement with Boston Scientific at the $80 per share price on January 25, 2006; the deal was approved by the shareholders of both companies, and was finalized on April 21, 2006.  Defs.' Mem. at 7-8; Defs.' Ex. B. Guidant thus became and remains a wholly-owned subsidiary of Boston Scientific. Compl. ¶ 54.

### The Present Lawsuit

Various plaintiffs initially brought five separate putative class action suits; we consolidated these actions under the present cause on March 16, 2006 [Docket No. 56; see also Order Consolidating Related Actions, Docket No. 61].  In this consolidated action, Plaintiffs, who represent a putative class of all purchasers of Guidant common stock between December 1, 2004 and October 18, 2005, allege that Defendants knew and intentionally concealed material information, including the fact that there were defects in

certain Guidant ICD and pacemaker devices, that some patients were experiencing serious

health issues (and, in at least one instance, death) resulting from these defects, and that

disclosure of these defects would have significantly impacted revenue and jeopardized

Guidant's merger with J&J.  Compl. ¶ 47.  Therefore, Plaintiffs allege that Defendants

made false and misleading public statements about the defective devices and the planned

J&J merger in order to keep Guidant's stock price at artificially inflated levels, thereby

violating §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5

(17 C.F.R. § 240.10b-5).  Plaintiffs assert that they suffered economic loss as a result of

their purchases of Guidant stock at artificially inflated prices during the class period.

Compl. ¶¶ 149-55.

## Legal Analysis

**I.      Plaintiffs' Motion to Strike Exhibits**

As an initial matter, we address Plaintiffs' Motion to Strike certain exhibits filed

by the Guidant Defendants.  In support of their motion to dismiss Plaintiffs' complaint,

Defendants' attorney, John Schaibley, filed a declaration [Docket No. 87] to which were

attached copies of thirty-four exhibits.  In a concurrent filing [Docket No. 88], Defendants

request that we take judicial notice of these documents and consider them in support of

their motion to dismiss.  Plaintiffs have moved to strike fourteen[9] of these exhibits

---

[9]  We note that it is not immediately apparent which exhibits Plaintiffs seek to have
stricken from the record.  In the brief supporting their motion, Plaintiffs include a list of
documents, which includes such entries as "Exhibit G – in (with Ex. AA: MDR's)" and "Not In:
Ex. M-O".  Pls.' Mem. at 5.  It is unclear from these cryptic references whether Plaintiffs intend

(continued...)

[Docket No. 92].

In ruling on a motion to dismiss, courts generally consider only the facts alleged on the face of the complaint along with documents incorporated by reference in the complaint.  However, courts may also consider judicially noticed documents; doing so does not convert a motion to dismiss into a motion for summary judgment.  See Menominee Indiana Tribe of Wisconsin v. Thompson, 161 F.3d 449, 456 (7th Cir. 1998). Among the documents of which a court may take judicial notice are public records, including SEC filings.  In doing so, "it is permissible for courts to take judicial notice of SEC filings at the 12(b)(6) stage in securities fraud cases for the purpose of determining what statements the documents contain."  Selbst v. Coca-Cola Co., 2008 WL 94774, at *1 (11th Cir. 2008) (internal quotation marks omitted).

Undisputed factual statements contained in an SEC filing may also be subject to judicial notice; however, where the contents of a filing are subject to reasonable dispute, they should not be judicially noticed.  See Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344, 1355 (7th Cir. 1995) (noting that "[i]n order for a fact to be judicially noticed, indisputability is a prerequisite[,]" and though "some courts have ruled that

---

[9](...continued)
to challenge such documents, particularly because those specific exhibits are not again discussed in the brief.  Further, in Plaintiffs' proposed order submitted with their motion, they request that Exhibits A through V be stricken from the record – but several exhibits within this range are not discussed at all in Plaintiffs' brief.  In responding to Plaintiffs' motion, Defendants have addressed only those exhibits which Plaintiffs discuss with any degree of detail in their brief. We follow Defendants' lead and limit our analysis to the following fourteen Exhibits: A, B, F, H, I, J, K, L, Q, R, S, T, U, and V.

12

judicial notice of some SEC filings is appropriate . . . we believe that the fact in question here was not capable of accurate and ready determination by resort to the [SEC filing]"). See also Sharbaugh v. First American Title Ins. Co., 2007 WL 3307019, at *2 (N.D. Ill. 2007); Hernandez v. Midland Credit Mgmt., Inc., 2006 WL 695451, at *3-*4 (N.D. Ill. 2006).

### A.      Exhibit A: Guidant's Annual Report (SEC Form 10-K)

Plaintiffs first move to strike Defendants' Exhibit A, which consists of Guidant's annual report for fiscal year 2005, reported on SEC Form 10-K.  Plaintiffs assert that Defendants cite to Exhibit A in support of their faulty assertion that Guidant "voluntarily collects and analyzes on an ongoing basis information regarding product performance[.] . . . Plaintiffs do not, because they cannot, allege that the FDA – or any other industry or regulatory body – has established criteria or guidelines for when medical device manufacturers like Guidant must communicate with physicians or patients regarding product issues."  Defs.' Mem. (Motion to Dismiss) at 4-5; Pls.' Mem. (Motion to Strike) at 6.  Plaintiffs assert that Guidant's collection of product performance data is "anything but voluntary" and cite to another part of Exhibit A which discusses FDA compliance requirements.  Defendants counter that, though the FDA does regulate Guidant's business and Guidant must comply with periodic inspections and reporting requirements, this does not contradict the fact that Guidant *also* conducts voluntary analysis of product performance.

Defendants correctly observe that the existence of FDA reporting requirements (the intricacies of which we need not explore here) does not necessarily negate their assertion that they also voluntarily collect product performance data.  Therefore, Plaintiffs have not demonstrated a reasonable dispute regarding the assertions made by Defendants which are supported by citation to Exhibit A.  Moreover, as Defendants accurately note, their limited factual assertions supported by Exhibit A -- though relevant -- are not central to the dispute at hand; the issue in this case is whether Defendants misled *Guidant investors*, not whether they violated FDA regulatory requirements.  Therefore, Plaintiffs' motion is <u>DENIED</u> with respect to Exhibit A.

**B.      Exhibits B, Q, R, S, T, U, and V: Current Reports (SEC Form 8-Ks)**

Plaintiffs also move to strike Defendants' Exhibits B, Q, R, S, T, U, and V, each of which consists of an SEC Form 8-K – a "current report" on the occurrence of important corporate events.  The forms in question were filed with the SEC between December 5, 2005, and April 21, 2006 – all after the conclusion of the class period – and evidence the competing bids between J&J and Boston Scientific for the purchase of Guidant, culminating in Boston Scientific's April 2006 acquisition of Guidant at an $80 per share price.

Plaintiffs assert that these seven exhibits should be stricken because, in their estimation, Defendants have cited them in an attempt to demonstrate that "plaintiffs' theory of the case [is] flawed" and "investors actually came out ahead when the merger

14

between Guidant and [J&J was] aborted and a different merger ensued." Pls.' Mem. at 9. Plaintiffs assert that this damages argument is fallacious and in any event premature at this stage of the litigation. Plaintiffs also seek to introduce other documents and request that, to the extent we take judicial notice of the exhibits in question, we also notice these new exhibits. Plaintiffs' new exhibits, consisting of a J&J press release and the Complaint in <u>Johnson & Johnson v. Guidant Corporation</u>, purport to demonstrate that "the $80 share offer price was dilutive and was not properly valued . . . [and] was not obtained by a 'bidding war' at all, but through improper actions by Guidant, Boston Scientific Corporation, and Abbott." <u>Id.</u> at 9-10; Gilchrist Exs. 2, 3.

Plaintiffs have not demonstrated a reasonable dispute of fact regarding the contents of the SEC filings at issue. Though Plaintiffs take issue with Defendants' legal reasoning (that shareholders were not, in fact, damaged as a result of any allegedly fraudulent statements), such objection does not call into question the veracity of the underlying facts. Plaintiffs have not disputed that J&J and Boston Scientific made bids for the purchase of Guidant, nor that Boston Scientific eventually finalized its purchase of Guidant in April 2006 – and the SEC filings at issue demonstrate only these limited facts. Though Plaintiffs are free to challenge Defendants' legal argument, they may not exclude from the record the undisputed facts evidenced in these exhibits. Moreover, while the new exhibits Plaintiffs seek to introduce may demonstrate J&J's opinion that the $80 share price was dilutive and based on improper conduct, such exhibits do not contradict the fact that such an offer was made and accepted. Accordingly, Plaintiffs' motion is <u>DENIED</u> as

to Exhibits B, Q, R, S, T, U, and V.

### C.    Exhibits F, H, I, J, K, and L: Physician Communications and Press Releases

Finally, Plaintiffs move to strike six exhibits,[10] consisting of various physician communications and press releases announcing those communications, issued between May 2005 and July 2005.  Plaintiffs acknowledge that these exhibits were all referenced in their Complaint (Pls.' Mem. at 10) and that therefore we may take judicial notice of the fact that such statements were made.  See Wright, 29 F.3d at 1248 ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.").  However, Plaintiffs maintain that the exhibits are offered by Defendants to demonstrate the *truth* of the propositions contained therein – specifically regarding Guidant's knowledge and disclosures related to product defects, and other facts related to the eventual recall of Guidant defibrillators – and that such assertions are disputed and thus should not be judicially noticed.

Clearly, the parties' disputes over what various Defendants knew and/or communicated during the class period are at the heart of this lawsuit.  Plaintiffs are correct that the contents of these six exhibits are therefore not admissible for their truth

---

[10] In certain parts of Plaintiffs' brief in support of their motion to strike, Plaintiffs also include Exhibit G in this "subset" of exhibits, and (apparently in error) refer to it as a press release announcing Exhibit F.  In fact, Exhibit G is a copy of the May 24, 2005 New York Times article discussing Guidant's alleged concealment of product defects from physicians.  This article is referenced (and largely quoted) in the Complaint, and therefore we may consider it in ruling on Defendants' motion to dismiss.  See Wright v. Associated Ins. Cos., 29 F.3d 1244, 1248 (7th Cir. 1994).

(and, in fact, Defendants are in agreement that judicial notice of these exhibits should extend only to the determination of what statements were made by Guidant to the public; see Defs.' Resp. at 10).  Accordingly, we have considered these six documents only for this limited purpose;[11] Plaintiffs' motion to strike the documents is thus <u>DENIED</u>.

## II.     Guidant's Motion to Dismiss Plaintiffs' Consolidated Complaint

### A.     Applicable Statutes and Standards of Review

Plaintiffs have articulated claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as well as SEC Rule 10b-5.  The standards of review applicable to such claims are drawn from Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

### 1.     Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act states, in relevant part, that:

It shall be unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection

---

[11] Because we so limit our analysis of these exhibits, we need not address Plaintiffs' contention that the exhibits have been rendered "factually inaccurate" because they were later superseded by subsequent physician communications.  The only purpose for which we consider these six documents is as evidence of what was communicated by Guidant to members of the public at certain points in time.  The parties do not dispute that these statements were made in these six documents; therefore, whether they were later superseded is irrelevant to our consideration of them here.

of investors.

15 U.S.C. § 78j(b).  SEC Rule 10b-5, promulgated pursuant to Section 10(b), makes it

unlawful:

> (a)  To employ any device, scheme, or artifice to defraud,
>
> (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  As the Supreme Court recently reiterated in Stoneridge

Investment Partners, LLC v. Scientific-Atlanta, Inc., Rule 10b-5 encompasses only

conduct already prohibited by § 10(b) of the Exchange Act, and a private right of action

for § 10(b) violations is implied in the words of the statute and regulation.  128 S.Ct. 761,

768 (2008).

In order to assert a violation of § 10(b), a plaintiff must allege the following six

elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3)

a connection between the misrepresentation or omission and the purchase or sale of a

security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6)

loss causation.  Id. (citing Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-42

(2005)).

## 2.     Rule 12(b)(6), Rule 9(a), and the PSLRA

On a motion to dismiss filed pursuant to Rule 12(b)(6) – including one in which the pleading standards are heightened by Rule 9(b) and the PSLRA – a court must treat all well-pleaded facts as true and draw all reasonable inferences from those facts in favor of the plaintiff.  See Makor Issues & Rights, Ltd. v. Tellabs Inc., ___ F.3d ___, 2008 WL 151180, at *2 (7th Cir. 2008) (citing Borsellino v. Goldman Sachs Group, Inc., 477 F.3d 502, 506-07 (7th Cir. 2007)).  In addition, Rule 9(b) requires that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity."  Rule 9(b) mandates a heightened pleading requirement for averments of fraud, in "response to the great harm to the reputation of a business firm or other enterprise a fraud claim can do."  Borsellino, 477 F.3d at 507 (internal quotation marks omitted).  Therefore, a plaintiff "'claiming fraud . . . must do more pre-complaint investigation to assure that the claim is responsible and supported, rather than defamatory and extortionate.' . . . A complaint alleging fraud must provide . . . 'the who, what, when, where, and how.'"  Id. (quoting Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 627 (7th Cir. 1999)).

In addition to the particularity requirements of Rule 9(b), the PSLRA further heightens the standard of pleading for plaintiffs alleging securities fraud.  The Act requires that, if a plaintiff alleges that the defendant either made an untrue statement of material fact or omitted to state a material fact necessary in order to make statements made not misleading, the plaintiff must "specify each statement alleged to have been

19

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  In addition, a plaintiff must, "with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

### B.   Standing to Challenge Post-Purchase Statements

Before addressing the merits of Plaintiffs' claim pursuant to § 10(b) and Rule 10b-5, we first consider Defendants' additional argument that the lead plaintiffs in this case do not have standing to bring a § 10(b) claim based on statements made after December 17, 2004.  The putative class period in this case runs from December 1, 2004, until October 18, 2005; co-lead plaintiffs in this matter are David J. Fannon and the Iron Workers of Western Pennsylvania Pension Plan.  Mr. Fannon's last alleged purchase of Guidant stock occurred on December 13, 2004, and Western Pennsylvania's occurred on December 17, 2004 – sixteen days after the beginning of the class period.

Defendants assert that, based on these undisputed facts, the lead plaintiffs lack standing to bring claims based on statements made after their last purchases of Guidant stock.  Defendants rely upon Roots Partnership v. Lands' End, Inc., 965 F.2d 1411 (7th Cir. 1992), in support of this proposition.  In Roots, the Seventh Circuit held that "post-purchase statements cannot form the basis of Rule 10b-5 liability, because the statements

20

could not have affected the price at which plaintiff actually purchased [the security]." Id.

at 1420.  Further, a plaintiff who has no claim of his or her own based on post-purchase

statements "cannot defeat dismissal by purporting to represent the interests of [later]

purchasers." Id.  See also Davis v. SPSS, Inc., 385 F.Supp.2d 697, 705-06 (N.D. Ill.

2005) (relying on Roots in holding that, on a motion to dismiss, a plaintiff cannot

establish liability based on post-purchase statements because such statements could not

have caused the plaintiff's claimed loss); DH2, Inc. v. Athanassiades, 359 F.Supp.2d 708,

718-19 (N.D. Ill. 2005) (holding that plaintiff lacked standing because it had not

sufficiently identified a securities purchase made after the alleged misrepresentation

occurred).

Plaintiffs argue that the timing of their stock purchases, relative to the alleged

misrepresentations, bears not on their standing to assert a claim, but rather on the

typicality of the lead plaintiffs to represent the putative class – an inquiry that, they assert,

is premature at this stage (as no motion for class certification has yet been filed).

Plaintiffs assert that Defendants' statements and omission were all part of a "common

course of conduct," and that, in such a situation, lead plaintiffs need not be identically

situated to each class member; they cite numerous cases (primarily from outside our

circuit) in which courts have determined that class representatives *do* have standing to

assert § 10(b) claims arising from post-purchase statements, so long as they were made in

the course of a common scheme to defraud.  See, e.g., Crowell v. Ionics, Inc. 343

F.Supp.2d 1, 13 (D.Mass. 2004); Upton v. McKerrow, 887 F. Supp. 1573, 1577 (N.D. Ga.

1995).

Though the law of other jurisdictions may indeed permit a plaintiff, in some cases, to bring a § 10(b) claim based in part on post-purchase statements, the Seventh Circuit's pronouncement to the contrary in <u>Roots</u> appears to us to be unequivocal; moreover, district courts in our circuit have applied <u>Roots</u> even in the face of an alleged common course of conduct.  <u>See, e.g.</u>, <u>In re Discovery Zone Sec. Litig.</u>, 169 F.R.D. 104, 112 (N.D. Ill. 1996) (following "the sound post-purchase rule established by the Seventh Circuit in <u>Roots</u>").  Therefore, we have serious doubts regarding Lead Plaintiffs' standing to allege § 10(b) claims based on alleged misstatements or omissions that occurred after their final purchases of Guidant stock (*i.e.,* December 17, 2004).  However, in the interest of a final resolution of this litigation – and in light of Plaintiffs' request for leave to amend their Complaint to join an additional later-purchasing Plaintiff, should we accept Defendants' standing argument here – we shall proceed to address the merits of Plaintiffs' claims as they relate to all alleged misstatements and omissions occurring during the entire class period.

**C.    Plaintiffs' Claim Pursuant to Section 10(b) and Rule 10b-5**

Defendants raise two primary arguments in support of dismissal of Plaintiffs' Section 10(b) claim: first, that Plaintiffs have not satisfied the PSLRA's heightened pleading requirements for alleging misleading statements; and second, that Plaintiffs have not pled particularized facts giving rise to a strong inference of scienter.  We address each

of Defendants' arguments in turn.

### 1.      Identification of Misleading Affirmative Statements

Defendants initially argue that Plaintiffs' § 10(b) claim must be dismissed because Plaintiffs have not identified with sufficient particularity any misleading affirmative statements made by Defendants.  As we have discussed, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if [such allegation] is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  As characterized by Defendants, Plaintiffs have employed a "puzzle pleading" method, which improperly "plac[es] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts. This method is deficient under the pleading standards."  In re Alcatel Sec. Litig., 382 F.Supp.2d 513, 534 (S.D.N.Y. 2005) (dismissing a complaint for lack of particularity in which Plaintiffs listed "lengthy quotations from various releases by [Defendants] . . . [followed by] a similar (in most cases identical) laundry list of 'specific' reasons why the statements are allegedly false.").

To some degree, any lack of specificity that exists in the Complaint may be aided by the fact that, rather than claiming that disputed statements were affirmatively false, Plaintiffs primarily assert that Defendants' statements were rendered misleading by the *omission* of information related to known product defects.  A firm generally has no

independent duty to disclose all information that might influence the price of its stock.
See Gallagher v. Abbott Laboratories, 269 F.3d 806, 808 (7th Cir. 2001) ("[F]irms are
entitled to keep silent (about good news as well as bad news) unless positive law creates a
duty to disclose."); see also Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 760 (7th
Cir. 2007).  A duty to disclose may arise, however, "when additional information is
necessary to rectify incomplete disclosures or half-truths."  Gaines v. Guidant Corp., 2004
WL 2538374, at *11 (S.D. Ind. 2004) (Barker, J.) (internal quotation marks omitted).

> (a)     Plaintiffs have not pled with requisite particularity that
> omission of product defect information rendered
> affirmative statements false or misleading.

Plaintiffs assert similar grounds for challenging the great majority of Defendants'
allegedly fraudulent statements: that the statements or documents[12] at issue were rendered
misleading because they failed to disclose material information about known product
defects (and, in some cases, because the statements were intended to enhance then-
pending merger negotiations with J&J, which would have been jeopardized had
Defendants disclosed the defects).[13]  As to each of these allegations, Plaintiffs allege that

---

[12] As Defendants correctly state, in some cases, it is quite difficult to identify precisely
what statements in a document Plaintiffs allege were false and/or misleading.  Defs.' Mem. at
20.  Such generalized assertions do not meet the stringent requirements of the PSLRA and Rule
9(b).

[13] In their Complaint, Plaintiffs makes essentially identical arguments to this effect in
relation to the following disputed statements:

- Guidant's December 1, 2004 press release, which "expressed an unreserved
  confidence" (Compl. ¶ 108) about growth prospects in the ICD market;

(continued...)

Defendants had a duty to disclose their knowledge of the defects to investors.  Plaintiffs

assert that a reasonable investor would have wanted to know about the product defects,

citing <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988) ("[T]o fulfill the *materiality*

*requirement* there must be a substantial likelihood that the disclosure of the omitted fact

would have been viewed by the reasonable investor as having significantly altered the

'total mix' of information made available.") (internal quotation marks omitted) (emphasis

added).

      Plaintiffs wrongly conflate this materiality requirement discussed in <u>Basic</u> with a

duty to disclose.  As we have repeatedly emphasized (and as the <u>Basic</u> Court went on to

---

[13](...continued)
- Guidant's December 15, 2004 press release (and accompanying December 16, 2004 SEC Form 8-K), which announced merger plans with J&J;
- Numerous SEC Form 425's filed by Guidant between December 2004 and March 2005, which updated investors on the planned J&J merger;
- Guidant's January 27, 2005 SEC Form 8-K filing, which contained (undisputedly accurate but allegedly "incomplete") financial terms relevant to the merger deal and described "next steps" in the merger process;
- Guidant's February 15, 2005 SEC Form 10-K filing (Guidant's annual financial report), which highlighted increased defibrillator sales revenues;
- Guidant's March 24, 2005 SEC Form DEFM 14A (proxy statement) filing, which did not designate product defects as "specific material adverse events" that could affect the merger; and
- Guidant's April 21, 2005 press release, and statements made by Defendant Dollens at the April 27, 2005 shareholder meeting, indicating an expectation of strong market growth;
- Comments made by Defendant McCoy in a July 27, 2005 interview with the <u>Minneapolis Star Tribune</u>, in which he defended Guidant's decisions regarding defect information disclosure, and expressed his opinion that the J&J merger was still viable.

In addition, this argument is relevant to several of the disputed statements discussed in Section II.C.1(b) below.

state), there is *no* affirmative independent duty for a company to disclose all information that could potentially affect its stock price, unless such silence renders an affirmative statement misleading.  See id. at 239 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); Stransky v. Cummins Engine Co., Inc., 51 F.3d 1329, 1331 (7th Cir. 1995) ("Mere silence about even material information is not fraudulent absent a duty to speak.").  Plaintiffs have not demonstrated with the requisite particularity how omission of product defect information rendered any specific affirmative statements misleading.  Therefore, they have not met their pleading burden here.[14]  See Gaines v. Guidant Corp., 2004 WL 2538374, at *10.

We note also that several of the statements[15] disputed by Plaintiffs can be understood as immaterial, non-actionable corporate puffery.  As we have previously stated in Gaines v. Guidant Corp., "puffery and 'optimistic rhetoric' generally cannot provide a basis for a securities fraud action."  2004 WL 2538374, at *18 (Barker, J.) (collecting cases).  See also Eisenstadt v. Centel Corp., 113 F.3d 738, 746 (7th Cir. 1997)

---

[14] Because we have held that none of the statements identified in the Complaint were in fact fraudulent under § 10(b) and Rule 10b-5, and that Plaintiffs have therefore not met the burden of particularized pleading imposed on such claims, we need not address Defendants' additional argument that such claims ought to be dismissed as to certain individual "non-speaking" Defendants.

[15] Though we need not definitively classify specific statements as puffery, we note for purposes of illustration the following documents: Guidant's December 1, 2004, press release, which expressed "confiden[ce] about the continued growth of the worldwide [ICD] market and [Guidant's] performance within the market"; the Form 425's issued on February 22, 2005, and March 29, 2005, in which Defendant Dollens expressed his opinion that there was a very high likelihood that the J&J merger would close; and the April 21, 2005 press release and comments made at the April 27, 2005 shareholder meeting, which indicated an expectation of continued strong market growth.

("Mere sales puffery is not actionable under Rule 10b-5."); In re Apple Computer, Inc.,

127 Fed.Appx. 296, 304 (9th Cir. 2005) (noting that "optimistic opinions, not guaranteed

factual promises" are non-actionable).  Though Plaintiffs assert that Defendants'

statements related to Guidant devices and the planned J&J merger "were not simple

expressions of optimism but reasoned predictions of the future" (Pls.' Resp. at 22), they

have not adequately distinguished such statements from the sorts of optimistic, forward-

looking statements that courts have routinely held to be puffery upon which reasonable

investors would not rely.  The fact that some of the disputed statements were made in

relation to a potential corporate merger does not erode this conclusion.  Compare

Grossman v. Novell, Inc., 120 F.3d 1112, 1115 (10th Cir. 1997) (classifying several

merger-related statements of optimism as immaterial puffery).

> (b)   Plaintiffs have not demonstrated that Guidant's eventual
> disclosures of product defect information were false or
> misleading.

The parties further dispute the effect of Defendants' eventual disclosures of

product defect information to physicians and the public, beginning in May 2005.[16]

--------

[16] Among the disputed statements to which this analysis applies are:

- Guidant's May 23, 2005 physician communication and May 25, 2005 press
  release which initially disclosed product defects in Guidant's Prizm 2 defibrillator
  devices, which Plaintiffs claim "only partially disclosed the severity of the
  defects";
- Guidant's June 17, 2005 press release and physician communication, disclosing
  defects in two other Guidant ICD models;
- Additional physician statements and press releases issued by Guidant regarding

(continued...)

27

Defendants assert that such disclosures were thorough and truthful; Plaintiffs counter that Guidant's disclosures were "partial," inadequate, and moreover created a duty to fully and completely disclose the truth about product defects.  Plaintiffs assert that Defendants' disclosures "sought to minimize the import" of the problems Guidant was facing, and failed to inform the public both that Defendants had (allegedly) been aware of such defects and not notified physicians about them for several years, and that J&J had not been informed of the defects throughout then-pending merger negotiations.  Pls.' Resp. at 17-19.  Plaintiffs assert that such "partial" disclosures were fraudulent because, "even absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects."  Helwig v. Vencor, Inc., 251 F.3d 540, 561 (6th Cir. 2001) (internal quotation marks omitted); see also Ackerman v. Schwartz, 947 F.2d 841, 848 (7th Cir. 1991) ("Under Rule 10b-5 . . . the lack of an independent duty does not excuse a material lie.").

From our review of the Complaint and Defendants' disclosures, it is unclear precisely what facts were allegedly omitted from these disclosures that – in Plaintiffs' assessment – would have more fully and truthfully informed the investing public about Guidant product defects.  Moreover, Plaintiffs have not identified with particularity any "half-truths" in the disclosures that are rendered misleading by such alleged omissions. The disclosures make quite clear the gravity of the product defects and FDA recalls – for

---

[16](...continued)
potential defects in additional ICD devices and pacemakers, issued on June 24, 2005, July 18, 2005, and July 22, 2005.

example, by disclosing the number of known device failures, and by reference to the recent death of Mr. Oukrop.

Plaintiffs appear to argue that Rule 10b-5 required Guidant to "ring an alarm bell" of sorts in these disclosures (i.e., a blatant declaration that the defects were serious and likely to jeopardize stock prices, or a "red flag" indicating that Guidant had withheld such information from J&J). However, our reading of § 10(b) and Rule 10b-5, as informed by the relevant caselaw, does not require a company to make such a statement – nor does omission of such a statement qualify as fraud. Therefore, for the reasons we have outlined in this section, we hold that Plaintiffs have failed to identify with particularity any false or misleading statements made by Defendants.[17]

### 2.     Scienter

#### (a)     "Strong inference" requirement.

The parties also dispute whether Plaintiffs have pled particularized facts which create a "strong inference" of scienter. As previously noted, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). See also Higginbotham, 495 F.3d 753, 756 (7th Cir. 2007) (describing the requisite scienter under the PSLRA as "an intent to deceive, demonstrated by knowledge of the statement's falsity

---

[17] Because we so hold, we need not address Defendants' additional argument that product defect information was adequately disclosed in Medical Device Reports ("MDRs") reported to the FDA during the relevant time period, nor Plaintiffs' counter-argument that the MDR disclosures were inadequate and were unlikely to reach the general investing public.

or reckless disregard of a substantial risk that the statement is false"); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2507 (2007) (defining scienter as "a mental state embracing intent to deceive, manipulate, or defraud") (citation omitted)). Recklessness may be considered "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Makor Issues & Rights, Ltd. v. Tellabs, Inc., __ F.3d __, 2008 WL 151180, at *1 (7th Cir. Jan. 17, 2008) (quoting In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 76 (2nd Cir. 2001)). However, for "forward-looking" statements, the Seventh Circuit has held that actual knowledge of falsity is required – rather than "[mere] indifference to the danger that a statement is false." Id.

This "strong inference" requirement has been recently further defined and applied in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499 (2007), and Makor Issues & Rights, Ltd. v. Tellabs, Inc., __ F.3d __, 2008 WL 151180 (7th Cir. Jan. 17, 2008). In Tellabs, the Supreme Court held that the Seventh Circuit's previous interpretation of the term "strong inference" – that the scienter requirement would be met if a complaint "allege[d] facts from which, if true, a reasonable person could infer that the defendant acted with the required intent" (127 S.Ct. at 2504, quoting Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 602 (7th Cir. 2006) – did not capture the strict demands of the PSLRA. In so ruling, the Supreme Court reasoned:

> It does not suffice that a reasonable fact-finder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for

30

sufficiency, a court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged.   An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.   *To qualify as "strong" within the intendment of [the PSLRA], we hold, an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.*

Id. at 2504-05 (emphasis added).

In making a determination regarding scienter, "courts must consider the complaint in its entirety," as well as judicially noticed documents and documents incorporated by reference into the complaint; "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  Id. at 2509.  However, Plaintiffs must still create such an inference "with respect to each individual defendant in multiple defendant cases."  Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 603 (7th Cir. 2006);  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499 (2007) (explicitly "not disturb[ing]" this determination).

(b)    Analysis.

Defendants assert that Plaintiffs have failed to allege *any* facts demonstrating *what* the Defendants, individually, knew about manufacturing defects and potential impact on merger negotiations and/or revenues, or *when* they allegedly possessed such information. Plaintiffs have not cited any internal documents, confidential witnesses, or other sources to support their allegations that Defendants deliberately concealed such information.

31

(i)      Stock sales.

Plaintiffs lean heavily on the assertion that Defendants had the *motive* to commit fraud – namely, personal gain through insider stock sales, and the potential financial benefit from merger with J&J.  In the Complaint, Plaintiffs assert that the Individual Defendants collectively sold off approximately $89 million in Guidant stock during the Class Period (Compl. ¶¶ 36, 37, 101, 128, 139, 148); Plaintiffs maintain that the temporal proximity of these sales to misleading statements made by Defendants, and the "coordinated fashion" of such sales, "render them unusual and suspicious in timing." Pls.' Resp. at 24; see In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999) (noting that "unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter").  For example, Plaintiffs allege that Defendant Lorell "suspiciously liquidated" all of her Guidant stock shares within two weeks after meeting with Dr. Maron, Joshua Oukrop's physician (Compl. ¶ 128)[18]; that Defendant Cornelius sold shares on the same day as the FDA pacemaker recall was announced (id. ¶ 139); and that on a single day in January 2005, Defendants Marchetti, McConnell, and Spaulding collectively sold off Guidant shares worth over $8 million (id. ¶ 148).

Defendants counter that Plaintiffs have not demonstrated that the stock sales were

---

[18] We note that Defendants dispute whether Defendant Lorell was present at the meeting with Dr. Maron.  Defs.' Reply at 17.

32

unusual or suspicious.[19]  Some of the stock sales referenced were, according to
Defendants, automatic, nondiscretionary sales made pursuant to 10b5-1 plans, and
therefore do not give rise to a strong inference of scienter.  See 17 C.F.R. § 240.10b5-
1(c)(1)(i)(A)(3); In re Netflix, Inc. Sec. Litig., 2005 WL 1562858, at *8 (N.D. Cal. 2005).
Other stock sales referenced by Plaintiffs constituted small percentages of Individual
Defendants' Guidant holdings; still other transactions were made over eleven months
prior to the eventual disclosure of Guidant product defects, and "took place after the
announcement of positive financial results during a window in which corporate officers
typically trade."  Defs.' Mem. at 28; Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1037
(9th Cir. 2002).

      Though Plaintiffs are correct that stock sales *may* constitute circumstantial
evidence of scienter, they have not demonstrated – as they are required to do – that such
sales were "dramatically out of line with prior trading practices at times calculated to
maximize the personal benefit from undisclosed inside information."  See Gaines, 2004
WL 2538374, at *17 (quoting In re Navarre Corp. Sec. Litig., 299 F.3d 735, 747 (8th Cir.
2002)).  It is Plaintiffs' burden to demonstrate such context.  Further, Plaintiffs' assertion

---

    [19] Moreover, Plaintiffs have not alleged in the Complaint that Defendants Lundberg and
McCoy sold *any* Guidant stock during the Class Period.  Compl. ¶ 148; Defs.' Mem. at 27.  In
Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753 (7th Cir. 2007), the Seventh Circuit noted that
"[o]ne possible inference [from] the *absence* of sales by other managers who would have
[allegedly] been in the know . . . implies that nothing was thought to be out of the ordinary[.] . . .
Because Tellabs instructs us to consider all potential inferences, and not just those that favor
plaintiffs, the absence of any demonstration that [the period in question] was an unusual period
for managerial sales means that the complaint lacks the required 'strong' demonstration of
scienter."  Id. at 759.

that we may not consider Defendants' alternative explanations for their stock sales at this point in the litigation is unavailing; as the <u>Makor</u> line of cases makes clear, we *must* consider competing inferences arising from the facts as pled in order to determine whether Plaintiffs have created the requisite "strong inference" of scienter.  Defendants' stock sales during the class period, taken together with all other facts alleged, do not do so.

(ii)   <u>Motive and opportunity to commit fraud.</u>

Plaintiffs also assert that Defendants, as "core members of the senior management team" at Guidant, were privy to proprietary information about Guidant's growth and financial condition, had direct involvement in day-to-day operations, and controlled the dissemination of information by the company.  Pls.' Resp. at 26-27, Compl. ¶¶ 66, 108, 111, 113-14, 116, 165.  Plaintiffs maintain that Defendants, by nature of their senior positions within Guidant, doubtlessly had the opportunity to manipulate Guidant's stock price, were aware of the defects in Guidant products, and intentionally concealed those defects, motivated by personal gain.

However, Plaintiffs' arguments to this effect are entirely conclusory and do not demonstrate with *any* particularity that *any* Individual Defendant had knowledge of the product defects, nor a duty to monitor modifications to specific device lines, at any time during the Class Period – nor any knowledge that such defects might have rendered any Guidant statements false or misleading (for, as we have stated, Plaintiffs have not

34

demonstrated that any statements *were* false or misleading).  Plaintiffs may not meet their burden based merely on Individual Defendants' corporate positions within the firm.[20]  See Friedman v. Rayovac Corp., 295 F.Supp.2d 957, 995 (W.D. Wis. 2003) ("Absent a showing that an officer had a *duty* to monitor particular information, alleging a defendant's job title is insufficient ¶ to plead scienter adequately.").

As Defendants correctly state, attribution of scienter to Defendants, without particularized allegations indicating *how* or *when* Defendants came to possess information about product defects, constitutes impermissible pleading of "fraud by hindsight" – a practice which the PSLRA was enacted to end.  See In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 988 (9th Cir. 1999).  Because Plaintiffs have not "pled facts rendering an inference of scienter *at least as likely as* any plausible opposing inference," their § 10(b) claim must be dismissed.[21]  Tellabs, 127 S.Ct. at 2513.

---

[20] We note also that Plaintiffs' allegations that Defendants were motivated to commit fraud by the desire to consummate the J&J merger do not create the requisite strong inference. See In re Bally Total Fitness Sec. Litig., 2006 WL 3714708, at *9 (N.D. Ill. 2006) ("We cannot infer scienter on the part of the Individual Defendants merely from their general desire for their corporation to appear profitable . . . and engage in mergers or acquisitions.").

[21] Further, we may dispose of Plaintiffs' additional argument regarding the implications of a plea agreement entered into by Endovascular Technologies, Inc. ("EVT"), a Guidant subsidiary, prior to the class period.  In their Complaint, Plaintiffs refer at length to Guidant's allegedly fraudulent conduct involving the Ancure Endograft System, a stent device which was designed, manufactured, and marketed by Guidant beginning in 1998.  Compl. ¶ 69.  In June 2003, EVT pled guilty to nine counts of introducing a misbranded medical device into interstate commerce and one count of making false statements to the FDA, and was ordered to pay $92.4 million in fines, in a criminal action relating to EVT's failure to report serious malfunctions in the Ancure device to the FDA.  Id. ¶¶ 76-77.

As part of the plea agreement, Guidant was required to enter into a Corporate Integrity Agreement ("CIA"), which was signed by Defendant Lundberg, Guidant's Senior Vice President

(continued...)

**D.      Control Person Liability Under Section 20(a)**

Section 20(a) of the Securities Exchange Act provides, in relevant part:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Accordingly, a claim pursuant to § 20(a) is cognizable only where there has been an underlying primary violation of the Exchange Act.  Because Plaintiffs have not adequately alleged such a violation, their § 20(a) claim necessarily fails.[22]  See Davis v. SPSS, Inc., 431 F.Supp.2d 823, 833 (N.D. Ill. 2006).

---

[21](...continued)
and Chief Compliance Officer.  The CIA, which was available on Guidant's website, set forth Guidant's commitment to "corporate integrity" and recognized the importance of medical product quality, and required Guidant to implement programs to ensure that it was meeting FDA and other health care regulatory requirements.  Id. ¶¶ 79-81.

In their brief, Plaintiffs argue that the CIA posted on Guidant's website following the EVT plea agreement "stood as an assurance to regulators that the Company would 'clean house' of its troubled business culture . . . [and] created a heightened level of accountability that results in . . . a strong inference of scienter in the event of additional false and misleading statements and material omissions of fact[.]" Pls.' Resp. at 5-6.

Plaintiffs' argument is unavailing and lacking in legal foundation.  Nothing in the CIA created a more stringent duty of disclosure under the securities laws.  Plaintiffs have not demonstrated (and indeed, have cited no caselaw to support) that the plea agreement of a subsidiary in an unrelated matter somehow evinces fraudulent intent on the part of Individual Defendants here.

[22] Because we so hold, we need not address Defendants' additional argument that Plaintiffs have failed to allege adequately that any of the Individual Defendants was, in fact, a "control person" under § 20(a).

**III.     Conclusion**

For the reasons outlined above, Plaintiffs' Complaint does not satisfy the stringent pleading requirements of the PSLRA, as it fails to plead with requisite particularity that Defendants' statements were misleading, and because it fails to plead particularized facts giving rise to the necessary strong inference of scienter.  Therefore, Defendants' Motion to Dismiss is <u>GRANTED</u>, and final judgment shall enter accordingly.[23]  IT IS SO ORDERED.

Date:   _____02/27/2008_____

*Sarah Evans Barker*
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

<u>Copies to:</u>

Mary K. Blasy
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
maryb@lerachlaw.com

Jeffrey C. Block
BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO
One Liberty Square
Boston, MA 02109

Willie Charles Briscoe
PROVOST & UMPHREY LAW FIRM LLP
provost_dallas@yahoo.com

James A.L. Buddenbaum
PARR RICHEY OBREMSKEY & MORTON- Lebanon
jbuddenbaum@parrlaw.com

---

[23] Additionally, for the reasons we have stated, Plaintiffs' Motion to Strike is <u>DENIED</u> in its entirety.

Keith E. Eggleton
WILSON SONSINI GOODRICH & ROSATI
keggleton@wsgr.com

Boris Feldman
WILSON SONSINI GOODRICH & ROSATI
boris.feldman@wsgr.com

Scott D. Gilchrist
COHEN & MALAD LLP
sgilchrist@cohenandmalad.com

James H. Ham III
BAKER & DANIELS
jhham@bakerd.com

Geoffrey M. Johnson
SCOTT + SCOTT LLC
gjohnson@scott-scott.com

Elton Joe Kendall
PROVOST UMPHREY LAW FIRM LLP
provost_dallas@yahoo.com

Meredith E. Kotler
WILSON SONSINI GOODRICH & ROSATI
mkotler@wsgr.com

William S. Lerach
LERACH COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Nina F. Locker
WILSON SONSINI GOODRICH & ROSATI
nlocker@wsgr.com

Anthony W. Patterson
PARR RICHEY OBREMSKEY & MORTON
tpatterson@parrlaw.com

Charles J. Piven
LAW OFFICE OF CHARLES J. PIVEN
piven@pivenlaw.com

Darren J. Robbins
COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
e_file_sd@csgrr.com

Neil Rothstein
SCOTT & SCOTT
108 Norwich Ave
Colchester, CT 06415

John R. Schaibley III
BAKER & DANIELS
jrschaib@bakerd.com

David R. Scott
SCOTT + SCOTT LLC
drscott@scott-scott.com

Richard E. Shevitz
COHEN & MALAD LLP
rshevitz@cohenandmalad.com

Arthur L. Shingler III
SCOTT + SCOTT LLC
ashingler@scott-scott.com

Evan J. Smith
BRODSKY & SMITH, LLC
240 Mineola Blvd.
Mineola, NY 11501

Leslie R. Stern
BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO
One Liberty Square
Boston, MA 02109

Bryan A. Wood
BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO
One Liberty Square
Boston, MA 02109

Denise V. Zamore
SCOTT & SCOTT LLC
drscott@scott-scott.com